1  REBECCA J. WINTHROP (SBN 116386)
   NORTON ROSE FULBRIGHT US LLP
2  555 South Flower Street, Forty-First Floor
   Los Angeles, California 90071
3  Telephone:  (213) 892-9200
   Facsimile:  (213) 892-9494
4  rebecca.winthrop@nortonrosefulbright.com

5  RYAN E. MANNS (*pro hac vice*)
   JAMES V. LEITO (*pro hac vice*)
6  JASON I. BLANCHARD (*pro hac vice*)
   NORTON ROSE FULBRIGHT US LLP
7  2200 Ross Avenue, Suite 3600
   Dallas, Texas 75201
8  Telephone:  (214) 855-8000
   Facsimile:  (214) 855-8200
9  ryan.manns@nortonrosefulbright.com
   jason.blanchard@nortonrosefulbright.com
10
   Attorneys for *Roman Catholic Welfare Corporation of
11 Oakland, Roman Catholic Cemeteries of the Diocese
   of Oakland, and Adventus*

12

13          **UNITED STATES BANKRUPTCY COURT**

14          **NORTHERN DISTRICT OF CALIFORNIA**

15                  **OAKLAND DIVISION**

16  In re:                                    Case No. 23-40523 WJL

17  THE ROMAN CATHOLIC BISHOP OF              Chapter 11
    OAKLAND, a California corporation sole,
18
                                              Adv. Proc. No. 24-04053 WJL
19          Debtor

20                                            **DECLARATION OF RYAN E. MANNS IN
    THE OFFICIAL COMMITTEE OF                 SUPPORT OF MOTION OF THE
21  UNSECURED CREDITORS OF THE                ROMAN CATHOLIC WELFARE
    ROMAN CATHOLIC BISHOP OF                  CORPORATION OF OAKLAND, THE
22  OAKLAND                                   ROMAN CATHOLIC CEMETERIES OF
                                              THE DIOCESE OF OAKLAND AND
23          Plaintiff,                        ADVENTUS TO DISMISS THE
                                              OFFICIAL COMMITTEE OF
24  v.                                        UNSECURED CREDITORS' FIRST
                                              AMENDED COMPLAINT
25  THE ROMAN CATHOLIC BISHOP OF
    OAKLAND, ADVENTUS, THE ROMAN              Date:   June 4, 2025
26  CATHOLIC WELFARE CORPORATION              Time:   10:30 a.m.
    OF OAKLAND, AND THE ROMAN                 Judge:  Hon. William J. Lafferty
27  CATHOLIC CEMETERIES OF THE                Place:  United States Bankruptcy Court
    DIOCESE OF OAKLAND,                               Courtroom 220
28                                                    1300 Clay Street
            Defendants.                               Oakland, CA 94612

I, Ryan E. Manns, hereby declare as follows:

1. I am an attorney admitted to practice in the States of Texas and New York, and am admitted to appear *pro hac vice* before this Bankruptcy Court. I am a partner with the law firm of Norton Rose Fulbright US LLP, counsel to the Roman Catholic Welfare Corporation of Oakland ("RCWC"), the Roman Catholic Cemeteries of the Diocese of Oakland ("RCC"), and Adventus (collectively, the "Non-Debtor Defendants"), defendants in the above-captioned adversary proceeding.

2. I submit this Declaration in support of the Non-Debtor Defendants' Motion to Dismiss ("Motion") the *First Amended Adversary Complaint for Declaratory Relief* (the "Amended Complaint") (Dkt No. 32) filed by the Official Committee of Unsecured Creditors of the Roman Catholic Bishop of Oakland, to provide the Court with copies of the documents the Non-Debtor Defendants assert are incorporated by reference in the Complaint.

3. Attached hereto as **Exhibit 1** is a true and correct copy of that certain Offering Memorandum for the Roman Catholic Bishop of Oakland Taxable Bonds, Series 2007 (referred to in the Motion as "Offering Memorandum")

4. Attached hereto as **Exhibit 2** is a true and correct copy of Appendix A to the Offering Memorandum.

5. Attached hereto as **Exhibit 3** is a true and correct copy of RCWC's Bylaws.

6. Attached hereto as **Exhibit 4** is a true and correct copy of RCC's Bylaws.

7. Attached hereto as **Exhibit 5** is a true and correct copy of Adventus' Bylaws.

8. Attached hereto as **Exhibit 6** is a true and correct copy of that certain Credit and Security Agreement, dated as of February 1, 2017, by and between PNC Bank (f/k/a Compass Bank), as lender, and the Roman Catholic Bishop of Oakland, as borrower, and RCWC, RCC, and Adventus, as guarantors.

9. Attached hereto as **Exhibit 7** is a true and correct copy of that certain Investment Account Agreement, dated April 1, 2023, by and between RCWC and OPF ("IAA Agreement").

DOCUMENT PREPARED
ON RECYCLED PAPER

298181014.1

- 2 -

1         I declare under the penalty of perjury that, to the best of my knowledge and after

2    reasonable inquiry, the foregoing is true and correct.

3

4    Dated: May 23, 2025                  By: */s/ Ryan E. Manns*_____

5                                            Ryan E. Manns

# EXHIBIT 1

# Exhibit Filed Under Seal

# EXHIBIT 2

# Exhibit Filed Under Seal

# EXHIBIT 3

# BYLAWS

## The Roman Catholic Welfare Corporation of Oakland
### a California nonprofit religious corporation

## 1. NAME AND OFFICES OF THE CORPORATION

**1.1** **Name.** The name of this corporation is The Roman Catholic Welfare Corporation of Oakland ("Corporation").

**1.2** **Location of Principal Office.** The principal office for the transaction of the activities and affairs of the Corporation is located in Alameda County, California. The Board of Directors ("Board") may change the principal office from one location to another. Any such change shall be noted on these Bylaws opposite this Section, or this Section may be amended to state the new location.

**1.3** **Location of Other Offices.** The Board may at any time establish branch or subordinate offices at any place or places where the Corporation is qualified to conduct its activities.

## 2. MEMBERSHIP

**2.1** **Members.** The Corporation shall have no members. Any action which would otherwise require approval by a majority of all members or approval by the members shall require only approval of the Board. All rights which would otherwise vest in the members shall vest in the directors.

**2.2** **Associates.** Nothing in this Section 2 shall be construed as limiting the right of the Corporation to refer to persons associated with it as "members" even though such persons are not members, and no such reference shall constitute anyone a member, within the meaning of Section 5056 of the California Nonprofit Corporation Law. The Corporation may confer by amendment of its Articles or of these Bylaws some or all of the rights of a member, as set forth in the California Nonprofit Corporation law, upon any person or persons who do not have the right to vote for election of directors or on a disposition of substantially all of the assets of the Corporation or on a merger or on a dissolution or on changes to the Corporation's Articles or Bylaws, but no such person shall be a member within the meaning of said Section 5056.

## 3. BOARD OF DIRECTORS

### 3.1 Powers of Directors.

**(a)** **General Corporate Powers.** Subject to the provisions and limitations of the California Nonprofit Religious Corporation Law and any other applicable laws, and subject to any limitations in the Articles of Incorporation or Bylaws relating to action requiring approval by the members, the activities, business, and affairs of the Corporation shall be managed, and all corporate powers shall be exercised, by or under the direction of the Board.

-1-

9622444.1

**(b)** **Specific Powers.** Without prejudice to the general powers set forth in Section 3.1(a) of these Bylaws, but subject to the same limitations, the Board shall have the following powers in addition to other powers enumerated in these Bylaws:

    (i)    to select and remove at the pleasure of the Board, all officers, agents, and employees; to prescribe powers and duties for them as may be consistent with law, the Articles of Incorporation, and these Bylaws; to fix their compensation; and to require from them security for faithful service.

    (ii)    to conduct, manage, and control the affairs and activities of the Corporation and make such rules and regulations for this purpose, consistent with law, the Articles of Incorporation, and these Bylaws, as they may deem best.

    (iii)    to adopt and use a corporate seal, and alter the form of seal.

    (iv)    to borrow money and incur indebtedness on behalf of the Corporation, and cause to be executed and delivered for the Corporation's purposes, in the corporate name, promissory notes, bonds, debentures, deeds of trust, mortgages, pledges, hypothecations, and other evidences of debt and securities.

    (v)    to transfer monies, funds assets and properties contributed or donated to, or otherwise received or owned by, this corporation in a manner consistent with the corporation's stated purpose in the corporation's articles of incorporation.

**(c)** **Delegation of Management.** The Board may delegate the management of the activities of the Corporation to any person or persons, a management company, or committees however composed, provided that the activities and affairs of the Corporation shall be managed and all corporate power shall be exercised under the ultimate direction of the Board.

**3.2** **Number and Qualification of Directors.**

**(a)** **Authorized Number and Qualifications.** The authorized number of directors shall be seven (7).

**3.3** **Election, Designation, and Term of Office.** Four (4) of the directors (the "Appointed Directors") shall be appointed by The Roman Catholic Bishop of Oakland, a corporation sole ("Corporation Sole"). Three (3) directors (the "Elected Directors") shall be elected by the Appointed Directors. At least three (3) of the directors shall be lay persons who are not employees of either the Corporation, Corporation Sole or any affiliate of either entity. Each director shall hold office for one year and until a successor has been designated and qualified.

- 2 -

### 3.4 Vacancies on Board.

(a) **Events Causing Vacancy.** A vacancy or vacancies on the Board shall exist on the occurrence of the following: (i) the death or resignation of any director; (ii) the declaration by Board resolution of a vacancy of the office of a director who has been declared of unsound mind by an order of court or convicted of a felony or found by final order or judgement of any court to have breached a duty under Article 4 of Chapter 2 of the California Nonprofit Religious Corporation Law; (iii) the increase of the authorized number of directors; or (iv) removal of a director pursuant to Section 3.4(e) below.

(b) **Resignations.** Except as provided below, any director may resign by giving written notice to the chairman of the Board, if any, or to the president or the secretary. The resignation shall be effective when the notice is given unless it specifies a later time for the resignation to become effective. If an Appointed Director's resignation is effective at a later time, Corporation Sole may elect a successor to take office as of the date when the resignation becomes effective. No director may resign if the Corporation would then be left without a duly elected director or directors.

(c) **Filling Vacancies.** Vacancies in the Appointed Directors group shall be filled only by Corporation Sole. Vacancies in the Elected Director group shall be filled, by election, by the Appointed Directors at any regular or special meeting or by consent of the Board. Any person appointed or elected to fill a vacancy of the Board shall serve for the unexpired term of the person whom he is elected to succeed.

(d) **No Vacancy on Reduction of Number of Directors.** No reduction of the authorized number of directors shall have the effect of removing any director before that director's term of office expires.

(e) **Removal.** A director may be removed as a director at any time for any reason or for no reason at all by Corporation Sole.

### 3.5 Directors' Meetings.

(a) **Place of Meetings.** Regular or special meetings of the Board may be held at any place within or outside California that the Board may designate or, if not so designated, meetings shall be held at the Corporation's principal office. Notwithstanding the above provisions of this Section, a regular or special meeting of the Board may be held at any place consented to in writing by all Board members, either before or after the meeting. If such consents are given, they shall be filed with the minutes of the meeting.

(b) **Meetings by Telephone.** Any meeting may be held by conference telephone or similar communication equipment, as long as all directors participating in the meeting can hear one another. All such directors shall be deemed to be present in person at such a meeting.

(c) **Annual Meeting.** The Board shall hold an annual meeting for the purpose of organization, selection of officers, and the transaction of other business. Annual meetings of the Board shall be held without call or notice on the first Tuesday of April at 10 o'clock a.m. local time; provided, however, should said day fall on a holiday observed by the Corporation at

- 3 -

Case: 24-04053   Doc# 36   Filed: 05/23/25   Entered: 05/23/25 17:31:07   Page 11 of 170

its principal office, then the meeting shall be held at the same time on the next day thereafter ensuing which is a full business day.

    **(d)**   **Other Regular Meetings.** Other regular meetings of the Board may be held without call or notice at such time and place as the Board shall fix from time to time.

    **(e)**   **Special Meetings.**

      **(i)**   **Authority To Call.** Special meetings of the Board for any purpose may be called at any time by the chairman of the Board, if any, the president or any vice president, or the secretary or any two directors.

      **(ii)**   **Notice.**

        **a.**   **Manner of Giving Notice.** Notice of the time and place of special meetings shall be given to each director by one of the following methods: (1) by personal delivery of written notice; (2) by first-class mail, postage prepaid; (3) by telephone, either directly to the director or to a person at the director's office who would reasonably be expected to communicate that notice promptly to the director; or (4) by telegram, charges prepaid. All such notices shall be given or sent to the director's address or telephone number as shown on the records of the Corporation.

        **b.**   **Time Requirements.** Notices of special meetings of the Board of Directors sent by first-class mail shall be deposited in the United States mails at least four days before the time set for the meeting. Notices given by personal delivery, telephone, or telegraph shall be delivered, telephoned, or given to the telegraph company at least forty-eight hours before the time set for the meeting.

        **c.**   **Notice Contents.** The notice of a special meeting of the Board shall state the time of the meeting, and the place if the place is other than the principal office of the Corporation. It need not specify the purpose of the meeting.

    **(f)**   **Quorum.** A majority of the authorized number of directors shall constitute a quorum for the transaction of business, except to adjourn. Every action taken or decision made by a majority of the directors present at a duly held meeting at which a quorum is present shall be the act of the Board, subject to the more stringent provisions of the California Nonprofit Religious Corporation Law, including, without limitation, those provisions relating to (i) approval of contracts or transactions in which a director has a direct or indirect material financial interest; (ii) approval of certain transactions between Corporations having common directorships, (iii) creation of and appointments to committees of the Board, and (iv) indemnification of directors. A meeting at which a quorum is initially present may continue to transact business, despite the withdrawal of directors, if any action taken or decision made is approved by at least a majority of the required quorum for that meeting.

    **(g)**   **Waiver of Notice.** Notice of a meeting need not be given to any director who, either before or after the meeting, signs a waiver of notice, a written consent to the holding of the meeting, or an approval of the minutes of the meeting. All such waivers, consents, and approvals shall be filed with the corporate records or made a part of the minutes of the meetings.

- 4 -

9622444.1

Notice of a meeting need not be given to any director who attends the meeting and does not protest, before or at the commencement of the meeting, the lack of notice to him or her.

(h) **Adjournment.** A majority of the directors present, whether or not a quorum is present, may adjourn any meeting to another time and place.

(i) **Notice of Adjourned Meeting.** Notice of the time and place of holding an adjourned meeting need not be given unless the original meeting is adjourned for more than twenty-four hours, notice of any adjournment to another time and place shall be given, before the time of the adjourned meeting, to the directors who were not present at the time of the adjournment.

3.6 **Action Without a Meeting.** Any action that the Board is required or permitted to take may be taken without a meeting, if all members of the Board, individually or collectively, consent in writing to that action; provided, however, that the consent of any director who has a material financial interest in a transaction to which the Corporation is a party and who is an "interested director" as defined in Section 5233 of the California Corporations Code shall not be required for approval of that transaction. Such action by written consent shall have the same force and effect as any other validly approved action of the Board. Such consents shall be filed with the minutes of the proceedings of the Board.

3.7 **Compensation and Reimbursement.** Directors and members of committees shall receive no compensation for their services as directors, but may receive just and reasonable reimbursement for expenses in attending meetings.

3.8 **Committees.**

(a) **Committees of the Board.** The Board, by resolution adopted by a majority of the directors then in office, provided a quorum is present, may create one or more committees, each consisting of two or more directors and no persons who are not directors, to serve at the pleasure of the Board. Appointments to committees of the Board shall be by majority vote of the directors then in office. The Board may appoint one or more directors as alternate members of any such committee, who may replace any absent member at any meeting. Any such committee, to the extent provided in the Board resolution, shall have all authority of the Board, except that no committee, regardless of Board resolution, may:

(1) fill vacancies on any committee that has the authority of the Board;

(2) fix compensation of the directors for serving on the Board or on any committee;

(3) amend or repeal Bylaws or adopt new Bylaws;

(4) amend or repeal any Board resolution that by its express terms is not so amendable or repealable;

(5) create any other committees of the Board or appoint members of committees of the Board;

- 5 -

9622444.1

(6)      expend corporate funds to support a nominee for director after more people have been nominated for director than can be elected; or

(7)      approve any contract or transaction to which the Corporation is a party and in which one or more of its directors has a material financial interest, except as special approval is provided for in Section 9243(d)(3) of the California Corporations Code.

**(b)**      **Meetings and Action of Committees.**    Meetings and actions of committees of the Board shall be governed by, held, and taken in accordance with the provisions of these Bylaws concerning meetings and other Board actions, except that the time for regular meetings of such committees and the calling of special meetings of such committees may be determined either by Board resolution or, if there is none, by resolution of the committee of the Board. Minutes of each meeting of any committee of the Board shall be kept and shall be filed with the corporate records. The Board may adopt rules for the government of any committee that are consistent with these Bylaws or, in the absence of rules adopted by the Board, the committee may adopt such rules.

## 4.    OFFICERS

     **4.1**      **Officers Of the Corporation.**    The officers of the Corporation shall be a president, a secretary, and a chief financial officer. The Corporation may also have, at the Board's discretion, a chairman of the Board, one or more vice presidents, one or more assistant secretaries, one or more assistant treasurers, and such other officers as may be appointed in accordance with Section 4.3 of these Bylaws. Any number of offices may be held by the same person, except that neither the secretary nor the chief financial officer may serve concurrently as either the president or the chairman of the Board.

     **4.2**      **Election of Officers.**    The officers of the Corporation, except those appointed under Section 4.3 of these Bylaws shall be chosen annually by the Board and each shall serve at the pleasure of the Board, subject to the rights, if any, of any officer under any contract of employment.

     **4.3**      **Other Officers.**    The Board may appoint and may authorize the chairman of the Board, the president, or other officer to appoint any other officers that the business of the Corporation may require, each of whom shall have the title, hold office for the period, have the authority, and perform the duties determined by the Board.

     **4.4**      **Removal of Officers.**    Without prejudice to any rights of an officer under any contract of employment, any officer may be removed, with or without cause, by the Board or by an officer on whom the Board may confer that power of removal.

     **4.5**      **Resignation of Officers.**    Any officer may resign at any time by giving written notice to the Corporation. The resignation shall take effect as of the date the notice is received or at any later time specified in the notice and, unless otherwise specified in the notice, the resignation need not be accepted to be effective. Any resignation shall be without prejudice to the rights, if any, of the Corporation under any contract to which the officer is a party.

- 6 -

9622444.1

**4.6** **Vacancies in Offices.** A vacancy in any office because of death, resignation, removal, disqualification, or any other cause shall be filled in the manner prescribed in these Bylaws for regular appointments to that office, provided that such vacancies shall be filled as they occur and not on an annual basis.

**4.7** **Responsibilities of Officers.**

**(a)** **Chairman of the Board.** If a chairman of the Board is elected, he or she shall preside at Board meetings and shall exercise and perform such other powers and duties as may be assigned by the Board or prescribed by the Bylaws. If there is no president, the chairman of the Board shall also be the chief executive officer and shall have the powers and duties prescribed by these Bylaws for the president of the Corporation.

**(b)** **President.** Subject to such supervisory powers as the Board may give to the chairman of the Board, if any, the president shall, subject to the control of the Board, be the general manager of the Corporation and shall supervise, direct, and control the business, activities, affairs and the officers of the Corporation. The president shall preside, in the absence of the chairman of the Board, or if there is none, at all Board meetings. The president shall have such other powers and duties as the Board or the Bylaws may prescribe.

**(c)** **Vice Presidents.** In the absence or disability of the president, the vice presidents, if any, in order of their rank as fixed by the Board or, if not ranked, a vice president designated by the Board, shall perform all duties of the president. When so acting, a vice president shall have all powers of and be subject to all restrictions on the president. The vice presidents shall have such other powers and perform such other duties as the Board or the Bylaws may prescribe.

**(d)** **Secretary.**

**(i)** **Book of Minutes.** The secretary shall keep or cause to be kept, at the Corporation's principal office or such other place as the Board may direct, a book of minutes of all meetings, proceedings, and actions of the Board, or committees of the Board. The minutes of meetings shall include the time and place of holding, whether the meeting was general or special and, if special, how authorized, the notice given, the names of those present at Board and committee meetings. The secretary shall keep or have kept at the principal office in California, a copy of the Articles of Incorporation and Bylaws, as amended to date.

**(ii)** **Membership Records.** The secretary shall keep or cause to be kept, at the Corporation's principal office or at a place determined by Board resolution, a record of the Corporation's members, showing all members' names, addresses, and class of membership.

**(iii)** **Notices, Seal, and Other Duties.** The secretary shall give, or cause to be given, notice of all meetings of the Board, and of committees of the Board required by the Bylaws to be given. The secretary shall keep the corporate seal in safe custody, and shall have such other powers and perform such other duties as the Board or the Bylaws may prescribe.

- 7 -

9622444.1

### (e) **Chief Financial Officer.**

(i) **Books of Account.** The chief financial officer shall keep and maintain, or cause to be kept and maintained, adequate and correct books and records of accounts of the Corporation's properties and business transactions, including accounts of its assets, liabilities, receipts, disbursements, gains, losses, capital, retained earnings, and other matters customarily included in financial statements. The books of account shall be open to inspection by any director at all reasonable times.

(ii) **Deposit and Disbursement of Money and Valuables.** The chief financial officer shall deposit, or cause to be deposited, all money and other valuables in the name and to the credit of the Corporation with such depositories as the Board may designate, shall disburse the Corporation's funds as the Board may order, shall render to the president and directors, when requested, an account of all transactions as chief financial officer and of the financial condition of the Corporation, and shall have such other powers and perform such other duties as the Board or the Bylaws may prescribe.

(iii) **Bond.** If required by the Board, the chief financial officer shall give the Corporation a bond in the amount and with the surety or sureties specified by the Board for faithful performance of the duties of his office and for restoration to the Corporation of all its books, papers, vouchers, money, and other property of every kind in his possession or under his control on his death, resignation, retirement, or removal from the office.

## 5. **INDEMNIFICATION**

**5.1** **Definitions.** For the purpose of this Section 5, "agent" means any person who is or was a director, officer, employee, or other agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee, or agent of another foreign or domestic corporation, partnership, joint venture, trust, or other enterprise, or was a director, officer, employee, or agent of a foreign or domestic corporation which was a predecessor corporation of the Corporation or of another enterprise at the request of such predecessor corporation; "proceeding" means any threatened, pending or completed action or proceeding, whether civil, criminal, administrative, or investigative; and "expense" includes, without limitation, attorneys' fees and any expenses of establishing a right to indemnification under Sections 5.5 or 5.5(b) of these Bylaws.

**5.2** **Indemnification in Actions by Third Parties.** The Corporation shall have power to indemnify any person who was or is a party or is threatened to be made a party to any proceeding (other than an action by or in the right of the Corporation to procure a judgment in its favor, an action brought under Section 9243 of the California Nonprofit Religious Corporation law, or an action brought by the Attorney General or a person granted relator status by the Attorney General for any breach of duty relating to assets held in charitable trust), by reason of the fact that such person is or was an agent of the Corporation, against expenses, judgments, fines, settlements, and other amounts actually and reasonably incurred in connection with such proceeding if such person acted in good faith and in a manner such person reasonably believed to be in the best interests of the Corporation and, in the case of a criminal proceeding, had no reasonable cause to believe the conduct of such person was unlawful. The termination of any proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its

-8-

equivalent shall not, of itself, create a presumption that the person did not act in good faith and in a manner which the person reasonably believed to be in the best interests of the Corporation or that the person had reasonable cause to believe that person's conduct was unlawful.

**5.3** **Indemnification in Actions by or in the Right of the Corporation.** The Corporation shall have the power to indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending, or completed action by or in the right of the Corporation, or brought under Section 9243 of the California Nonprofit Religious Corporation Law, or brought by the Attorney General or a person granted relator status by the Attorney General for breach of duty relating to assets held in charitable trust, to procure a judgment in its favor by reason of the fact that such person is or was an agent of the Corporation, against expenses actually and reasonably incurred by such person in connection with the defense or settlement of such action if such person acted in good faith, in a manner such person believed to be in the best interests of the Corporation, and with such care, including reasonably inquiry, as an ordinarily prudent person in a like position would use under similar circumstances. No indemnification shall be made under this Section 5.3:

(a) in respect of any claim, issue, or matter as to which such person shall have been adjudged to be liable to the Corporation in the performance of such person's duty to the Corporation, unless and only to the extent that the court in which such proceeding is or was pending shall determine upon application that, in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for the expenses which such court shall determine;

(b) of amounts paid in settling or otherwise disposing of a threatened or pending action, with or without court approval; or

(c) of expense incurred in defending a threatened or pending action which is settled or otherwise disposed of without court approval, unless it is settled with the approval of the Attorney General.

**5.4** **Indemnification Against Expenses.** To the extent that an agent of the Corporation has been successful on the merits in defense of any proceeding referred to in Sections 5.2 or 5.3 of these Bylaws or in defense of any claim, issue, or matter therein, the agent shall be indemnified against expenses actually and reasonably incurred by the agent in connection therewith.

**5.5** **Required Determinations.** Except as provided in Section 5.4 of these Bylaws any indemnification under this Section 5 shall be made by the Corporation only if authorized in the specific case, upon a determination that indemnification of the agent is proper in the circumstances because the agent has met the applicable standard of conduct set forth in Sections 5.2 or 5.3 of these Bylaws, by:

(a) a majority vote of a quorum consisting of directors who are not parties to such proceeding;

(b) the court in which such proceeding is or was pending upon application made by the Corporation or the agent or the attorney or other person rendering services in

- 9 -

9622444.1

connection with the defense, whether or not such application by the agent, attorney, or other person is opposed by the Corporation.

**5.6** **Advance of Expenses.** Expenses incurred in defending any proceeding may be advanced by the Corporation prior to the final disposition of such proceeding upon receipt of an undertaking by or on behalf of the agent to repay such amount unless it shall be determined ultimately that the agent is entitled to be indemnified as authorized in this Section 5.

**5.7** **Other Indemnification.** No provision made by the Corporation to indemnify its or its subsidiary's directors or officers for the defense of any proceeding, whether contained in the Articles, Bylaws, a resolution of members or directors, an agreement, or otherwise, shall be valid unless consistent with this Section 5. Nothing contained in this Section 5 shall affect any right to indemnification to which persons other than such directors and officers may be entitled by contract or otherwise.

**5.8** **Forms of Indemnification Not Permitted.** No indemnification or advance shall be made under this Section 5, except as provided in Sections 5.4 or 5.5(b), in any circumstances where it appears:

(a)     that it would be inconsistent with a provision of the Articles, these Bylaws, or an agreement in effect at the time of the accrual of the alleged cause of action asserted in the proceeding in which the expenses were incurred or other amounts were paid, which prohibits or otherwise limits indemnification; or

(b)     that it would be inconsistent with any condition expressly imposed by a court in approving a settlement.

**5.9** **Insurance.** The Corporation shall have power to purchase and maintain insurance on behalf of any agent of the Corporation against any liability asserted against or incurred by the agent in such capacity or arising out of the agent's status as such whether or not the Corporation would have the power to indemnify the agent against such liability under the provisions of this Section 5, provided, however, that a Corporation shall have no power to purchase and maintain such insurance to indemnify any agent of the Corporation for a violation of Section 9243 of the California Nonprofit Religious Corporation Law.

**5.10** **Nonapplicability to Fiduciaries of Employee Benefit Plans.** This Section 5 does not apply to any proceeding against any trustee, investment manager, or other fiduciary of an employee benefit plan in such person's capacity as such, even though such person may also be an agent of the Corporation as defined in Section 5.1 of these Bylaws. The Corporation shall have power to indemnify such trustee, investment manager, or other fiduciary to the extent permitted by Section 207(f) of the California General Corporation Law.

**6.** **RECORDS AND REPORTS**

**6.1** **Maintenance of Corporate Records.** The Corporation shall keep:

1.      Adequate and correct books and records of account; and

- 10 -

2. Written minutes of the proceedings of its Board, and committees of the Board.

**6.2 Inspection by Directors.** Every director shall have the absolute right at any reasonable time to inspect and copy all books, records, and documents of every kind and to inspect the physical properties of the Corporation for a purpose reasonably related to the director's interests as a director.

**6.3 Annual Report.** The Board shall cause an annual report to be sent to all directors within 120 days after the end of the Corporation's fiscal year. That report shall contain the following information, in appropriate detail, for the fiscal year:

1. the assets and liabilities, including the trust funds, of the Corporation as of the end of the fiscal year

2. the principal changes in assets and liabilities, including trust funds

3. the revenue or receipts of the Corporation, both unrestricted and restricted to particular purposes

4. the expenses or disbursements of the Corporation for both general and restricted purposes

5. the information required by Section 6.4 of these Bylaws.

The annual report shall be accompanied by any report on it of independent accountants or, if there is no such report, by the certificate of an authorized officer of the Corporation that such statements were prepared without audit from the Corporation's books and records.

This requirement of an annual report shall not apply if the Corporation receives less than $25,000 in gross receipts during the fiscal year, provided, however, that the information specified above for inclusion in the annual report must be furnished annually to all directors who requests it in writing.

**6.4 Annual Statements of Certain Transactions and Indemnifications.** As part of the annual report, or as a separate document if no annual report is issued, the Corporation shall annually furnish to each director a statement of any transaction or indemnification of the following kind within 120 days after the end of the Corporation's fiscal year:

(a) Any transaction (i) in which the Corporation, its parent, or its subsidiary was a party, (ii) in which an "interested person" had a direct or indirect material financial interest, and (iii) which involved more than $50,000, or was one of a number of transactions with the same interested person invoking, in the aggregate, more than $50,000. for this purpose, an "interested person" is either of the following:

1. any director or officer of the Corporation, its parent, or subsidiary (but mere common directorship shall not be considered such an interest);

- 11 -

9622444.1

2.    any holder of more than ten percent of the voting power of the Corporation, its parent, or its subsidiary. The statement shall include a brief description of the transaction, the names of interested persons involved, their relationship to the Corporation, the nature of their interest in the transaction and, if practicable, the amount of that interest, provided that if the transaction was with a partnership in which the interested person is a partner, only the interest of the partnership need be stated.

(b)    Any indemnifications or advances aggregating more than $10,000 paid during the fiscal year to any officer or director of the Corporation under Section 5 of these Bylaws, unless that indemnification has already been approved by the members under Section 9246(e)(2) of the California Corporations Code.

## 7.    ENDORSEMENT OF DOCUMENTS; CONTRACTS

Subject to the provisions of applicable law, any note, mortgage, evidence of indebtedness, contract, deed, conveyance, or other instrument in writing and any assignment or endorsement thereof executed or entered into between the Corporation and any other person, when signed by the chairman of the Board, the president, or any vice president and the secretary, any assistant secretary, the treasurer, or any assistant treasurer of the Corporation shall be valid and binding on the Corporation in the absence of actual knowledge on the part of the other person that the signing officers had no authority to execute the same. Any such instruments may be signed by any other person or persons and in such manner as from time to time shall be determined by the Board, and, unless so authorized by the Board, no officer, agent, or employee shall have any power or authority to bind the Corporation by any contract or engagement or to pledge its credit or to render it liable for any purpose.

## 8.    CONSTRUCTION AND DEFINITIONS

Unless the context requires otherwise, the general provisions, rules of construction, and definitions in the California Nonprofit Corporation Law and in the California Nonprofit Religious Law shall govern the construction of these Bylaws. Without limiting the generality of the preceding sentence, the masculine gender includes the feminine and neuter, the singular number includes the plural, the plural number includes the singular and the term "person" includes both a legal entity and a natural person.

## 9.    AMENDMENTS; APPROVALS

New Bylaws and Articles of Incorporation may be adopted, or these Bylaws and the Articles of Incorporation may be amended or repealed, only by approval of the Board and Corporation Sole. No merger, reorganization, liquidation, or dissolution of the Corporation or sale or other disposition of all or substantially all of the assets of this Corporation shall occur without the approval of the Board and Corporation Sole.

### [REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

- 12 -

## OFFICER'S CERTIFICATION OF BYLAWS

I hereby certify that I am the duly elected and acting Assistant Secretary of The Roman Catholic Welfare Corporation of Oakland, a California nonprofit religious corporation, and that the foregoing Bylaws, consisting of twelve (12) pages, constitute the Bylaws of said corporation as duly approved by resolutions of the members of the Board effective as of November 7_ , 2002.

IN WITNESS WHEREOF, I have hereunto subscribed my name this _14_ day of _November_ , 2002.

_S. Barbara Flannery_
Sister Barbara Flannary
Assistant Secretary

9622444.1

**Paul Bongiovanni**

---

**From:** Kemp, John M. [JKemp@ReedSmith.com]
**Sent:** Tuesday, July 08, 2008 2:42 PM
**To:** Paul Bongiovanni
**Subject:** RE: ROMAN CATHOLIC WELFARE CORPORATION

1. correct

2. most recent bylaws 11/7/02--i'll get a copy to you

---

**From:** Paul Bongiovanni [mailto:PBongiovanni@oakdiocese.org]
**Sent:** Monday, July 07, 2008 1:59 PM
**To:** Kemp, John M.
**Cc:** Mike Canizzaro
**Subject:** ROMAN CATHOLIC WELFARE CORPORATION

Good afternoon, John.

In reviewing the files for the RCWC, I noted the following items which I want to confirm are accurate (i.e., up to date):

1. The articles of incorporation have been amended three times, with the last amendment dated 11/07/02 (certified 12/21/02).

2. The bylaws have been amended three times, with amendments dated 9/10/65, 1/31/90, and 3/16/95.

Thanks again,

Paul Bongiovanni
Diocese of Oakland
Controller
(510) 267-8321

* * *

This E-mail, along with any attachments, is considered confidential and may well be legally privileged. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.
* * *
To ensure compliance with Treasury Department regulations, we inform you that, unless otherwise indicated in writing, any U.S. Federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or applicable state and local provisions or (2) promoting, marketing or recommending to another party any tax-related matters addressed herein.

Disclaimer Version RS.US.1.01.03
pdc1

# EXHIBIT 4

# BYLAWS
## OF
## The Roman Catholic Cemeteries of the Diocese of Oakland
## A California Nonprofit Religious Corporation

## 1.   NAME AND OFFICES OF THE CORPORATION

**1.1   Name.** The name of this corporation is The Roman Catholic Cemeteries of the Diocese of Oakland ("Corporation").

**1.2   Location of Principal Office.** The principal office for the transaction of the activities and affairs of the Corporation is located in Alameda, County, California. The Board of Directors ("Board") may change the principal office from one location to another. Any such change shall be noted on these Bylaws opposite this Section, or this Section may be amended to state the new location.

**1.3   Location of Other Offices.** The Board may at any time establish branch or subordinate offices at any place or places where the Corporation is qualified to conduct its activities.

## 2.   PURPOSES

The purposes of this corporation are religious. The corporation shall provide for the burial of the faithful of the Roman Catholic Church, maintain lands and improvements for burial and insure compliance with all Catholic teachings and traditions concerning the reverent interment of deceased Catholic faithful.

## 3.   MEMBERSHIP

**3.1   Members.** The Corporation shall have no members. Any action which would otherwise require approval by a majority of all members or approval by the members shall require only approval of the Board. All rights which would otherwise vest in the members shall vest in the directors.

**3.2   Associates.** Nothing in this Section 3 shall be construed as limiting the right of the Corporation to refer to persons associated with it as "members" even though such persons are not members, and no such reference shall constitute anyone a member, within the meaning of Section 5056 of the California Nonprofit Corporation Law. The Corporation may confer by amendment of its Articles or of these Bylaws some or all of

4012967

the rights of a member, as set forth in the California Nonprofit Corporation law, upon any person or persons who do not have the right to vote for election of directors or on a disposition of substantially all of the assets of the Corporation or on a merger or on a dissolution or on changes to the Corporation's Articles or Bylaws, but no such person shall be a member within the meaning of said Section 5056.

4. **BOARD OF DIRECTORS**

### 4.1 Powers of Directors.

(a) **General Corporate Powers.** Subject to the provisions and limitations of the California Nonprofit Religious Corporation Law and any other applicable laws, and subject to any limitations in the Articles of Incorporation or Bylaws relating to action requiring approval by the members, the activities, business, and affairs of the Corporation shall be managed, and all corporate powers shall be exercised, by or under the direction of the Board.

(b) **Specific Powers.** Without prejudice to the general powers set forth in Section 4.1(a) of these Bylaws, but subject to the same limitations, the Board shall have the following powers in addition to other powers enumerated in these Bylaws:

   (i)   to select and remove at the pleasure of the Board, all officers, agents, and employees; to prescribe powers and duties for them as may be consistent with law, the Articles of Incorporation, and these Bylaws; to fix their compensation; and to require from them security for faithful service.

   (ii)  to conduct, manage, and control the affairs and activities of the Corporation and make such rules and regulations for this purpose, consistent with law, the Articles of Incorporation, and these Bylaws, as they may deem best.

   (iii) to adopt and use a corporate seal, and alter the form of seal.

   (iv)  to borrow money and incur indebtedness on behalf of the Corporation, and cause to be executed and delivered for the Corporation's purposes, in the corporate name, promissory notes, bonds, debentures, deeds of trust, mortgages, pledges, hypothecations, and other evidences of debt and securities.

4012967                                    2

(c)     **Delegation of Management.**  The Board may delegate the management of the activities of the Corporation to any person or persons, a management company, or committees however composed, provided that the activities and affairs of the Corporation shall be managed and all corporate power shall be exercised under the ultimate direction of the Board.

### 4.2     Number and Qualification of Directors.

(a)     **Authorized Number and Qualifications.**   The authorized number of directors shall be four.

(b)     **Restriction on Interested Persons as Directors.**  No more than forty-nine percent of the persons serving on the Board may be interested persons. An interested person is (i) any person compensated by the Corporation for services rendered to it within the previous twelve months, whether as a full-time or part-time employee, independent contractor, or otherwise, excluding any reasonable compensation paid to a director as director; and (ii) any brother, sister, ancestor, descendent, spouse, brother-in-law, sister-in-law, son-in-law, daughter-in-law, mother-in-law or father-in-law of such person. However, any violation of the provisions of this Section 4.2(b) shall not affect the validity or enforceability of any transaction entered into by the Corporation.

### 4.3     Election, Designation, and Term of Office.     All directors shall be appointed by The Roman Catholic Bishop of Oakland, a corporation sole ("Corporation Sole"). Each such director shall hold office for one year and until a successor has been designated and qualified.

### 4.4     Vacancies on Board.

(a)     **Events Causing Vacancy.**  A vacancy or vacancies on the Board shall exist on the occurrence of the following: (i) the death or resignation of any director; (ii) the declaration by Board resolution of a vacancy of the office of a director who has been declared of unsound mind by an order of court or convicted of a felony or found by final order or judgement of any court to have breached a duty under Article 4 of Chapter 2 of the California Nonprofit Religious Corporation Law; (iii) the increase of the authorized number of directors; or (iv) removal of a director pursuant to Section 4.4(e) below.

(b)     **Resignations.**  Except as provided below, any director may resign by giving written notice to the chairman of the Board, if any, or to the president or the secretary.  The resignation shall be effective when the notice is given unless it specifies a

Case: 24-04053   Doc# 36   Filed: 05/23/25   Entered: 05/23/25 17:31:07   Page 26 of 170

later time for the resignation to become effective. If a director's resignation is effective at a later time, Corporation Sole may elect a successor to take office as of the date when the resignation becomes effective. No director may resign if the Corporation would then be left without a duly elected director or directors.

        (c)    <u>Filling Vacancies</u>. Vacancies on the Board shall be filled only by Corporation Sole.

        (d)    <u>No Vacancy on Reduction of Number of Directors</u>. No reduction of the authorized number of directors shall have the effect of removing any director before that director's term of office expires.

        (e)    <u>Removal</u>. A director may be removed as a director at any time for any reason or for no reason at all by Corporation Sole.

### 4.5    <u>Directors' Meetings</u>.

        (a)    <u>Place of Meetings</u>. Regular or special meetings of the Board may be held at any place within or outside California that the Board may designate or, if not so designated, meetings shall be held at the Corporation's principal office. Notwithstanding the above provisions of this Section, a regular or special meeting of the Board may be held at any place consented to in writing by all Board members, either before or after the meeting. If such consents are given, they shall be filed with the minutes of the meeting.

        (b)    <u>Meetings by Telephone</u>. Any meeting may be held by conference telephone or similar communication equipment, as long as all directors participating in the meeting can hear one another. All such directors shall be deemed to be present in person at such a meeting.

        (c)    <u>Annual Meeting</u>. The Board shall hold an annual meeting for the purpose of organization, selection of officers, and the transaction of other business. Annual meetings of the Board shall be held without call or notice on the first Tuesday of April at 10 o'clock a.m. local time; provided, however, should said day fall on a holiday observed by the Corporation at its principal office, then the meeting shall be held at the same time on the next day thereafter ensuing which is a full business day.

        (d)    <u>Other Regular Meetings</u>. Other regular meetings of the Board may be held without call or notice at such time and place as the Board shall fix from time to time.

4012967                         4

(e)    **Special Meetings.**

(i) **Authority To Call.** Special meetings of the Board for any purpose may be called at any time by the chairman of the Board, if any, the president or any vice president, or the secretary or any two directors.

(ii) **Notice.**

a.    **Manner of Giving Notice.** Notice of the time and place of special meetings shall be given to each director by one of the following methods: (1) by personal delivery of written notice; (2) by first-class mail, postage prepaid; (3) by telephone, either directly to the director or to a person at the director's office who would reasonably be expected to communicate that notice promptly to the director; or (4) by telegram, charges prepaid. All such notices shall be given or sent to the director's address or telephone number as shown on the records of the Corporation.

b.    **Time Requirements.** Notices of special meetings of the Board of Directors sent by first-class mail shall be deposited in the United States mails at least four days before the time set for the meeting. Notices given by personal delivery, telephone, or telegraph shall be delivered, telephoned, or given to the telegraph company at least forty-eight hours before the time set for the meeting.

c.    **Notice Contents.** The notice of a special meeting of the Board shall state the time of the meeting, and the place if the place is other than the principal office of the Corporation. It need not specify the purpose of the meeting.

(f)    **Quorum.** A majority of the authorized number of directors shall constitute a quorum for the transaction of business, except to adjourn. Every action taken or decision made by a majority of the directors present at a duly held meeting at which a quorum is present shall be the act of the Board, subject to the more stringent provisions of the California Nonprofit Religious Corporation Law, including, without limitation, those provisions relating to (i) approval of contracts or transactions in which a director has a direct or indirect material financial interest; (ii) approval of certain transactions between Corporations having common directorships; (iii) creation of and appointments to committees of the Board, and (iv) indemnification of directors. A meeting at which a quorum is initially present may continue to transact business, despite the withdrawal of directors, if any action taken or decision made is approved by at least a majority of the required quorum for that meeting.

4012967                                              5

(g)  Waiver of Notice.  Notice of a meeting need not be given to any director who, either before or after the meeting, signs a waiver of notice, a written consent to the holding of the meeting, or an approval of the minutes of the meeting.  All such waivers, consents, and approvals shall be filed with the corporate records or made a part of the minutes of the meetings.  Notice of a meeting need not be given to any director who attends the meeting and does not protest, before or at the commencement of the meeting, the lack of notice to him or her.

(h)  Adjournment.  A majority of the directors present, whether or not a quorum is present, may adjourn any meeting to another time and place.

(i)  Notice of Adjourned Meeting.  Notice of the time and place of holding an adjourned meeting need not be given unless the original meeting is adjourned for more than twenty-four hours, notice of any adjournment to another time and place shall be given, before the time of the adjourned meeting, to the directors who were not present at the time of the adjournment.

**4.6  Action Without a Meeting.**  Any action that the Board is required or permitted to take may be taken without a meeting, if all members of the Board, individually or collectively, consent in writing to that action; provided, however, that the consent of any director who has a material financial interest in a transaction to which the Corporation is a party and who is an "interested director" as defined in Section 5233 of the California Corporations Code shall not be required for approval of that transaction.  Such action by written consent shall have the same force and effect as any other validly approved action of the Board.  Such consents shall be filed with the minutes of the proceedings of the Board.

**4.7  Compensation and Reimbursement.**  Directors and members of committees shall receive no compensation for their services as directors, but may receive just and reasonable reimbursement for expenses in attending meetings.

Case: 24-04053   Doc# 36   Filed: 05/23/25   Entered: 05/23/25 17:31:07   Page 29 of 170

### 4.8 Committees.

(a) **Committees of the Board.** The Board, by resolution adopted by a majority of the directors then in office, provided a quorum is present, may create one or more committees, each consisting of two or more directors and no persons who are not directors, to serve at the pleasure of the Board. Appointments to committees of the Board shall be by majority vote of the directors then in office. The Board may appoint one or more directors as alternate members of any such committee, who may replace any absent member at any meeting. Any such committee, to the extent provided in the Board resolution, shall have all authority of the Board, except that no committee, regardless of Board resolution, may:

    (1) fill vacancies on any committee that has the authority of the Board;

    (2) fix compensation of the directors for serving on the Board or on any committee;

    (3) amend or repeal Bylaws or adopt new Bylaws;

    (4) amend or repeal any Board resolution that by its express terms is not so amendable or repealable;

    (5) create any other committees of the Board or appoint members of committees of the Board;

    (6) expend corporate funds to support a nominee for director after more people have been nominated for director than can be elected; or

    (7) approve any contract or transaction to which the Corporation is a party and in which one or more of its directors has a material financial interest, except as special approval is provided for in Section 9243(d)(3) of the California Corporations Code.

(b) **Meetings and Action of Committees.** Meetings and actions of committees of the Board shall be governed by, held, and taken in accordance with the provisions of these Bylaws concerning meetings and other Board actions, except that the time for regular meetings of such committees and the calling of special meetings of such

4012967

7

committees may be determined either by Board resolution or, if there is none, by resolution of the committee of the Board. Minutes of each meeting of any committee of the Board shall be kept and shall be filed with the corporate records. The Board may adopt rules for the government of any committee that are consistent with these Bylaws or, in the absence of rules adopted by the Board, the committee may adopt such rules.

## 5. OFFICERS.

**5.1** **Officers Of the Corporation.** The officers of the Corporation shall be a president, a secretary, and a chief financial officer. The Corporation may also have, at the Board's discretion, a chairman of the Board, one or more vice presidents, one or more assistant secretaries, one or more assistant treasurers, and such other officers as may be appointed in accordance with Section 5.3 of these Bylaws. Any number of offices may be held by the same person, except that neither the secretary nor the chief financial officer may serve concurrently as either the president or the chairman of the Board.

**5.2** **Election of Officers.** The officers of the Corporation, except those appointed under Section 5.3 of these Bylaws shall be chosen annually by the Board and each shall serve at the pleasure of the Board, subject to the rights, if any, of any officer under any contract of employment.

**5.3** **Other Officers.** The Board may appoint and may authorize the chairman of the Board, the president, or other officer to appoint any other officers that the business of the Corporation may require, each of whom shall have the title, hold office for the period, have the authority, and perform the duties determined by the Board.

**5.4** **Removal of Officers.** Without prejudice to any rights of an officer under any contract of employment, any officer may be removed, with or without cause, by the Board or by an officer on whom the Board may confer that power of removal.

**5.5** **Resignation of Officers.** Any officer may resign at any time by giving written notice to the Corporation. The resignation shall take effect as of the date the notice is received or at any later time specified in the notice and, unless otherwise specified in the notice, the resignation need not be accepted to be effective. Any resignation shall be without prejudice to the rights, if any, of the Corporation under any contract to which the officer is a party.

**5.6** **Vacancies in Offices.** A vacancy in any office because of death, resignation, removal, disqualification, or any other cause shall be filled in the manner

Case: 24-04053   Doc# 36   Filed: 05/23/25   Entered: 05/23/25 17:31:07   Page 31 of 170

prescribed in these Bylaws for regular appointments to that office, provided that such vacancies shall be filled as they occur and not on an annual basis.

5.7    Responsibilities of Officers.

(a)    Chairman of the Board.  If a chairman of the Board is elected, he or she shall preside at Board meetings and shall exercise and perform such other powers and duties as may be assigned by the Board or prescribed by the Bylaws.  If there is no president, the chairman of the Board shall also be the chief executive officer and shall have the powers and duties prescribed by these Bylaws for the president of the Corporation.

(b)    President.  Subject to such supervisory powers as the Board may give to the chairman of the Board, if any, the president shall, subject to the control of the Board, be the general manager of the Corporation and shall supervise, direct, and control the business, activities, affairs and the officers of the Corporation.  The president shall preside, in the absence of the chairman of the Board, or if there is none, at all Board meetings.  The president shall have such other powers and duties as the Board or the Bylaws may prescribe.

(c)    Vice Presidents.  In the absence or disability of the president, the vice presidents, if any, in order of their rank as fixed by the Board or, if not ranked, a vice president designated by the Board, shall perform all duties of the president.  When so acting, a vice president shall have all powers of and be subject to all restrictions on the president.  The vice presidents shall have such other powers and perform such other duties as the Board or the Bylaws may prescribe.

(d)    Secretary.

(i)    Book of Minutes.  The secretary shall keep or cause to be kept, at the Corporation's principal office or such other place as the Board may direct, a book of minutes of all meetings, proceedings, and actions of the Board, or committees of the Board.  The minutes of meetings shall include the time and place of holding, whether the meeting was general or special and, if special, how authorized, the notice given, the names of those present at Board and committee meetings.  The secretary shall keep or have kept at the principal office in California, a copy of the Articles of Incorporation and Bylaws, as amended to date.

(ii)    Membership Records.  The secretary shall keep or cause to be kept, at the Corporation's principal office or at a place determined by Board resolution,

4012967                                   9

a record of the Corporation's members, showing all members' names, addresses, and class of membership.

        **(iii)**   <u>Notices, Seal, and Other Duties</u>. The secretary shall give, or cause to be given, notice of all meetings of the Board, and of committees of the Board required by the Bylaws to be given. The secretary shall keep the corporate seal in safe custody, and shall have such other powers and perform such other duties as the Board or the Bylaws may prescribe.

      **(e)**   <u>Chief Financial Officer</u>.

        **(i)**   <u>Books of Account</u>. The chief financial officer shall keep and maintain, or cause to be kept and maintained, adequate and correct books and records of accounts of the Corporation's properties and business transactions, including accounts of its assets, liabilities, receipts, disbursements, gains, losses, capital, retained earnings, and other matters customarily included in financial statements. The books of account shall be open to inspection by any director at all reasonable times.

        **(ii)**   <u>Deposit and Disbursement of Money and Valuables</u>. The chief financial officer shall deposit, or cause to be deposited, all money and other valuables in the name and to the credit of the Corporation with such depositories as the Board may designate, shall disburse the Corporation's funds as the Board may order, shall render to the president and directors, when requested, an account of all transactions as chief financial officer and of the financial condition of the Corporation, and shall have such other powers and perform such other duties as the Board or the Bylaws may prescribe.

        **(iii)**   <u>Bond</u>. If required by the Board, the chief financial officer shall give the Corporation a bond in the amount and with the surety or sureties specified by the Board for faithful performance of the duties of his office and for restoration to the Corporation of all its books, papers, vouchers, money, and other property of every kind in his possession or under his control on his death, resignation, retirement, or removal from the office.

**6.**   **INDEMNIFICATION.**

    **6.1**   <u>Definitions</u>. For the purpose of this Section 6, "agent" means any person who is or was a director, officer, employee, or other agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee, or agent of another foreign or domestic corporation, partnership, joint venture, trust, or other

enterprise, or was a director, officer, employee, or agent of a foreign or domestic corporation which was a predecessor corporation of the Corporation or of another enterprise at the request of such predecessor corporation; "proceeding" means any threatened, pending or completed action or proceeding, whether civil, criminal, administrative, or investigative; and "expense" includes, without limitation, attorneys' fees and any expenses of establishing a right to indemnification under Sections 6.5 or 6.5(b) of these Bylaws.

6.2    **Indemnification in Actions by Third Parties.** The Corporation shall have power to indemnify any person who was or is a party or is threatened to be made a party to any proceeding (other than an action by or in the right of the Corporation to procure a judgment in its favor, an action brought under Section 9243 of the California Nonprofit Religious Corporation law, or an action brought by the Attorney General or a person granted relator status by the Attorney General for any breach of duty relating to assets held in charitable trust), by reason of the fact that such person is or was an agent of the Corporation, against expenses, judgments, fines, settlements, and other amounts actually and reasonably incurred in connection with such proceeding if such person acted in good faith and in a manner such person reasonably believed to be in the best interests of the Corporation and, in the case of a criminal proceeding, had no reasonable cause to believe the conduct of such person was unlawful. The termination of any proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the person did not act in good faith and in a manner which the person reasonably believed to be in the best interests of the Corporation or that the person had reasonable cause to believe that person's conduct was unlawful.

6.3    **Indemnification in Actions by or in the Right of the Corporation.** The Corporation shall have the power to indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending, or completed action by or in the right of the Corporation, or brought under Section 9243 of the California Nonprofit Religious Corporation Law, or brought by the Attorney General or a person granted relator status by the Attorney General for breach of duty relating to assets held in charitable trust, to procure a judgment in its favor by reason of the fact that such person is or was an agent of the Corporation, against expenses actually and reasonably incurred by such person in connection with the defense or settlement of such action if such person acted in good faith, in a manner such person believed to be in the best interests of the Corporation, and with such care, including reasonably inquiry, as an ordinarily prudent person in a like position would use under similar circumstances. No indemnification shall be made under this Section 6.3:

4012967

11

      (a)    in respect of any claim, issue, or matter as to which such person shall have been adjudged to be liable to the Corporation in the performance of such person's duty to the Corporation, unless and only to the extent that the court in which such proceeding is or was pending shall determine upon application that, in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for the expenses which such court shall determine;

      (b)    of amounts paid in settling or otherwise disposing of a threatened or pending action, with or without court approval; or

      (c)    of expense incurred in defending a threatened or pending action which is settled or otherwise disposed of without court approval, unless it is settled with the approval of the Attorney General.

    6.4    **Indemnification Against Expenses.**  To the extent that an agent of the Corporation has been successful on the merits in defense of any proceeding referred to in Sections 6.2 or 6.3 of these Bylaws or in defense of any claim, issue, or matter therein, the agent shall be indemnified against expenses actually and reasonably incurred by the agent in connection therewith.

    6.5    **Required Determinations.**  Except as provided in Section 6.4 of these Bylaws any indemnification under this Section 6 shall be made by the Corporation only if authorized in the specific case, upon a determination that indemnification of the agent is proper in the circumstances because the agent has met the applicable standard of conduct set forth in Sections 6.2 or 6.3 of these Bylaws, by:

      (a)    a majority vote of a quorum consisting of directors who are not parties to such proceeding;

      (b)    the court in which such proceeding is or was pending upon application made by the Corporation or the agent or the attorney or other person rendering services in connection with the defense, whether or not such application by the agent, attorney, or other person is opposed by the Corporation.

    6.6    **Advance of Expenses.**  Expenses incurred in defending any proceeding may be advanced by the Corporation prior to the final disposition of such proceeding upon receipt of an undertaking by or on behalf of the agent to repay such amount unless it shall be determined ultimately that the agent is entitled to be indemnified as authorized in this Section 6.

Case: 24-04053   Doc# 36   Filed: 05/23/25   Entered: 05/23/25 17:31:07   Page 35 of 170

**6.7    Other Indemnification.** No provision made by the Corporation to indemnify its or its subsidiary's directors or officers for the defense of any proceeding, whether contained in the Articles, Bylaws, a resolution of members or directors, an agreement, or otherwise, shall be valid unless consistent with this Section 6. Nothing contained in this Section 6 shall affect any right to indemnification to which persons other than such directors and officers may be entitled by contract or otherwise.

**6.8    Forms of Indemnification Not Permitted.** No indemnification or advance shall be made under this Section 6, except as provided in Sections 6.4 or 6.5(b), in any circumstances where it appears:

(a)    that it would be inconsistent with a provision of the Articles, these Bylaws, or an agreement in effect at the time of the accrual of the alleged cause of action asserted in the proceeding in which the expenses were incurred or other amounts were paid, which prohibits or otherwise limits indemnification; or

(b)    that it would be inconsistent with any condition expressly imposed by a court in approving a settlement.

**6.9    Insurance.** The Corporation shall have power to purchase and maintain insurance on behalf of any agent of the Corporation against any liability asserted against or incurred by the agent in such capacity or arising out of the agent's status as such whether or not the Corporation would have the power to indemnify the agent against such liability under the provisions of this Section 6, provided, however, that a Corporation shall have no power to purchase and maintain such insurance to indemnify any agent of the Corporation for a violation of Section 9243 of the California Nonprofit Religious Corporation Law.

**6.10    Nonapplicability to Fiduciaries of Employee Benefit Plans.** This Section 6 does not apply to any proceeding against any trustee, investment manager, or other fiduciary of an employee benefit plan in such person's capacity as such, even though such person may also be an agent of the Corporation as defined in Section 6.1 of these Bylaws. The Corporation shall have power to indemnify such trustee, investment manager, or other fiduciary to the extent permitted by Section 207(f) of the California General Corporation Law.

## 7.    RECORDS AND REPORTS.

**7.1    Maintenance of Corporate Records.** The Corporation shall keep:

4012987

13

1.      Adequate and correct books and records of account; and

2.      Written minutes of the proceedings of its Board, and committees of the Board.

**7.2   Inspection by Directors.** Every director shall have the absolute right at any reasonable time to inspect and copy all books, records, and documents of every kind and to inspect the physical properties of the Corporation for a purpose reasonably related to the director's interests as a director.

**7.3   Annual Report.** The Board shall cause an annual report to be sent to all directors within 120 days after the end of the Corporation's fiscal year. That report shall contain the following information, in appropriate detail, for the fiscal year:

1. the assets and liabilities, including the trust funds, of the Corporation as of the end of the fiscal year

2. the principal changes in assets and liabilities, including trust funds

3. the revenue or receipts of the Corporation, both unrestricted and restricted to particular purposes

4. the expenses or disbursements of the Corporation for both general and restricted purposes

5. the information required by Section 7.4 of these Bylaws.

The annual report shall be accompanied by any report on it of independent accountants or, if there is no such report, by the certificate of an authorized officer of the Corporation that such statements were prepared without audit from the Corporation's books and records.

This requirement of an annual report shall not apply if the Corporation receives less than $25,000 in gross receipts during the fiscal year, provided, however, that the information specified above for inclusion in the annual report must be furnished annually to all directors who requests it in writing.

**7.4   Annual Statements of Certain Transactions and Indemnifications.** As part of the annual report, or as a separate document if no annual report is issued, the Corporation shall annually furnish to each director a statement of any transaction or

Case: 24-04053   Doc# 36   Filed: 05/23/25   Entered: 05/23/25 17:31:07   Page 37 of 170

indemnification of the following kind within 120 days after the end of the Corporation's fiscal year:

(a) Any transaction (i) in which the Corporation, its parent, or its subsidiary was a party, (ii) in which an "interested person" had a direct or indirect material financial interest, and (iii) which involved more than $50,000, or was one of a number of transactions with the same interested person invoking, in the aggregate, more than $50,000. for this purpose, an "interested person" is either of the following:

1. any director or officer of the Corporation, its parent, or subsidiary (but mere common directorship shall not be considered such an interest);

2. any holder of more than ten percent of the voting power of the Corporation, its parent, or its subsidiary. The statement shall include a brief description of the transaction, the names of interested persons involved, their relationship to the Corporation, the nature of their interest in the transaction and, if practicable, the amount of that interest, provided that if the transaction was with a partnership in which the interested person is a partner, only the interest of the partnership need be stated.

(b). Any indemnifications or advances aggregating more than $10,000 paid during the fiscal year to any officer or director of the Corporation under Sections 6 of these Bylaws, unless that indemnification has already been approved by the members under Section 9246(e)(2) of the California Corporations Code.

8. **ENDORSEMENT OF DOCUMENTS; CONTRACTS.**

Subject to the provisions of applicable law, any note, mortgage, evidence of indebtedness, contract, deed, conveyance, or other instrument in writing and any assignment or endorsement thereof executed or entered into between the Corporation and any other person, when signed by the chairman of the Board, the president, or any vice president and the secretary, any assistant secretary, the treasurer, or any assistant treasurer of the Corporation shall be valid and binding on the Corporation in the absence of actual knowledge on the part of the other person that the signing officers had no authority to execute the same. Any such instruments may be signed by any other person or persons and in such manner as from time to time shall be determined by the Board, and, unless so authorized by the Board, no officer, agent, or employee shall have any power or authority to bind the Corporation by any contract or engagement or to pledge its credit or to render it liable for any purpose.

4012967

15

9. **CONSTRUCTION AND DEFINITIONS.**

Unless the context requires otherwise, the general provisions, rules of construction, and definitions in the California Nonprofit Corporation Law and in the California Nonprofit Religious Law shall govern the construction of these Bylaws. Without limiting the generality of the preceding sentence, the masculine gender includes the feminine and neuter, the singular number includes the plural, the plural number includes the singular and the term "person" includes both a legal entity and a natural person.

10. **AMENDMENTS: APPROVALS.**

New Bylaws and Articles of Incorporation may be adopted, or these Bylaws and the Articles of Incorporation may be amended or repealed, only by approval of the Board and Corporation Sole. No merger, reorganization, liquidation, or dissolution of the Corporation or sale or other disposition of all or substantially all of the assets of this Corporation shall occur without the approval of the Board and Corporation Sole.

Case: 24-04053   Doc# 36   Filed: 05/23/25   Entered: 05/23/25 17:31:07   Page 39 of 170

## OFFICER'S CERTIFICATION OF BYLAWS

I hereby certify that I am the duly elected and acting Secretary of The Roman Catholic Cemeteries of the Diocese of Oakland, a California Nonprofit Religious Corporation, and that the foregoing Bylaws, consisting of fifteen pages, constitute the Bylaws of said corporation as duly approved by resolutions of the Incorporator and of the Board effective as of November 15, 1995.

IN WITNESS WHEREOF, I have hereunto subscribed my name this 20th day of November, 1995.


_S. Barbara Flannery_
Sister Barbara Flannery
Secretary

Case: 24-04053   Doc# 36   Filed: 05/23/25   Entered: 05/23/25 17:31:07   Page 40 of 170

# CONSENT TO ACTION
## BY THE BOARD OF DIRECTORS WITHOUT A MEETING
## IN LIEU OF AN ORGANIZATIONAL MEETING

### The Roman Catholic Cemeteries of the Diocese of Oakland
### a California Nonprofit Religious Corporation

Pursuant to Section 9211(b) of the California Nonprofit Corporation Law and effective this date, the undersigned, being all the members of the Board of Directors of The Roman Catholic Cemeteries of the Diocese of Oakland, a California Nonprofit Religious Corporation, hereby give their unanimous written consent to their election as Directors, accept the resignation of the Incorporator, adopt the following resolutions, and consent to the following actions without a meeting, but with the same force and effect as if adopted and consented to at a meeting duly held:

### Approval of Acts of Incorporator

RESOLVED: That all actions taken by the Incorporator on behalf of this corporation are hereby ratified, confirmed and approved in all respects.

### Articles of Incorporation

RESOLVED: That a certified copy of the Articles of Incorporation of this corporation as filed in the Office of the California Secretary of State on October 11, 1995 be inserted in the Minute Book of this corporation.

## Approval of Bylaws

RESOLVED: That the Bylaws adopted by the Incorporator of this corporation are approved and adopted as the Bylaws of this corporation; and

RESOLVED FURTHER: That the Secretary of this corporation is authorized and directed to execute a certificate of the adoption of these Bylaws, to insert a copy of the Bylaws as certified in the minute book of this corporation, and to cause a copy of those Bylaws, as they may be amended from time to time, to be kept and maintained in the principal executive office of this corporation, in accordance with Section 9160 of the California Nonprofit Religious Corporation Law.

## Adoption of Corporate Seal

RESOLVED: That the Secretary is authorized to obtain a seal for this corporation, circular in form, having within its circumference the words:

**THE ROMAN CATHOLIC CEMETERIES OF THE
DIOCESE OF OAKLAND
INCORPORATED - OCTOBER 11, 1995
CALIFORNIA**

and is instructed, after obtaining the seal, to cause to be made on this document an impression of the seal for further reference.

## Agent for Service of Process

RESOLVED: That John M. Kemp, Esq., of Crosby, Heafey, Roach & May Professional Corporation, is confirmed as this

2

corporation's agent for the purpose of service of process in California; and

RESOLVED FURTHER: That the Secretary shall keep the California Secretary of State's office properly informed as to any changes in the corporation's agent for service of process.

## Principal Executive Office

RESOLVED: That the principal executive office for the transaction of business of this corporation shall be located in California at 2900 Lakeshore Avenue, Oakland, CA 94610.

## Election of Officers

RESOLVED: That the following named persons are elected to the office indicated before their respective names to hold office until the first annual meeting of the Board of Directors and until their respective successors shall be duly elected and qualified:

| | |
|---|---|
| Chairman of the Board/President | Most Reverend John S. Cummins |
| Vice President | Reverend Albano Oliveira |
| Secretary | Sister Barbara Flannery |
| Chief Financial Officer | Reverend David E. Staal |

## Bank Accounts

RESOLVED: That the President and Secretary, acting jointly on behalf of the corporation, are authorized to designate as depositaries of this corporation's funds one or more banks, trust companies, or other financial institutions, and to

3

COPY

establish, keep, and close general and special accounts in such
depositaries;

RESOLVED FURTHER:  That the President and Secretary of
this corporation, acting jointly on behalf of the corporation,
are authorized from time to time to designate or change the
designation of the officer or officers and agent or agents of
this corporation who will be authorized to sign or countersign,
checks drafts or other orders for the payment of money issued
in the name of this corporation against any funds deposited in
those accounts, and to revoke any such designation;

RESOLVED FURTHER:  That any officer of the corporation
is authorized to endorse checks, drafts, and other evidences of
indebtedness made payable to the corporation, but only for
the purpose of deposit; and

RESOLVED FURTHER:  That the standard form of
corporate resolution for establishing any corporate account
required by any bank, trust company or other financial
institution designated as depositaries of this corporation is
adopted as the resolution of the Board of Directors, and the
Secretary is directed to obtain the necessary signature,
execute the necessary certifications, and take such steps as
needed to open the account.  The Secretary is further directed
to insert a copy of any such executed form in the minute
book.

Accounting Period

RESOLVED:  That the fiscal year of this corporation shall
end on the last day of December of each year.

Expenses of Incorporation

RESOLVED:  That the Chief Financial Officer of this
corporation is authorized and directed to pay the expenses of
incorporation and organization of this corporation.

4

## Appointment of Accountant

RESOLVED: That this corporation appoints Grant Thornton Certified Public Accountants, San Francisco, California to serve at the pleasure of the Board of Directors of this corporation to assist the corporation in establishing its books of account, to audit its financial statements and otherwise to advise this corporation in connection with accounting matters.

## Exemptions from Federal and State Taxes

RESOLVED: That the Chief Financial Officer consult with legal counsel to ascertain the availability of exemptions from taxation under the federal and state tax laws and, if such exemptions are available, the appropriate officer of this Corporation is authorized and directed to execute and file with the United States Catholic Conference and California FranchiseTax Board all necessary applications and documents for exemption from those taxes with the appropriate state and federal tax authorities, and to pay necessary filing fees.

## Statement by Domestic Nonprofit Corporation

RESOLVED: That any officer of this corporation is authorized and directed to execute and file with the office of the California Secretary of State, at the times required by law, the annual statement required by the California Corporations Code to be filed by domestic nonprofit corporations.

## Employer Identification Number

RESOLVED: That the officers of this corporation are authorized and directed to make such filings and applications as are necessary to secure for the corporation a federal employer identification number.

5

## Officers Authorized to Contract

**RESOLVED:** That any officer of the corporation, acting alone, is authorized to sign contracts and obligations of this corporation in the ordinary course of business; provided that no contract or obligation involving the transfer of any substantial right in any major asset of this corporation shall be so signed and no substantial indebtedness shall be incurred without prior approval of the Board of Directors or the signature of the President or Vice-President and Secretary or Chief Financial Officer of this Corporation.

## Licenses

**RESOLVED:** That the officers of the corporation are directed to obtain licenses and/or permits in the name of the corporation as may be required by any federal, state, county or municipal government ordinance or regulation and to do all thingsnecessary to comply with the laws and regulations of any federal, state, county or municipal government authority.

Dated: November 15, 1995

Most Reverend John S. Cummins
Director

Reverend Albano Oliveira
Director

6

_S. Barbara Flannery_

Sister Barbara Flannery
Director

Reverend David E. Staal
Director

7

# EXHIBIT 5

# BYLAWS
## OF
## ADVENTUS
### A California Nonprofit Public Benefit Corporation

## 1. NAME AND OFFICES OF THE CORPORATION

**1.1** **Name.** The name of this corporation is ADVENTUS ("Corporation").

**1.2** **Location of Principal Office.** The principal office for the transaction of the activities and affairs of the Corporation is located in Alameda, County, California. The Board of Directors ("Board") may change the principal office from one location to another. Any such change shall be noted on these Bylaws opposite this Section, or this Section may be amended to state the new location.

**1.3** **Location of Other Offices.** The Board may at any time establish branch or subordinate offices at any place or places where the Corporation is qualified to conduct its activities.

## 2. PURPOSES

The purposes of this corporation are charitable. This corporation shall perform certain functions of The Roman Catholic Diocese of Oakland, and its affiliated entities, relating to real estate and such other functions as may be agreed upon from time to time.

## 3. MEMBERSHIP

**3.1** **Members.** The Corporation shall have no members. Any action which would otherwise require approval by a majority of all members or approval by the members shall require only approval of the Board. All rights which would otherwise vest in the members shall vest in the directors.

**3.2** **Associates.** Nothing in this Section 3 shall be construed as limiting the right of the Corporation to refer to persons associated with it as "members" even though such persons are not members, and no such reference shall constitute anyone a member, within the meaning of Section 5056 of the California Nonprofit Corporation Law. The Corporation may confer by amendment of its Articles or of these Bylaws some or all of the rights of a member, as set forth in the California Nonprofit Corporation law, upon any person or persons who do not have the right to vote for election of directors or on a disposition of substantially all of the assets of the Corporation or on a merger or on a dissolution or on changes to the Corporation's Articles or Bylaws, but no such person shall be a member within the meaning of said Section 5056.

## 4. BOARD OF DIRECTORS

**4.1** **Powers of Directors.**

(a) **General Corporate Powers.** Subject to the provisions and limitations of the California Nonprofit Public Benefit Corporation Law and any other applicable laws, and subject to any limitations in the Articles of Incorporation or Bylaws relating to action requiring approval by the members, the activities, business, and affairs of the Corporation

shall be managed, and all corporate powers shall be exercised, by or under the direction of the Board.

      (b)   **Specific Powers.**  Without prejudice to the general powers set forth in Section 4.1(a) of these Bylaws, but subject to the same limitations, the Board shall have the following powers in addition to other powers enumerated in these Bylaws:

      (i)   to select and remove at the pleasure of the Board, all officers, agents, and employees; to prescribe powers and duties for them as may be consistent with law, the Articles of Incorporation, and these Bylaws; to fix their compensation; and to require from them security for faithful service.

      (ii)   to conduct, manage, and control the affairs and activities of the Corporation and make such rules and regulations for this purpose, consistent with law, the Articles of Incorporation, and these Bylaws, as they may deem best.

      (iii)   to adopt and use a corporate seal, and alter the form of seal.

      (iv)   to borrow money and incur indebtedness on behalf of the Corporation, and cause to be executed and delivered for the Corporation's purposes, in the corporate name, promissory notes, bonds, debentures, deeds of trust, mortgages, pledges, hypothecations, and other evidences of debt and securities.

      (c)   **Delegation of Management.**  The Board may delegate the management of the activities of the Corporation to any person or persons, a management company, or committees however composed, provided that the activities and affairs of the Corporation shall be managed and all corporate power shall be exercised under the ultimate direction of the Board.

**4.2**   **Number and Qualification of Directors.**

      (a)   **Authorized Number and Qualifications.**  The authorized number of directors shall be four.

      (b)   **Restriction on Interested Persons as Directors.**  No more than forty-nine percent of the persons serving on the Board may be interested persons.  An interested person is (i) any person compensated by the Corporation for services rendered to it within the previous twelve months, whether as a full-time or part-time employee, independent contractor, or otherwise, excluding any reasonable compensation paid to a director as director; and (ii) any brother, sister, ancestor, descendent, spouse, brother-in-law, sister-in-law, son-in-law, daughter-in-law, mother-in-law or father-in-law of such person.  However, any violation of the provisions of this Section 4.2(b) shall not affect the validity or enforceability of any transaction entered into by the Corporation.

**4.3**   **Election, Designation, and Term of Office.**  All directors shall be appointed by The Roman Catholic Bishop of Oakland, a corporation sole ("Corporation Sole").  Each such director shall hold office for one year and until a successor has been designated and qualified.

2

### 4.4 Vacancies on Board.

(a) **Events Causing Vacancy.** A vacancy or vacancies on the Board shall exist on the occurrence of the following: (i) the death or resignation of any director; (ii) the declaration by Board resolution of a vacancy of the office of a director who has been declared of unsound mind by an order of court or convicted of a felony or found by final order or judgement of any court to have breached a duty under Article 3 of Chapter 2 of the California Nonprofit Public Benefit Corporation Law; (iii) the increase of the authorized number of directors; or (iv) removal of a director pursuant to Section 4.4(e) below.

(b) **Resignations.** Except as provided below, any director may resign by giving written notice to the chairman of the Board, if any, or to the president or the secretary. The resignation shall be effective when the notice is given unless it specifies a later time for the resignation to become effective. If a director's resignation is effective at a later time, Corporation Sole may elect a successor to take office as of the date when the resignation becomes effective. No director may resign if the Corporation would then be left without a duly elected director or directors.

(c) **Filling Vacancies.** Vacancies on the Board shall be filled only by Corporation Sole.

(d) **No Vacancy on Reduction of Number of Directors.** No reduction of the authorized number of directors shall have the effect of removing any director before that director's term of office expires.

(e) **Removal.** A director may be removed as a director at any time for any reason or for no reason at all by Corporation Sole.

### 4.5 Directors' Meetings.

(a) **Place of Meetings.** Regular or special meetings of the Board may be held at any place within or outside California that the Board may designate or, if not so designated, meetings shall be held at the Corporation's principal office. Notwithstanding the above provisions of this Section, a regular or special meeting of the Board may be held at any place consented to in writing by all Board members, either before or after the meeting. If such consents are given, they shall be filed with the minutes of the meeting.

(b) **Meetings by Telephone.** Any meeting may be held by conference telephone or similar communication equipment, as long as all directors participating in the meeting can hear one another. All such directors shall be deemed to be present in person at such a meeting.

(c) **Annual Meeting.** The Board shall hold an annual meeting for the purpose of organization, selection of officers, and the transaction of other business. Annual meetings of the Board shall be held without call or notice on the first Tuesday of April at 10 o'clock a.m. local time; provided, however, should said day fall on a holiday observed by the Corporation at its principal office, then the meeting shall be held at the same time on the next day thereafter ensuing which is a full business day.

3

(d)     **Other Regular Meetings**.  Other regular meetings of the Board may be held without call or notice at such time and place as the Board shall fix from time to time.

(e)     **Special Meetings**.

(i) **Authority To Call**.  Special meetings of the Board for any purpose may be called at any time by the chairman of the Board, if any, the president or any vice president, or the secretary or any two directors.

(ii) **Notice**.

a.     **Manner of Giving Notice**.  Notice of the time and place of special meetings shall be given to each director by one of the following methods:  (1) by personal delivery of written notice; (2) by first-class mail, postage prepaid; (3) by telephone, either directly to the director or to a person at the director's office who would reasonably be expected to communicate that notice promptly to the director; or (4) by telegram, charges prepaid.  All such notices shall be given or sent to the director's address or telephone number as shown on the records of the Corporation.

b.     **Time Requirements**.  Notices of special meetings of the Board of Directors sent by first-class mail shall be deposited in the United States mails at least four days before the time set for the meeting.  Notices given by personal delivery, telephone, or telegraph shall be delivered, telephoned, or given to the telegraph company at least forty-eight hours before the time set for the meeting.

c.     **Notice Contents**.  The notice of a special meeting of the Board shall state the time of the meeting, and the place if the place is other than the principal office of the Corporation.  It need not specify the purpose of the meeting.

(f)     **Quorum**.  A majority of the authorized number of directors shall constitute a quorum for the transaction of business, except to adjourn.  Every action taken or decision made by a majority of the directors present at a duly held meeting at which a quorum is present shall be the act of the Board, subject to the more stringent provisions of the California Nonprofit Public Benefit Corporation Law, including, without limitation, those provisions relating to (i) approval of contracts or transactions in which a director has a direct or indirect material financial interest; (ii) approval of certain transactions between Corporations having common directorships, (iii) creation of and appointments to committees of the Board, and (iv) indemnification of directors.  A meeting at which a quorum is initially present may continue to transact business, despite the withdrawal of directors, if any action taken or decision made is approved by at least a majority of the required quorum for that meeting.

(g)     **Waiver of Notice**.  Notice of a meeting need not be given to any director who, either before or after the meeting, signs a waiver of notice, a written consent to the holding of the meeting, or an approval of the minutes of the meeting.  All such waivers, consents, and approvals shall be filed with the corporate records or made a part of the minutes of the meetings.  Notice of a meeting need not be given to any director who attends the meeting and does not protest, before or at the commencement of the meeting, the lack of notice to him or her.

4

(h) **Adjournment.** A majority of the directors present, whether or not a quorum is present, may adjourn any meeting to another time and place.

(i) **Notice of Adjourned Meeting.** Notice of the time and place of holding an adjourned meeting need not be given unless the original meeting is adjourned for more than twenty-four hours, notice of any adjournment to another time and place shall be given, before the time of the adjourned meeting, to the directors who were not present at the time of the adjournment.

**4.6** **Action Without a Meeting.** Any action that the Board is required or permitted to take may be taken without a meeting, if all members of the Board, individually or collectively, consent in writing to that action; provided, however, that the consent of any director who has a material financial interest in a transaction to which the Corporation is a party and who is an "interested director" as defined in Section 5233 of the California Corporations Code shall not be required for approval of that transaction. Such action by written consent shall have the same force and effect as any other validly approved action of the Board. Such consents shall be filed with the minutes of the proceedings of the Board.

**4.7** **Compensation and Reimbursement.** Directors and members of committees shall receive no compensation for their services as directors, but may receive just and reasonable reimbursement for expenses in attending meetings.

**4.8** **Committees.**

(a) **Committees of the Board.** The Board, by resolution adopted by a majority of the directors then in office, provided a quorum is present, may create one or more committees, each consisting of two or more directors and no persons who are not directors, to serve at the pleasure of the Board. Appointments to committees of the Board shall be by majority vote of the directors then in office. The Board may appoint one or more directors as alternate members of any such committee, who may replace any absent member at any meeting. Any such committee, to the extent provided in the Board resolution, shall have all authority of the Board, except that no committee, regardless of Board resolution, may:

(1) fill vacancies on any committee that has the authority of the Board;

(2) fix compensation of the directors for serving on the Board or on any committee;

(3) amend or repeal Bylaws or adopt new Bylaws;

(4) amend or repeal any Board resolution that by its express terms is not so amendable or repealable;

(5) create any other committees of the Board or appoint members of committees of the Board;

5

(6)      expend corporate funds to support a nominee for director after more people have been nominated for director than can be elected; or

(7)      approve any contract or transaction to which the Corporation is a party and in which one or more of its directors has a material financial interest, except as special approval is provided for in Section 5233(d)(3) of the California Corporations Code.

**(b)**    **Meetings and Action of Committees.**  Meetings and actions of committees of the Board shall be governed by, held, and taken in accordance with the provisions of these Bylaws concerning meetings and other Board actions, except that the time for regular meetings of such committees and the calling of special meetings of such committees may be determined either by Board resolution or, if there is none, by resolution of the committee of the Board.  Minutes of each meeting of any committee of the Board shall be kept and shall be filed with the corporate records.  The Board may adopt rules for the government of any committee that are consistent with these Bylaws or, in the absence of rules adopted by the Board, the committee may adopt such rules.

## 5.    OFFICERS.

**5.1**    **Officers Of the Corporation.**  The officers of the Corporation shall be a president, a secretary, and a chief financial officer.  The Corporation may also have, at the Board's discretion, a chairman of the Board, one or more vice presidents, one or more assistant secretaries, one or more assistant treasurers, and such other officers as may be appointed in accordance with Section 5.3 of these Bylaws.  Any number of offices may be held by the same person, except that neither the secretary nor the chief financial officer may serve concurrently as either the president or the chairman of the Board.

**5.2**    **Election of Officers.**  The officers of the Corporation, except those appointed under Section 5.3 of these Bylaws shall be chosen annually by the Board and each shall serve at the pleasure of the Board, subject to the rights, if any, of any officer under any contract of employment.

**5.3**    **Other Officers.**  The Board may appoint and may authorize the chairman of the Board, the president, or other officer to appoint any other officers that the business of the Corporation may require, each of whom shall have the title, hold office for the period, have the authority, and perform the duties determined by the Board.

**5.4**    **Removal of Officers.**  Without prejudice to any rights of an officer under any contract of employment, any officer may be removed, with or without cause, by the Board or by an officer on whom the Board may confer that power of removal.

**5.5**    **Resignation of Officers.**  Any officer may resign at any time by giving written notice to the Corporation.  The resignation shall take effect as of the date the notice is received or at any later time specified in the notice and, unless otherwise specified in the notice, the resignation need not be accepted to be effective.  Any resignation shall be without prejudice to the rights, if any, of the Corporation under any contract to which the officer is a party.

6

**5.6**    **Vacancies in Offices.**    A vacancy in any office because of death, resignation, removal, disqualification, or any other cause shall be filled in the manner prescribed in these Bylaws for regular appointments to that office, provided that such vacancies shall be filled as they occur and not on an annual basis.

**5.7**    **Responsibilities of Officers.**

(a)    **Chairman of the Board.**    If a chairman of the Board is elected, he or she shall preside at Board meetings and shall exercise and perform such other powers and duties as may be assigned by the Board or prescribed by the Bylaws.  If there is no president, the chairman of the Board shall also be the chief executive officer and shall have the powers and duties prescribed by these Bylaws for the president of the Corporation.

(b)    **President.**    Subject to such supervisory powers as the Board may give to the chairman of the Board, if any, the president shall, subject to the control of the Board, be the general manager of the Corporation and shall supervise, direct, and control the business, activities, affairs and the officers of the Corporation.  The president shall preside, in the absence of the chairman of the Board, or if there is none, at all Board meetings.  The president shall have such other powers and duties as the Board or the Bylaws may prescribe.

(c)    **Vice Presidents.**    In the absence or disability of the president, the vice presidents, if any, in order of their rank as fixed by the Board or, if not ranked, a vice president designated by the Board, shall perform all duties of the president.  When so acting, a vice president shall have all powers of and be subject to all restrictions on the president. The vice presidents shall have such other powers and perform such other duties as the Board or the Bylaws may prescribe.

(d)    **Secretary.**

(i)    **Book of Minutes.**    The secretary shall keep or cause to be kept, at the Corporation's principal office or such other place as the Board may direct, a book of minutes of all meetings, proceedings, and actions of the Board, or committees of the Board. The minutes of meetings shall include the time and place of holding, whether the meeting was general or special and, if special, how authorized, the notice given, the names of those present at Board and committee meetings.  The secretary shall keep or have kept at the principal office in California, a copy of the Articles of Incorporation and Bylaws, as amended to date.

(ii)    **Membership Records.**    The secretary shall keep or cause to be kept, at the Corporation's principal office or at a place determined by Board resolution, a record of the Corporation's members, showing all members' names, addresses, and class of membership.

(iii)    **Notices, Seal, and Other Duties**.    The secretary shall give, or cause to be given, notice of all meetings of the Board, and of committees of the Board required by the Bylaws to be given.  The secretary shall keep the corporate seal in safe custody, and shall have such other powers and perform such other duties as the Board or the Bylaws may prescribe.

(e)    **Chief Financial Officer.**

7

(i) **Books of Account.** The chief financial officer shall keep and maintain, or cause to be kept and maintained, adequate and correct books and records of accounts of the Corporation's properties and business transactions, including accounts of its assets, liabilities, receipts, disbursements, gains, losses, capital, retained earnings, and other matters customarily included in financial statements. The books of account shall be open to inspection by any director at all reasonable times.

(ii) **Deposit and Disbursement of Money and Valuables.** The chief financial officer shall deposit, or cause to be deposited, all money and other valuables in the name and to the credit of the Corporation with such depositories as the Board may designate, shall disburse the Corporation's funds as the Board may order, shall render to the president and directors, when requested, an account of all transactions as chief financial officer and of the financial condition of the Corporation, and shall have such other powers and perform such other duties as the Board or the Bylaws may prescribe.

(iii) **Bond.** If required by the Board, the chief financial officer shall give the Corporation a bond in the amount and with the surety or sureties specified by the Board for faithful performance of the duties of his office and for restoration to the Corporation of all its books, papers, vouchers, money, and other property of every kind in his possession or under his control on his death, resignation, retirement, or removal from the office.

## 6. INDEMNIFICATION.

**6.1 Definitions.** For the purpose of this Section 6, "agent" means any person who is or was a director, officer, employee, or other agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee, or agent of another foreign or domestic corporation, partnership, joint venture, trust, or other enterprise, or was a director, officer, employee, or agent of a foreign or domestic corporation which was a predecessor corporation of the Corporation or of another enterprise at the request of such predecessor corporation; "proceeding" means any threatened, pending or completed action or proceeding, whether civil, criminal, administrative, or investigative; and "expense" includes, without limitation, attorneys' fees and any expenses of establishing a right to indemnification under Sections 6.5 or 6.5(b) of these Bylaws.

**6.2 Indemnification in Actions by Third Parties.** The Corporation shall have power to indemnify any person who was or is a party or is threatened to be made a party to any proceeding (other than an action by or in the right of the Corporation to procure a judgment in its favor, an action brought under Section 5233 of the California Nonprofit Public Benefit Corporation law, or an action brought by the Attorney General or a person granted relator status by the Attorney General for any breach of duty relating to assets held in charitable trust), by reason of the fact that such person is or was an agent of the Corporation, against expenses, judgments, fines, settlements, and other amounts actually and reasonably incurred in connection with such proceeding if such person acted in good faith and in a manner such person reasonably believed to be in the best interests of the Corporation and, in the case of a criminal proceeding, had no reasonable cause to believe the conduct of such person was unlawful. The termination of any proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the person did not act in good faith and in a manner which

8

the person reasonably believed to be in the best interests of the Corporation or that the person had reasonable cause to believe that person's conduct was unlawful.

**6.3** <u>Indemnification in Actions by or in the Right of the Corporation.</u>  The Corporation shall have the power to indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending, or completed action by or in the right of the Corporation, or brought under Section 5233 of the California Nonprofit Public Benefit Corporation Law, or brought by the Attorney General or a person granted relator status by the Attorney General for breach of duty relating to assets held in charitable trust, to procure a judgment in its favor by reason of the fact that such person is or was an agent of the Corporation, against expenses actually and reasonably incurred by such person in connection with the defense or settlement of such action if such person acted in good faith, in a manner such person believed to be in the best interests of the Corporation, and with such care, including reasonably inquiry, as an ordinarily prudent person in a like position would use under similar circumstances.  No indemnification shall be made under this Section 6.3:

(a)     in respect of any claim, issue, or matter as to which such person shall have been adjudged to be liable to the Corporation in the performance of such person's duty to the Corporation, unless and only to the extent that the court in which such proceeding is or was pending shall determine upon application that, in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for the expenses which such court shall determine;

(b)     of amounts paid in settling or otherwise disposing of a threatened or pending action, with or without court approval; or

(c)     of expense incurred in defending a threatened or pending action which is settled or otherwise disposed of without court approval, unless it is settled with the approval of the Attorney General.

**6.4** <u>Indemnification Against Expenses.</u>  To the extent that an agent of the Corporation has been successful on the merits in defense of any proceeding referred to in Sections 6.2 or 6.3 of these Bylaws or in defense of any claim, issue, or matter therein, the agent shall be indemnified against expenses actually and reasonably incurred by the agent in connection therewith.

**6.5** <u>Required Determinations.</u>  Except as provided in Section 6.4 of these Bylaws any indemnification under this Section 6 shall be made by the Corporation only if authorized in the specific case, upon a determination that indemnification of the agent is proper in the circumstances because the agent has met the applicable standard of conduct set forth in Sections 6.2 or 6.3 of these Bylaws, by:

(a)     a majority vote of a quorum consisting of directors who are not parties to such proceeding;

(b)     the court in which such proceeding is or was pending upon application made by the Corporation or the agent or the attorney or other person rendering services in connection with the defense, whether or not such application by the agent, attorney, or other person is opposed by the Corporation.

9

**6.6    Advance of Expenses.**  Expenses incurred in defending any proceeding may be advanced by the Corporation prior to the final disposition of such proceeding upon receipt of an undertaking by or on behalf of the agent to repay such amount unless it shall be determined ultimately that the agent is entitled to be indemnified as authorized in this Section 6.

**6.7    Other Indemnification.**  No provision made by the Corporation to indemnify its or its subsidiary's directors or officers for the defense of any proceeding, whether contained in the Articles, Bylaws, a resolution of members or directors, an agreement, or otherwise, shall be valid unless consistent with this Section 6.  Nothing contained in this Section 6 shall affect any right to indemnification to which persons other than such directors and officers may be entitled by contract or otherwise.

**6.8    Forms of Indemnification Not Permitted.**  No indemnification or advance shall be made under this Section 6, except as provided in Sections 6.4 or 6.5(b), in any circumstances where it appears:

(a)    that it would be inconsistent with a provision of the Articles, these Bylaws, or an agreement in effect at the time of the accrual of the alleged cause of action asserted in the proceeding in which the expenses were incurred or other amounts were paid, which prohibits or otherwise limits indemnification; or

(b)    that it would be inconsistent with any condition expressly imposed by a court in approving a settlement.

**6.9    Insurance.**  The Corporation shall have power to purchase and maintain insurance on behalf of any agent of the Corporation against any liability asserted against or incurred by the agent in such capacity or arising out of the agent's status as such whether or not the Corporation would have the power to indemnify the agent against such liability under the provisions of this Section 6, provided, however, that a Corporation shall have no power to purchase and maintain such insurance to indemnify any agent of the Corporation for a violation of Section 5233 of the California Nonprofit Public Benefit Corporation Law.

**6.10    Nonapplicability to Fiduciaries of Employee Benefit Plans.**  This Section 6 does not apply to any proceeding against any trustee, investment manager, or other fiduciary of an employee benefit plan in such person's capacity as such, even though such person may also be an agent of the Corporation as defined in Section 6.1 of these Bylaws.  The Corporation shall have power to indemnify such trustee, investment manager, or other fiduciary to the extent permitted by Section 207(f) of the California General Corporation Law.

## 7.    RECORDS AND REPORTS.

**7.1    Maintenance of Corporate Records.**  The Corporation shall keep:

1.    Adequate and correct books and records of account; and

2.    Written minutes of the proceedings of its Board, and committees of the Board.

10

**7.2** **Inspection by Directors.** Every director shall have the absolute right at any reasonable time to inspect and copy all books, records, and documents of every kind and to inspect the physical properties of the Corporation for a purpose reasonably related to the director's interests as a director.

**7.3** **Annual Report.** The Board shall cause an annual report to be sent to all directors within 120 days after the end of the Corporation's fiscal year. That report shall contain the following information, in appropriate detail, for the fiscal year:

>     1. the assets and liabilities, including the trust funds, of the Corporation as of the end of the fiscal year
>
>     2. the principal changes in assets and liabilities, including trust funds
>
>     3. the revenue or receipts of the Corporation, both unrestricted and restricted to particular purposes
>
>     4. the expenses or disbursements of the Corporation for both general and restricted purposes
>
>     5. the information required by Section 7.4 of these Bylaws.

The annual report shall be accompanied by any report on it of independent accountants or, if there is no such report, by the certificate of an authorized officer of the Corporation that such statements were prepared without audit from the Corporation's books and records.

This requirement of an annual report shall not apply if the Corporation receives less than $25,000 in gross receipts during the fiscal year, provided, however, that the information specified above for inclusion in the annual report must be furnished annually to all directors who requests it in writing.

**7.4** **Annual Statements of Certain Transactions and Indemnifications.** As part of the annual report, or as a separate document if no annual report is issued, the Corporation shall annually furnish to each director a statement of any transaction or indemnification of the following kind within 120 days after the end of the Corporation's fiscal year:

>     (a) Any transaction (i) in which the Corporation, its parent, or its subsidiary was a party, (ii) in which an "interested person" had a direct or indirect material financial interest, and (iii) which involved more than $50,000, or was one of a number of transactions with the same interested person invoking, in the aggregate, more than $50,000. for this purpose, an "interested person" is either of the following:

>>     1. any director or officer of the Corporation, its parent, or subsidiary (but mere common directorship shall not be considered such an interest);
>>
>>     2. any holder of more than ten percent of the voting power of the Corporation, its parent, or its subsidiary. The statement shall include a brief description of the transaction, the names of interested persons

11

involved, their relationship to the Corporation, the nature of their interest in the transaction and, if practicable, the amount of that interest, provided that if the transaction was with a partnership in which the interested person is a partner, only the interest of the partnership need be stated.

(b)     Any indemnifications or advances aggregating more than $10,000 paid during the fiscal year to any officer or director of the Corporation under Sections 6 of these Bylaws, unless that indemnification has already been approved by the members under Section 5238(e)(2) of the California Corporations Code.

## 8.     ENDORSEMENT OF DOCUMENTS; CONTRACTS.

Subject to the provisions of applicable law, any note, mortgage, evidence of indebtedness, contract, deed, conveyance, or other instrument in writing and any assignment or endorsement thereof executed or entered into between the Corporation and any other person, when signed by the chairman of the Board, the president, or any vice president and the secretary, any assistant secretary, the treasurer, or any assistant treasurer of the Corporation shall be valid and binding on the Corporation in the absence of actual knowledge on the part of the other person that the signing officers had no authority to execute the same. Any such instruments may be signed by any other person or persons and in such manner as from time to time shall be determined by the Board, and, unless so authorized by the Board, no officer, agent, or employee shall have any power or authority to bind the Corporation by any contract or engagement or to pledge its credit or to render it liable for any purpose.

## 9.     CONSTRUCTION AND DEFINITIONS.

Unless the context requires otherwise, the general provisions, rules of construction, and definitions in the California Nonprofit Corporation Law and in the California Nonprofit Public Benefit Law shall govern the construction of these Bylaws. Without limiting the generality of the preceding sentence, the masculine gender includes the feminine and neuter, the singular number includes the plural, the plural number includes the singular and the term "person" includes both a legal entity and a natural person.

## 10.     AMENDMENTS; APPROVALS.

New Bylaws and Articles of Incorporation may be adopted, or these Bylaws and the Articles of Incorporation may be amended or repealed, only by approval of the Board and Corporation Sole. No merger, reorganization, liquidation, or dissolution of the Corporation or sale or other disposition of all or substantially all of the assets of this Corporation shall occur without the approval of the Board and Corporation Sole.

12

## OFFICERS'S CERTIFICATION OF BYLAWS

      I hereby certify that I am the duly elected and acting Secretary of ADVENTUS, a California Nonprofit Public Benefit Corporation, and that the foregoing Bylaws, consisting of twelve pages, constitute the Bylaws of said corporation as duly approved by resolution of the Incorporator effective as of April _15_, 1995.

      IN WITNESS WHEREOF, I have hereunto subscribed my name and affixed the seal of said corporation this _15th_ day of April, 1995.

 

 

*Barbara Flannery*
Sister Barbara Flannery
Secretary

[Seal]

13

# EXHIBIT 6

# CREDIT AND SECURITY AGREEMENT

dated as of February 1, 2017

among

**THE ROMAN CATHOLIC BISHOP OF OAKLAND,** as Borrower

and

**THE ROMAN CATHOLIC WELFARE CORPORATION OF OAKLAND,
THE ROMAN CATHOLIC CEMETERIES OF THE DIOCESE OF OAKLAND,** and
**ADVENTUS,** jointly and severally as Guarantors

and

**COMPASS BANK,** as Lender

SMRH:480003929.12

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS AND ACCOUNTING TERMS ...................................................1

    1.01.    Defined Terms ...........................................................................................1

    1.02.    UCC Definitions ......................................................................................24

    1.03.    Other Interpretive Provisions ..................................................................25

    1.04.    Accounting Terms ...................................................................................25

    1.05.    Financial Statements ...............................................................................26

    1.06.    Calculating Financial Covenants ............................................................26

    1.07.    Rounding.................................................................................................26

    1.08.    References to Agreements and Laws ........................................................26

    1.09.    Times of Day ...........................................................................................26

ARTICLE II THE COMMITMENT AND LOANS .......................................................27

    2.01.    Delayed Draw Term Facility ..................................................................27

    2.02.    Borrowings, Conversions and Continuations of Loans. ..........................27

    2.03.    Prepayments............................................................................................27

    2.04.    Termination or Reduction of Commitment ............................................28

    2.05.    Repayment of Loans ...............................................................................28

    2.06.    Interest....................................................................................................28

    2.07.    Unused Commitment Fee ........................................................................29

    2.08.    Computation of Interest and Fees ...........................................................29

    2.09.    Evidence of Debt ....................................................................................29

    2.10.    Payments Generally.................................................................................30

ARTICLE III TAXES, YIELD PROTECTION AND ILLEGALITY .................................30

    3.01.    Taxes.......................................................................................................30

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 64 of 170

| 3.02. | Illegality | 31 |
| 3.03. | Increased Cost and Reduced Return; Capital Adequacy. | 31 |
| 3.04. | Funding Losses | 32 |
| 3.05. | Requests for Compensation | 32 |
| 3.06. | Survival | 32 |

ARTICLE IV CONDITIONS PRECEDENT TO THE EFFECTIVENESS OF THIS AGREEMENT AND TO THE MAKING OF THE LOANS ............ 32

| 4.01. | Effectiveness of this Agreement | 32 |
| 4.02. | Conditions to the Borrowing of Loans | 34 |

ARTICLE V REPRESENTATIONS AND WARRANTIES .......... 35

| 5.01. | Existence, Qualification and Power; Compliance with Laws | 35 |
| 5.02. | Corporate Authorization; No Contravention | 35 |
| 5.03. | Tax Exempt Organizations | 35 |
| 5.04. | Governmental or Other Authorizations | 36 |
| 5.05. | Binding Effect | 36 |
| 5.06. | Enforceability of Section 6.15 | 36 |
| 5.07. | Financial Statements; No Material Adverse Change. | 36 |
| 5.08. | Litigation | 37 |
| 5.09. | No Default | 37 |
| 5.10. | Ownership of Property; Liens | 37 |
| 5.11. | Environmental Compliance | 37 |
| 5.12. | ERISA Plans | 37 |
| 5.13. | Margin Regulations | 37 |
| 5.14. | Disclosure | 38 |
| 5.15. | Compliance with Laws | 38 |
| 5.16. | Solvency | 38 |

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 65 of 170

5.17.    Taxes ...................................................................................................38

5.18.    Swap Contracts ...................................................................................38

5.19.    Anti-Corruption Laws and Anti-Terrorism Laws.............................38

ARTICLE VI AFFIRMATIVE COVENANTS ........................................................39

6.01.    Financial Statements ...........................................................................39

6.02.    Certificates; Other Information...........................................................39

6.03.    Notices ................................................................................................41

6.04.    Payment of Obligations ......................................................................41

6.05.    Preservation of Existence, Rights, Privileges, Permits, Licenses, Accreditations and Qualifications........................................................42

6.06.    Maintenance of Properties ..................................................................42

6.07.    Insurance .............................................................................................42

6.08.    Compliance with Laws .......................................................................43

6.09.    Books and Records .............................................................................43

6.10.    Inspection Rights ................................................................................43

6.11.    Performance of Covenants..................................................................43

6.12.    Swap Contracts ...................................................................................43

6.13.    Maintenance of Deposit Account Relationship ..................................44

6.14.    Further Assurances .............................................................................44

6.15.    Covenant to Obtain Assets .................................................................44

ARTICLE VII NEGATIVE COVENANTS (PRIOR TO THE MASTER INDENTURE TERMINATION DATE)..................................................................44

7.01.    Liens ...................................................................................................45

7.02.    Indebtedness .......................................................................................45

7.03.    Fundamental Changes.........................................................................48

7.04.    Dispositions ........................................................................................49

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 66 of 170

| | | |
|---|---|---|
| 7.05. | Transactions with Affiliates | 50 |
| 7.06. | Use of Proceeds | 50 |
| 7.07. | Members as Tax-Exempt Organizations | 51 |
| 7.08. | Financial Covenants | 51 |

ARTICLE VIII NEGATIVE COVENANTS (AFTER THE MASTER INDENTURE TERMINATION DATE) .................................................................................51

| | | |
|---|---|---|
| 8.01. | Liens | 51 |
| 8.02. | Indebtedness | 52 |
| 8.03. | Fundamental Changes | 53 |
| 8.04. | Dispositions | 53 |
| 8.05. | Transactions with Affiliates | 55 |
| 8.06. | Use of Proceeds | 55 |
| 8.07. | Members as Tax-Exempt Organizations | 55 |
| 8.08. | Financial Covenants | 55 |

ARTICLE IX EVENTS OF DEFAULT AND REMEDIES ...............................................56

| | | |
|---|---|---|
| 9.01. | Events of Default | 56 |
| 9.02. | Remedies Upon Event of Default | 58 |
| 9.03. | Application of Funds | 58 |

ARTICLE X SECURITY AGREEMENT ...........................................................................59

| | | |
|---|---|---|
| 10.01. | Generally | 59 |
| 10.02. | Perfection of Security Interest | 60 |
| 10.03. | Ownership of Collateral | 60 |
| 10.04. | Defense of Lender's Interests | 60 |
| 10.05. | Limitation on Lender's Duties with respect to Collateral; Exculpation of Liability | 60 |
| 10.06. | Lender's Appointment as Attorney-in-Fact | 61 |

Case: 24-04053   Doc# 36   Filed: 05/23/25   Entered: 05/23/25 17:31:07   Page 67 of 170

ARTICLE XI GUARANTY .................................................................................................62

    11.02. Separate Obligation ......................................................................................63

    11.03. Insolvency Laws; Right of Contribution. ....................................................63

    11.04. Liability of Guarantors ................................................................................64

    11.05. Consents of Guarantors................................................................................65

    11.06. Guarantors' Waivers ....................................................................................66

    11.07. Additional Guarantor Waivers and Agreements...........................................67

    11.08. Stay of Acceleration ....................................................................................68

    11.09. Financial Condition of Borrower .................................................................68

    11.10. Subrogation..................................................................................................68

    11.11. Subordination...............................................................................................68

    11.12. Reinstatement ..............................................................................................69

    11.13. Substantial Benefits .....................................................................................69

    11.14. Knowing and Explicit Waivers ....................................................................69

ARTICLE XII MISCELLANEOUS.................................................................................69

    12.01. Members' Right of Contest .........................................................................69

    12.02. Amendments; Etc.........................................................................................70

    12.03. Notices and Other Communications; Facsimile Copies. ..............................70

    12.04. No Waiver; Cumulative Remedies ...............................................................72

    12.05. Attorney Costs, Expenses and Taxes...........................................................72

    12.06. Indemnification by Borrower .......................................................................72

    12.07. Payments Set Aside .....................................................................................73

    12.08. Successors and Assigns. ...............................................................................73

    12.09. Confidentiality .............................................................................................75

    12.10. Set-off .........................................................................................................76

Case: 24-04053   Doc# 36   Filed: 05/23/25   Entered: 05/23/25 17:31:07   Page 68 of 170

12.11. Interest Rate Limitation ...................................................................................76

12.12. Counterparts ...................................................................................................76

12.13. Electronic Execution of Documents .................................................................76

12.14. Integration.......................................................................................................76

12.15. Survival of Representations and Warranties...................................................77

12.16. Severability .....................................................................................................77

12.17. Governing Law; Jurisdiction. .........................................................................77

12.18. Waiver of Right to Trial by Jury.....................................................................78

12.19. Immunity of Officers and Employees of the Members ......................................79

12.20. USA Patriot Act Notice ...................................................................................79

**SCHEDULES**

7.02        Existing Indebtedness
10.01       Cash and Liquid Investment Collateral

**EXHIBITS**

A          Eligible Collateral
B          Form of Loan Notice
C          Form of Note
D          Form of Compliance Certificate
E          Form of Joinder Agreement
F          Principal Amortization Schedule (to be inserted by the Lender following the
           Availability Period Termination Date)

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 69 of
170

# CREDIT AND SECURITY AGREEMENT

This CREDIT AND SECURITY AGREEMENT (*"Agreement"*) dated as of February 1, 2017, is entered into among THE ROMAN CATHOLIC BISHOP OF OAKLAND, a California corporation sole (*"RCBO"* or, as further defined below, *"Borrower"*), as borrower, THE ROMAN CATHOLIC WELFARE CORPORATION OF OAKLAND, a California religious corporation (*"RCWC"*), THE ROMAN CATHOLIC CEMETERIES OF THE DIOCESE OF OAKLAND, a California religious corporation (*"RCC"*), and ADVENTUS, a California nonprofit public benefit corporation (*"Adventus"*), as Guarantors, each other Person that may, after the Closing Date pursuant to **Section 11.01(b)**, become a Guarantor hereunder, and COMPASS BANK, an Alabama banking corporation (together with its successors and permitted assigns, *"Lender"*).

## RECITALS

**A.**     Borrower has requested that Lender provide a senior secured, delayed draw term loan facility in the aggregate available principal amount of up to $70,000,000 for the purpose of, among other things, funding the redemption of the outstanding Series 2007 Bonds.

**B.**     Lender has agreed to advance the Loans to Borrower for Borrower's benefit and for the benefit of each of the other Members of the Obligated Group, but only on the terms and provisions, subject to the conditions, and in reliance on the representations and warranties set forth below.

NOW, THEREFORE, in consideration of the mutual agreements, provisions and covenants contained herein and for other good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged), the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS AND ACCOUNTING TERMS

**1.01.     Defined Terms**. As used in this Agreement, the following terms shall have the meanings set forth below:

*"Affiliate"* means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified. *"Control"* means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. *"Controlling"* and *"Controlled"* have meanings correlative thereto.

*"Agreement"* means this Credit and Security Agreement.

*"Annual Financial Information"* has the meaning given such term in **Section 6.01(a)**.

*"Anti-Corruption Laws"* means any applicable Laws relating to corruption, including the United States Foreign Corrupt Practices Act of 1977 (15 U.S.C. §§ 78dd-1, *et seq.*), and the rules and regulations related thereto, and other Laws pertaining to unlawful payments to any

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 70 of
170

governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage.

"***Anti-Terrorism Laws***" means any applicable Laws relating to terrorism or money laundering, including Executive Order No. 13224, the PATRIOT Act, the applicable Laws comprising or implementing the Bank Secrecy Act of 1970, the applicable Laws administered by OFAC.

"***Applicable Loan Rate***" means, as determined as of any date with respect to each Loan hereunder, the per annum rate of interest established on the most recent Computation Date equal to the *sum* of (a) the LIBOR Index as determined as of such Computation Date, *plus* (b) the Applicable Margin then in effect.

"***Applicable Margin***" means, as determined at any time, the following applicable rate percentage *per annum*: (a) during the Availability Period, 1.40%, *provided* that (i) at all times as the Appraised Value of Owned Real Property shall constitute more than 25% but 50% or less of the Total Collateral Value, the Applicable Margin set forth in the preceding **clause (a)** shall be increased by 5 basis points (0.05%), and (ii) at all times as the Appraised Value of Owned Real Property shall constitute more than 50% of the Total Collateral Value, the Applicable Margin set forth in the preceding clause (a) shall be increased by 10 basis points (0.10%); and (b) at any time after the Availability Period, 1.70%; *provided* that (i) at all times as the Appraised Value of Owned Real Property shall constitute more than 50% but 66% or less of the Total Collateral Value, the Applicable Margin set forth in the preceding clause (b) shall be increased by 5 basis points (0.05%), and (ii) at all times as the Appraised Value of Owned Real Property shall constitute more than 66% of the Total Collateral Value, the Applicable Margin set forth in the preceding **clause (b)** shall be increased by 10 basis points (0.10%). Each adjustment described in the *proviso* of the preceding sentence of this definition shall be determined by Lender, which determination shall be conclusive, absent manifest error, and shall become effective as of the first day of the calendar month immediately following the delivery of written notice of such adjustment by Lender to Borrower, which adjusted Applicable Margin shall then continue in effect until the first day of the calendar month immediately following the delivery of a subsequent written notice by Lender to Borrower notifying Borrower of a superseding adjustment pursuant to the foregoing *proviso*.

"***Appraised Value of Owned Real Property***" means, as determined at any time, the appraised value of each real estate location owned in fee by any Member of the Obligated Group (inclusive of the real property and the improvements located thereon) that has been designated by the Group Representative as an "***Appraised Location***" and approved as such by Lender (in its Reasonable Discretion), in each case as set forth in the then current written third party real estate appraisal prepared by a certified real estate appraiser (acceptable to Lender in its Reasonable Discretion) for such purpose in compliance with the appraisal standards of FIRREA, including as codified at 12 C.F.R. Part 323, as determined by Lender (in its Reasonable Discretion); *provided* that no value shall be ascribed to any such real estate location if for any reason (including a subsequent Disposition thereof) such real estate location is not subject to a valid and enforceable recorded Lien of a Deed of Trust in favor of Lender securing the Obligations, subject only to Permitted Encumbrances.

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 71 of 170

"*Asset Coverage Ratio*" means, as calculated at any time for the Members of the Obligated Group taken as a whole, the ratio of (a) the Total Collateral Value to (b) the then Outstanding Amount of all Loans.

"*Availability Period*" means the period from the Closing Date to the Availability Period Termination Date.

"*Availability Period Termination Date*" means the earlier to occur of (a) November 1, 2019, (b) the termination of the entire Commitment pursuant to **Section 2.04** and (c) the termination of the entire Commitment pursuant to **Section 9.02(a)**.

"*Bankruptcy Code*" means the Federal Bankruptcy Reform Act of 1978 (11 U.S.C. Sections 101 *et seq*.), and the Bankruptcy Rules promulgated thereunder.

"*Basic Revenues*" means, as calculated for any period for any Person or group of Persons, the revenues of the Person or group of Persons involved, as determined in accordance with GAAP; but excluding (a) any unrealized gain or loss resulting from changes in the value of investment securities including any Swap Contract, and (b) earnings resulting from any reappraisal, revaluation or write-up of fixed or capital assets; and (c) any extraordinary revenues (such as gains on the sale of assets other than in the ordinary course of business and gains on the extinguishment of debt); *provided, however*, that if such calculation is being made with respect to the Obligated Group, such calculation shall be made in such a manner so as to exclude any revenues attributable to transactions between any Member of the Obligated Group and any other Member.

"*Bishop of Oakland*" means Michael C. Barber and any successor duly appointed in accordance with Canon Law.

"*Book Value*" when used with respect to Property of any Member, means the value of such Property, net of accumulated depreciation and amortization, as reflected in the most recent audited (or with respect to RCWC, compiled) financial statements of such Member delivered to Lender pursuant to **Section 6.01(a)**, and, when used with respect to Property of the Members, means the aggregate of the values of such Property (without duplication), net of accumulated depreciation and amortization, as reflected in the most recent Annual Financial Information delivered to Lender pursuant to **Section 6.01(a)**.

"*Borrower*" has the meaning given such term in the preamble hereto, and shall include any successors to, and any surviving, resulting or transferee corporation of, The Roman Catholic Bishop of Oakland.

"*Business Day*" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, New York, New York or San Francisco, California, and will also include, if such day relates to any interest rate settings as to a LIBOR Index, any day on which dealings in Dollar deposits are conducted by and between banks in the London interbank Eurodollar market.

"*Canon Law*" means the religious laws of the Roman Catholic Church which govern the activities of the Obligated Group.

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 72 of 170

"***Capitalization Ratio***" means, as calculated in accordance with GAAP as of any date for the Obligated Group taken together as a whole, the ratio of (a) Long-Term Indebtedness as of such date to (b) the *sum* of (i) Long-Term Indebtedness as of such date *plus* (ii) Unrestricted Net Assets as of such date.

"***Capitalized Interest***" means amounts irrevocably deposited in escrow in connection with the issuance of Funded Indebtedness, including the Series 2007 Bonds, to pay interest on such Funded Indebtedness, including the Series 2007 Bonds, and interest earned on amounts irrevocably deposited in escrow in connection with the issuance of Funded Indebtedness, including the Series 2007 Bonds, to pay interest on such Funded Indebtedness, including the Series 2007 Bonds.

"***Capitalized Leases***" means all leases that have been or should be, in accordance with GAAP, recorded as capitalized leases; *provided* that, for the avoidance of doubt, any lease that is accounted for as an operating lease as of the Closing Date or any lease entered into after the Closing Date that would have been accounted for as an operating lease as of the Closing Date, may, in the sole discretion of the Borrower, be accounted for as an operating lease and not as a Capitalized Lease.

"***Cash***" means money, currency or a credit balance in a Deposit Account.

"***Cash Management Obligations***" means all liabilities and other obligations of Borrower or any of the other Members in respect of any overdraft and related liabilities arising from treasury, depository, cash pooling arrangements and cash management services or any automated clearing house transfers of funds, netting services, employee credit or purchase card programs and similar arrangements.

"***Change in Law***" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority, or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; *provided* that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "***Change in Law***", regardless of the date enacted, adopted or issued.

"***Closing Date***" means the first date all the conditions precedent in **Section 4.01** are satisfied or waived by Lender and the executed signature pages of the initial parties hereto are deemed delivered.

"***Code***" means the Internal Revenue Code of 1986.

Case: 24-04053   Doc# 36   Filed: 05/23/25   Entered: 05/23/25 17:31:07   Page 73 of 170

"*Collateral*" mean all property and proceeds thereof now owned or hereafter acquired by any Member in or upon which a Lien is granted, purported to be granted, or now or hereafter exists in favor of Lender under this Agreement or any other Collateral Document.

"*Collateral Documents*" means, individually and collectively, the Deeds of Trust and such other agreements (including Deposit Account control agreements and Securities Account control agreements), UCC financing statements (including continuations and amendments thereof), assignments, documents and instruments as are from time to time executed and delivered by any Member granting, assigning or transferring or otherwise evidencing or relating to any security interest or Lien granted, assigned or transferred to Lender pursuant to or in connection with the transactions contemplated by this Agreement.

"*Combined Statements*" has the meaning given such term in **Section 6.01(a)**.

"*Commitment*" means the obligation of Lender to make Loans hereunder in an aggregate principal amount not to exceed $70,000,000.

"*Commodity Exchange Act*" means the Commodity Exchange Act of 1936 (7 U.S.C. Sections 1 *et seq.*).

"*Completion Funded Indebtedness*" means any Long-Term Indebtedness for borrowed money (a) incurred for the purpose of financing the completion of the acquisition, construction, remodeling, renovation or equipping of any Facility with respect to which Funded Indebtedness for borrowed money has been incurred in accordance with the provisions hereof, and (b) having a principal amount not exceeding the amount required to provide a completed and equipped Facility of substantially the same type and scope contemplated at the time such prior Funded Indebtedness was originally incurred, to provide for capitalized interest during the period of construction, to provide any reserve fund relating to such Completion Funded Indebtedness and to pay the costs and expenses of issuing such Completion Funded Indebtedness.

"*Compliance Certificate*" means a certificate substantially in the form of **Exhibit D**.

"*Computation Date*" means, with respect to each Loan outstanding hereunder, the second Business Day preceding the Closing Date, and thereafter the second Business Day preceding each LIBOR Index Reset Date.

"*Construction Index*" means the Dodge Construction Index for U.S. and Canadian Cities, with reference to the city in which the subject property is located (or, if such index is not available for such city, with reference to the city closest geographically to the city in which the subject property is located), as most recently published prior to the date in question or, if such index is no longer published, such other index which is certified to be comparable and appropriate by the Group Representative in a certificate of the Chief Financial Officer of the Group Representative (or other authorized officer having primary responsibility for the financial affairs of the Group Representative) delivered to Lender and which other index is acceptable to Lender (in its Reasonable Discretion).

"*Consultant*" means VeraCruz Advisory, LLC or another financial consulting firm satisfactory to Lender (in its Reasonable Discretion), having the skill and experience necessary to

Case: 24-04053   Doc# 36   Filed: 05/23/25   Entered: 05/23/25 17:31:07   Page 74 of 170

render the particular report required and having a favorable reputation for such skill and experience, which firm shall have no interest, direct or indirect, in any Member or any Affiliate thereof, it being understood that an arm's-length contract between such firm and any Member or any Affiliate thereof for the performance of consulting or investment banking services shall not in and of itself be regarded as creating an interest in or an employee relationship with such Member or Affiliate.

"*Contractual Obligation*" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"*Control*" has the meaning specified in the definition of "Affiliate."

"*CSA*" means the unit of the Diocese of Oakland referred to as the Central Services Administration, inclusive of the Chancery which provides administrative services and programmatic and financial support to the entities, institutions and associations comprising the Diocese of Oakland and, for purposes of **Section 6.01**, such additional Diocesan entities as are consolidated with the Chancery from time to time for financial accounting statement purposes (for purposes of **Section 6.01**, it is understood and agreed that such additional Diocesan entities shall be limited to Adventus and Furrer Properties unless otherwise consented in writing by Lender).

"*Current Value*" means (a) with respect to Land or Property, Plant and Equipment: (i) the aggregate replacement value of such Land or Property, Plant and Equipment as reflected in the most recently available written report of Arthur J. Gallagher & Co. or another firm proposed by Borrower and acceptable to Lender, *plus* (ii) the Book Value of any Land or Property, Plant and Equipment acquired since the last such report increased or decreased by a percentage equal to the aggregate percentage increase or decrease in the Construction Index on the date of such acquisition to the date as of which Current Value is to be calculated, *minus* (iii) the greater of the Book Value or the replacement value of any Land or Property, Plant and Equipment disposed of since the last such report increased or decreased by a percentage equal to the aggregate percentage increase or decrease in the Construction Index from the date of such report to the date as of which Current Value is to be calculated; and (B) with respect to any other Property, the fair market value of such Property, which fair market value shall be evidenced in a manner satisfactory to Lender (in its Reasonable Discretion).

"*Debtor Relief Laws*" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"*Deed of Trust*" means each deed of trust, mortgage or similar document executed by any Member as trustor or mortgagor and delivered to Lender as beneficiary or mortgagee, as applicable, pursuant to the terms of this Agreement after the Closing Date.

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 75 of 170

"*Default*" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"*Default Rate*" means, as determined at any time, when used with respect to the Obligations, a *per annum* interest rate equal to the *sum* of (a) the LIBOR Index, *plus* (b) the Applicable Margin, *plus* (c) 3.0%.

"*Debt Service Requirements*" means, with respect to the period of time for which calculated, the aggregate of the payments required to be made during such period in respect of principal (whether at maturity, as a result of mandatory sinking fund redemption, mandatory prepayment or otherwise) and interest on outstanding Funded Indebtedness of each Person or group of Persons with respect to which calculated; *provided* that (a) with respect to any such Indebtedness initially incurred prior to the Master Indenture Termination Date, the amount of such payments for a future period shall be calculated in accordance with the assumptions contained in **Section 7.02** and in this definition of "Debt Service Requirements" as set forth in the paragraphs below, (b) interest shall be excluded from the determination of the Debt Service Requirements to the extent that Capitalized Interest is available to pay such interest, and (c) principal on Indebtedness shall be excluded from the determination of the Debt Service Requirements to the extent that amounts are on deposit in an irrevocable escrow and such amounts (including, where appropriate, the earnings or other increment to accrue thereon) are required to be applied to pay such principal and such amounts so required to be applied are sufficient to pay such principal; and, *provided further* that, notwithstanding the foregoing, the Debt Service Requirements with respect to the Series 2007 Bonds shall be equal to the Interest Requirements with respect thereto.

The various calculations of the amount of Indebtedness of a Person, the amortization schedule of such Indebtedness and the debt service payable with respect to such Funded Indebtedness required under certain provisions of this Agreement shall be made in a manner consistent with the assumptions adopted (i) in **Section 7.02** in respect of Indebtedness initially incurred prior to the Master Indenture Termination Date, and (ii) in **Section 8.02** in respect of Indebtedness initially incurred on or after the Master Indenture Termination Date, and (iii) in the below paragraphs of this definition of "Debt Service Requirements".

In determining the amount of debt service payable on Indebtedness in the course of the various calculations required under certain provisions of this Agreement, if the terms of the Indebtedness being considered are such that interest thereon for any future period of time is expressed to be calculated at a varying rate *per annum*, a formula rate or a fixed rate *per annum* based on a varying index, then for the purpose of making such determination of debt service, interest on such Indebtedness for such period (the "*Determination Period*") shall be computed by assuming that the rate of interest applicable to the Determination Period is equal to the rate of interest (calculated in the manner in which the rate of interest for the Determination Period is expressed to be calculated) which would have been in effect on a date specified by the Member incurring such Indebtedness, which date shall be a date occurring within the 45 day period next preceding the date on which such calculation is made.

"*Designated Jurisdiction*" means any country or territory to the extent that such country or territory itself is the subject of any Sanction, including, as of the Closing Date, the Crimea

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 76 of 170

region, Cuba, Iran, North Korea, Sudan and Syria (for the avoidance of doubt, the preceding list is intended to be illustrative only as of the Closing Date; the comprehensive list of Designated Jurisdictions is subject to change from time to time in accordance with the Sanctions then in effect).

"*Diocese of Oakland*" (including the related term "*Diocesan*") means the territory recognized as the Diocese of Oakland by the Roman Catholic Church of the United States.

"*Disposition*" or "*Dispose*" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction) of any property by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"*Dollar*" and "*$*" mean lawful money of the United States.

"*Eligible Personal Property Collateral*" means Collateral satisfactory to Lender (in its Reasonable Discretion) of the type(s) described in, and satisfying the conditions of, clauses (a) through (c), inclusive, of the definition of 'Total Collateral Value".

"*Encumbered*" means subject to a Lien other than Liens which constitute Permitted Liens, *provided* that any amounts on deposit in a construction fund created in connection with the issuance of an obligation which are held as security for the payment of such obligation, or any Indebtedness incurred to purchase such obligation or the proceeds of which are advanced or otherwise made available in connection with the issuance of such obligation, shall not be deemed to be Encumbered if the amounts are to be applied to construct or otherwise acquire Property which is not subject to a Lien.

"*Environmental Laws*" means any and all Federal, state and local statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions relating to pollution and the protection of the environment or the release of any materials into the environment, including those related to hazardous substances or wastes, air emissions and discharges to waste or public systems.

"*Environmental Liability*" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of Borrower or any other Member of the Obligated Group directly or indirectly resulting from or based upon (a) any violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) any exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"*ERISA*" means the Employee Retirement Income Security Act of 1974.

"*ERISA Affiliate*" means any Person who for purposes of Title IV of ERISA is a member of a controlled group of which Borrower is a member, is under common control with

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 77 of 170

Borrower, or is a member of an affiliated service group of which Borrower is a member in accordance with the provisions of Section 414(b), (c) or (m) of the Code.

"*Event of Default*" has the meaning given such term in **Section 9.01**.

"*Excluded Taxes*" means any of the following Taxes imposed on or with respect to Lender or required to be withheld or deducted from a payment to Lender: (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of the Lender being organized under the laws of, or having its principal office or its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) U.S. federal and California withholding Taxes imposed on amounts payable to or for the account of Lender with respect to an applicable interest in the Loans or the Commitment pursuant to a law in effect on the date on which (i) Lender acquires such interest in such Loans or the Commitment or (ii) Lender changes its Lending Office, and (c) any Taxes imposed under FATCA.

"*Expenses*" means, as calculated for any period for any Person or group of Persons, the aggregate of all expenses calculated in accordance with GAAP, including any taxes, incurred by the Person or group of Persons involved during such period, *minus* interest on Funded Indebtedness, depreciation and amortization and extraordinary expenses (including losses on the sale of assets other than in the ordinary course of business and losses on the extinguishment of debt) and, if such calculation is being made with respect to the Obligated Group, excluding any such expenses attributable to transactions between any Member and any other Member.

"*Facilities*" means all land, leasehold interests and buildings and all fixtures and equipment (as defined in the UCC) of a Member.

"*FATCA*" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof, and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"*FIRREA*" means the Financial Institutions Reform, Recovery, and Enforcement Act of 1989.

"*Fiscal Year*" means (a) in the case of RCWC, any twelve consecutive month period beginning July 1 and ending June 30, and (b) in the case of any other Member, any twelve consecutive month period beginning on January 1 and ending December 31.

"*Fixed Charge Coverage Ratio*" means, as calculated in accordance with GAAP as of the last day of each Fiscal Year of Borrower for the Members of the Obligated Group taken as a whole, the ratio of (a) the *sum* of ((i) the net change in Unrestricted Net Assets (excluding unrealized gains or losses on Investments, changes in net mark-to-market exposure on Swap Contracts or any other non-cash items or non-recurring items) for the Fiscal Year just ended, *plus* (ii) amounts treated as expenses during the Fiscal Year just ended for depreciation and amortization, *plus* (iii) Interest Expense for the Fiscal Year just ended to (b) the *sum* of (A) the scheduled current portion of Long-Term Indebtedness becoming due and payable during the

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 78 of 170

immediately following Fiscal Year (*provided* that for the calculation of the Fixed Charge Coverage Ratio as of the last day of the Fiscal Year of Borrower immediately preceding the Stated Maturity Date, the current portion of Long-Term Indebtedness for purposes of this Clause (A) shall be deemed to be the scheduled portion of Loan-Term Indebtedness that became due and payable during the Fiscal Year just ended) and (B) Interest Expense for the Fiscal Year just ended.

"*FRB*" means the Board of Governors of the Federal Reserve System of the United States.

"*Funded Indebtedness*" means with respect to any Person (a) all Indebtedness for borrowed money of such Person which is not Short-Term, (b) all Indebtedness of such Person incurred or assumed in connection with the acquisition or construction of Property which is not Short-Term, (c) all Guaranties of such Person, and (d) all Capitalized Leases entered into by such Person.

"*Furrer Properties*" means Furrer Properties, a California corporation wholly owned by RCBO.

"*GAAP*" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"*Governing Body*" means, with respect to a Member other than the RCBO, the board of directors or similar group in which the right to exercise the powers of corporate directors or trustees is vested and, with respect to the RCBO, the Bishop of Oakland.

"*Governmental Authority*" means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"*Group Representative*" means Borrower or such other Member of the Obligated Group as is designated in a written notice delivered by each Member of the Obligated Group to Lender and approved by Lender.

"*Guaranteed Obligations*" has the meaning given such term in **Section 11.01(a)**.

"*Guarantors*" means, collectively, (a) for the purposes of **Article XI:** (i) each of RCWC, RCC and Adventus, each of whom is party to this Agreement as of the Closing Date and named in the signature pages hereto as a Guarantor, (ii) Borrower (solely as to and for the Cash Management Obligations and the Secured Swap Obligations of the other Members), and (iii) each other Person that at a date subsequent to the Closing Date executes a Joinder Agreement, including as required by **Section 11.01(b)**, in order to become a Guarantor hereunder, and (b)

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 79 of
170

each other Person who, at a date subsequent to the Closing Date, becomes a guarantor of all or any portion of the Obligations.

"*Guaranty*" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "*primary obligor*") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person. The amount of any Guaranty will be deemed to be the amount recognized as a guaranty and shown on the guaranteeing Person's financial statements in accordance with GAAP; *provided* that if such financial statements of the guaranteeing Person are not reasonably available to Lender at its reasonable request, the amount of such Guaranty will be deemed to be the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"*Hazardous Materials*" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"*Historical Debt Service Coverage Ratio*" means, as calculated in accordance with GAAP as of the last day of each Fiscal Year of Borrower for the Members of the Obligated Group taken as a whole, the ratio of (a) the Income Available for Debt Service for the Fiscal Year just ended to (b) the Maximum Annual Debt Service Requirement for the Funded Indebtedness then outstanding.

"*Historical Pro Forma Debt Service Coverage Ratio*" means, as calculated in accordance with GAAP as of the last day of each Fiscal Year of Borrower for the Members of the Obligated Group taken as a whole, the ratio of (a) the Income Available for Debt Service for the Fiscal Year just ended to (b) the Maximum Annual Debt Service Requirement for the Funded Indebtedness then outstanding (other than any Funded Indebtedness proposed to be refunded with the proceeds of the Funded Indebtedness then proposed to be issued) and the Funded Indebtedness then proposed to be issued, if any.

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 80 of 170

"*Income Available for Debt Service*" means, as calculated for any period for Borrower and the other Members of the Obligated Group taken as a whole, the excess of Revenues over Expenses of the Person or group of Persons involved.

"*Indebtedness*" means, as to any Person at a particular time (without duplication), all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)     all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)     all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(c)     net obligations of such Person under any Swap Contract;

(d)     all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business);

(e)     indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)     Capitalized Leases; and

(g)     all Guaranties of such Person in respect of any of the foregoing.

"*Indemnified Liabilities*" has the meaning specified in **Section 12.06**.

"*Indemnified Taxes*" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Member under any Loan Document and (b) to the extent not otherwise described in the preceding clause (a), Other Taxes.

"*Indemnitees*" has the meaning specified in **Section 12.06**.

"*Insurance Consultant*" means Arthur J. Gallagher & Co. or another Person (who may be an insurance broker or agent) appointed by the Group Representative and satisfactory to Lender (in its Reasonable Discretion), qualified to survey risks and to recommend insurance coverage for facilities and services of the type involving the Obligated Group and its Members, and having a favorable reputation for skill and experience in such surveys and such recommendations, and which may include a broker or agent with whom any Member or any Affiliate thereof transacts business; *provided* that such Person shall have no interest, direct or indirect, in any Member or any Affiliate thereof, it being understood that an arm's-length contract between such Person and any Member or any Affiliate thereof for the performance of consulting or other insurance related services shall not in and of itself be regarded as creating an interest in or an employee relationship with such Member or Affiliate.

Case: 24-04053     Doc# 36     Filed: 05/23/25     Entered: 05/23/25 17:31:07     Page 81 of 170

"*Interest Expense*" means, as calculated for the members of the Obligated Group taken as a whole for any period, the sum of (without duplication) (a) all interest payable in cash, premium payments, debt discount, fees, charges and related expenses in connection with borrowed money (including all commissions, discounts, fees and other charges under Swap Contracts, letters of credit and similar instruments and all Capitalized Interest), in each case to the extent treated as interest expense in accordance with GAAP, *plus* (b) the portion of rent expense with respect to such period under Capitalized Leases that is treated as interest in accordance with GAAP that is payable in cash.

"*Interest Payment Date*" means the 30th day of each March, June, September and December (or the next Business Day if such 30th day is not a Business Day).

"*Interest Period*" means the period from the 30th day of a calendar month (or the next Business Day if such 30th day is not a Business Day) through and including the calendar day before the 30th day of the next calendar month (or the calendar day before the next Business Day if such 30th day is not a Business Day).

"*Interest Requirements*" means, as calculated for any period of time for Borrower and the other Members of the Obligated Group taken as a whole, the aggregate of the payments required to be made during such period in respect of interest on outstanding Funded Indebtedness during such period; *provided* that (a) in respect of Funded Indebtedness initially incurred prior to the Master Indenture Termination Date, the amount of such payments for future periods shall be calculated in accordance with the assumptions contained in **Section 7.02** and the definition of "Debt Service Requirements" set forth in this **Section 1.01**, and (b) interest shall be excluded from the determination of the Interest Requirements to the extent that Capitalized Interest is available to pay such interest.

"*Investment*" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of capital stock or other securities of another Person, (b) a loan, advance or capital contribution to, Guaranty or assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person, or (c) the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person that constitute a business unit. For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"*IRS*" means the United States Internal Revenue Service.

"*Joinder Agreement*" means an agreement, in substantially the form of **Exhibit E** or any other form approved by Lender, entered into by a Person pursuant to **Section 11.01(b)** following the date hereof to join in the Guaranty set forth in **Article XI**, and to become a Member of the Obligated Group hereunder and under the other Loan Documents..

"*Land*" means the real property of the Obligated Group, together with all buildings, improvements and fixtures located thereon.

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 82 of 170

*"**Laws**"* means, collectively, (a) all Federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law, including Anti-Corruption Laws, Anti-Terrorism Laws and Environmental Laws, and (b) all Canon Laws.

*"**Lending Office**"* means the office or offices of Lender described as such in **Section 12.03**, or such other office or offices as Lender may from time to time notify Borrower.

*"**LIBOR Index**"* means, for each Interest Period, the London interbank offered rate for Dollar deposits for a one-month period, as reported on Reuters Screen LIBOR01 Page or any successor thereto, which shall be that one-month LIBOR rate in effect two Business Days prior to the applicable LIBOR Index Reset Date, adjusted for any reserve requirement and any subsequent costs arising from a change in government regulation, such rate to be reset monthly on each LIBOR Index Reset Date. Lender's internal records of applicable interest rates shall be determinative in the absence of manifest error; *provided* that if the LIBOR Index, as determined above with respect to any interest rate calculation, shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement. If the LIBOR Index is no longer available or is clearly erroneous, the rate shall be the LIBOR Index that was in effect for the immediately preceding Interest Period, and such rate will continue to remain in effect until the LIBOR Index becomes available again.

*"**LIBOR Index Reset Date**"* means the 30th day of each calendar month (or the next Business Day if such 30th day is not a Business Day).

*"**Lien**"* means (a) any mortgage, pledge or lease of, security interest in or lien, charge, restriction or encumbrance on any Property of the Person involved in favor of, or which secures any obligation to, any Person other than a Member, and (b) any Capitalized Lease under which any Member is lessee and the lessor is not another Member.

*"**Liquid Investments**"* means Dollar denominated Investments in any of the following:

      (a)     United States Government Obligations;

      (b)     Direct obligations of any agency or instrumentality of the United States of America and obligations on which the timely payment of principal and interest is fully guaranteed by any such agency or instrumentality;

      (c)     Certificates of deposit, time deposits or other direct, unsecured debt obligations of any bank, trust company or savings and loan association if all of the direct, unsecured debt obligations of such institution at the time of purchase of such certificates of deposit, time deposits or obligations, which are rated by a Rating Agency are rated in one of the three highest rating categories assigned by such Rating Agency (without regard to any refinement or gradation of rating category by numerical modifier or otherwise);

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 83 of 170

(d)     Certificates of deposit or time deposits of any bank, trust company or savings and loan association which certificates of deposit or time deposits are fully insured by a federally sponsored deposit insurance program;

(e)     Securities of the type described in the preceding **clauses (a)** or **(b)** of this definition purchased under agreements to resell such securities to any registered broker/dealer subject to the Securities Investors Protection Corporation jurisdiction or any commercial bank, if such broker/dealer or bank's uninsured, unsecured and unguaranteed obligations which are rated by a Rating Agency are rated in one of the three highest rating categories assigned by such Rating Agency (without regard to any refinement or gradation of rating category by numerical modifier or otherwise); *provided*: (i) a master repurchase agreement or specific written repurchase agreement governs the transaction, (ii) the repurchase agreement has a term of 30 days or less and (iii) the fair market value of the securities in relation to the amount of the repurchase obligation, including principal and interest, is equal to at least 100%;

(f)     Investment agreements with banks which meet the rating criteria set forth in the preceding **clause (c)** of this definition or investment agreements with non-bank financial institutions (i) all of the unsecured, direct long-term debt of which non-bank financial institutions which is rated by a Rating Agency is rated in one of the three highest rating categories (without regard to any refinement or gradation of rating category by numerical modifier or otherwise) assigned by such Rating Agency for obligations of that nature, or (ii) if such non-bank financial institutions have no such outstanding long-term debt which is rated, all of the short-term debt of which is rated by a Rating Agency is rated in the highest rating category (without regard to any refinement or gradation of rating category by numerical modifier or otherwise) assigned to short-term indebtedness by such Rating Agency, all of which agreements referred to in this **clause (f)** provide that if such banks or non-bank financial institutions' debt no longer satisfies such rating criteria such banks or institutions will secure such agreements as soon as reasonably practicable to the extent and in the manner *provided* in the preceding **clause (c)** of this definition;

(g)     Shares of a fund registered under the Investment Company Act of 1940, as amended, whose shares are registered under the Securities Act of 1933, as amended, having assets of at least $100,000,000, whose investment assets are obligations which constitute Liquid Investments;

(h)     Commercial paper which, at the time of purchase, is rated by a Rating Agency in one of the two highest categories (without regard to any refinements or gradation of rating category by numerical modifier or otherwise) assigned by such Rating Agency for obligations of that nature;

(i)     Obligations of, or obligations fully guaranteed by, any state of the United States of America or any political subdivision thereof, which obligations, at the time of purchase, are rated by a Rating Agency in one of the three highest rating categories (without regard to any refinement or gradation of rating category by numerical modifier or otherwise) assigned by such Rating Agency to obligations of that nature;

(j)     Debt obligations of any corporation organized under the laws of any state of the United States of America which securities, at the time of purchase, are rated by a Rating

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 84 of 170

Agency in one of the three highest rating categories (without regard to any refinements or gradation of rating category by numerical modifier or otherwise) assigned by such Rating Agency for obligations of that nature;

(k)     Obligations which are rated in the highest rating category by a Rating Agency and are issued or incurred by any state, commonwealth or territory of the United States of America or any political subdivision, public instrumentality or public authority of any state, commonwealth or territory of the United States of America, which obligations are fully secured by and payable solely from an escrow fund consisting of direct obligations of, or obligations the timely payment of principal and interest on which are fully guaranteed by, the United States of America, which security is held by a corporate fiduciary pursuant to an escrow agreement; and

(1)     Bankers acceptances of any bank, if all of the direct, unsecured debt obligations of such institution at the time of purchase of such acceptances which are rated by a Rating Agency are rated in one of the three highest rating categories (without regard to any refinement or gradation of rating category by numerical modifier or otherwise) by such Rating Agency.

"*Loan*" has the meaning specified in **Section 2.01.**

"*Loan Document Obligations*" means all advances to, and debts, liabilities, obligations, covenants and duties of, any Member arising under any Loan Document or otherwise with respect to any Loan, in each case whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Member of any proceeding under any Debtor Relief Laws naming such Member as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding.

"*Loan Documents*" means this Agreement, any Note, the Collateral Documents and any and all other agreements, documents and instruments executed or delivered by or on behalf of or in support of any Member of the Obligated Group to Lender or its designee evidencing or otherwise relating to the Loans hereunder.

"*Loan Notice*" means a notice of a borrowing of a Loan, which shall be substantially in the form of **Exhibit A.**

"*Long-Term Indebtedness*" means Indebtedness having an original stated maturity or term greater than one year or renewable at the option of the debtor for a period greater than one year from the date of original issuance.

"*Margin Stock*" means "margin stock" as defined in Regulation U adopted by the FRB (12 C.F.R. Part 221).

"*Master Indenture*" means that Master Trust Indenture dated as of November 1, 2007, among the Obligated Group and U.S. Bank National Association as master indenture trustee (as successor to Deutsche Bank National Trust Company), as amended and supplemented to, and in effect on, the Closing Date, and as the same may be further amended and supplemented from time to time in accordance with the terms thereof.

Case: 24-04053     Doc# 36     Filed: 05/23/25     Entered: 05/23/25 17:31:07     Page 85 of 170

"*Master Indenture Termination Date*" means the date as of which all Obligations (as such term is defined in the Master Indenture), including all Obligations in respect of the Series 2007 Bonds issued pursuant to the Series 2007 Indenture, have been redeemed, cancelled, surrendered or otherwise paid in full and there are no other Related Bonds (as such term in defined in the Master Indenture) outstanding or entitled to any Lien, benefit or security under the Series 2007 Indenture or any other Related Bond Indenture Obligations (as such term in defined in the Master Indenture), and the Master Indenture has been terminated.

"*Material Adverse Change*" means (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties, liabilities (actual or contingent) or condition (financial or otherwise) of Borrower or the Obligated Group taken as a whole; (b) a material impairment of the ability of any Member to perform its obligations under any Loan Document to which it is a party; or (c) a material adverse effect upon the legality, validity, binding effect or enforceability against any Member of any Loan Document to which it is a party.

"*Maturity Date*" means the earliest of (a) the Stated Maturity Date and (b) the date of the acceleration of the Loans pursuant to **Section 9.02(b)**.

"*Maximum Annual Debt Service Requirement*" means the largest total Debt Service Requirements for the current or any succeeding Fiscal Year of Borrower.

"*Member*" means, individually, Borrower and each Guarantor from time to time party to this Agreement, including, as of the Closing Date, RCWC, RCC and Adventus.

"*Multiemployer Plan*" means a Plan which is a "multiemployer plan" as defined in Section 3(37) or 4001(a)(3) of ERISA.

"*Net Proceeds*" means, when used with respect to any insurance or condemnation award, the gross proceeds from the insurance or condemnation award with respect to which that term is used less all expenses incurred in the collection of such gross proceeds.

"*Non-Recourse Indebtedness*" means any Indebtedness secured by a Lien on Property, Plant and Equipment of any Member, liability for which is effectively limited to the Property, Plant and Equipment subject to such Lien with no recourse, directly or indirectly, to any other Property of any Member.

"*Note*" means a promissory note made by Borrower in favor of the Lender evidencing Loans made by Lender, substantially in the form of **Exhibit B**.

"*Obligated Group*" means, collectively at any time, Borrower and each of the other Members then party to this Agreement.

"*Obligations*" means, collectively, (a) the Loan Document Obligations, (b) the Cash Management Obligations and (c) the Secured Swap Obligations.

"*OFAC*" means the Office of Foreign Assets Control of the United States Department of the Treasury.

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 86 of 170

*"Ordinary Course of Business"* means the religious, charitable, educational and social welfare activities of the Obligated Group conducted consistent with the mission of the Roman Catholic Church and the Bishop of Oakland.

*"Organization Documents"* means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws; (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

*"Other Connection Taxes"* means, with respect to Lender, Taxes imposed as a result of a present or former connection between Lender and the jurisdiction imposing such Tax (other than connections arising from Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

*"Other Taxes"* means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, *except* any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

*"Outstanding Amount"* means, with respect to the Loans hereunder on any date, the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of the Loans occurring on such date.

*"Participant"* has the meaning given such term in **Section 12.08(c)**.

*"PATRIOT Act"* means the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

*"PBGC"* means the Pension Benefit Guaranty Corporation.

*"Permitted Encumbrances"* means and includes:

(a) any Lien arising by reason of a good faith deposit with a Person in connection with any tender, lease of real estate, bid or contract (other than a contract for the payment of money), deposit by a Person to secure public or statutory obligations, or to secure, or in lieu of, surety, stay or appeal bonds, or deposit as security for the payment of taxes or assessments or other similar charges; and any Lien arising by reason of a deposit with, or the giving of any form of security to, any Governmental Authority or anybody created or approved by Law for any purpose at any time as required by Law as a condition to the transaction of any business or the exercise of any privilege or license, or to enable a Person to maintain self-

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 87 of 170

insurance or to participate in any funds established to cover any insurance risks or in connection with workmen's compensation, unemployment insurance, pensions or profit sharing plans or other social security plans or programs, or to share in the privileges or benefits required for corporations participating in such arrangements;

(b)     any lease which relates to Property which is of a type that is customarily the subject of such a lease, such as office space for religious, charitable, educational, and social welfare organizations or religious institutions; any lease, license or similar right to use Property existing as of the Closing Date and any renewal and extension of any of the foregoing thereof; and any lease, license or similar right to use Property whereunder a Member is lessee, licensee or the equivalent thereof upon fair and reasonable terms no less favorable to the lessee or licensee than would obtain in a comparable arm's-length transaction;

(c)     any Lien for taxes and special assessments which are not then delinquent, or if then delinquent are being contested in accordance with **Section 12.1**;

(d)     utility, access and other easements and rights-of-way, restrictions, encumbrances and exceptions which do not materially interfere with or materially impair the operation of the Property affected thereby (or, if such Property is not being then operated, the operation for which it was designed or last modified);

(e)     any mechanic's, laborer's, materialman's, supplier's or vendor's Lien or right in respect thereof if payment is not yet due under the contract in question or if such Lien is being contested in accordance with **Section 12.1**;

(f)     such minor defects and irregularities of title and encroachments on adjoining property as normally exist with respect to Property similar in character to the Property involved and which do not materially adversely affect the value of, or materially impair, the Property affected thereby for the purpose for which it was acquired or is held by the owner thereof;

(g)     zoning laws and similar restrictions which are not violated by the Property affected thereby or the use thereof;

(h)     all right, title and interest of the state where the Property involved is located, municipalities and the public in and to tunnels, bridges and passageways over, under or upon a public way;

(i)     any Lien on or in Property given, bequeathed or devised to the owner thereof existing at the time of such gift, bequest or devise, *provided* that (i) such Lien attaches solely to the Property which is the subject of such gift, bequest or devise, and (ii) the Indebtedness secured by such Liens is not assumed by any Member;

(j)     any Lien of or resulting from any judgment or award, the time for the appeal or petition for rehearing of which shall not have expired, or in respect of which the Person shall at any time in good faith be prosecuting an appeal or proceeding for a review and in respect of which a stay of execution pending such appeal or proceeding for review shall be in existence;

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 88 of 170

(k)     any interest, including any leasehold and ownership interest, of any Affiliate in Property leased or transferred to such Affiliate as permitted by this Agreement;

(l)     any Lien on moneys or funds deposited with a Person as security for, or as prepayment of, the cost of life care, burial, education or other similar services *provided* by the Obligated Group;

(m)     any Lien on Property received by a Person through gifts, grants or bequests, such Liens being due to restrictions on such gifts, grants or bequests of Property or the income thereon;

(n)     any Lien on Property due to rights of third party payers for recoupment of excess reimbursement paid to a Person; and

(o)     any Lease entered into between Members of the Obligated Group.

*"Permitted Lien"* means, as of any date of determination, any Lien permitted to have been created, incurred or assumed or otherwise to exist as of such date upon any Property, assets or revenues of any Member of the Obligated Group pursuant to **Section 7.01** or **Section 8.01**, as applicable

*"Person"* means any natural person, firm, joint venture, association, partnership, business trust, corporation, public body, agency or political subdivision thereof or any other similar entity, including entities, institutions and associations commonly used in the Ordinary Course of Business.

*"Plan"* means an employee pension benefit plan as defined in Section 3(2) of ERISA, which (a) is currently or hereafter sponsored, maintained or contributed to by a Member or an ERISA Affiliate or (b) was at any time during the last 6 calendar years preceding the date of this Agreement, sponsored, maintained or contributed to by a Member or an ERISA Affiliate.

*"Prohibited Transaction"* means any transaction set forth in Section 406 of ERISA or Section 4975 of the Code.

*"Projected Debt Service Coverage Ratio"* means, as calculated for any period of time for the Members of the Obligated Group taken as a whole, the ratio of (a) the projected Income Available for Debt Service for that period to (b) the Maximum Annual Debt Service Requirement for the Funded Indebtedness expected to be outstanding during such period.

*"Property"* means any and all rights, titles and interests in and to any and all property whether real or personal, tangible or intangible, and wherever situated.

*"Property, Plant and Equipment"* means all Property of each Member of the Obligated Group which is classified as property, plant and equipment under GAAP.

*"Rating Agency"* means a nationally recognized investment rating agency, and shall include (a) Moody's Investors Service, Inc. and any successor thereto and (b) Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and any successor thereto.

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 89 of 170

*"RCBO"* has the meaning given such term in the preamble to this Agreement.

*"Reasonable Discretion"* means a determination made in the exercise of reasonable (from the perspective of a secured lender) business judgment.

*"Reportable Event"* means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30-day notice period has been waived.

*"Responsible Person"* means (a) with respect to RCBO, the Bishop of Oakland, and in addition (b) with respect to each Member of the Obligated Group, including RCBO, the chief executive officer, president or chief financial officer of such Member. Any document delivered hereunder that is signed by a Responsible Person of a Member shall be conclusively presumed to have been authorized by all necessary corporate and other action on the part of such Member and such Responsible Person shall be conclusively presumed to have acted on behalf of such Member.

*"Restricted"* means, when referring to Cash, Liquid Investments or other Eligible Personal Property Collateral of any Member of the Obligated Group, that such Cash, Liquid Investments or other Eligible Personal Property Collateral (a) appear (or would be required to appear) as "restricted" on a combined balance sheet of the Obligated Group (unless such appearance is related to the Loan Documents or the Liens created thereunder or, prior to the Master Indenture Termination Date, to the Master Indenture and the Series 2007 Indenture and the Liens created thereunder), (b) are subject to any Liens in favor of any Person other than Lender (or, prior to the Master Indenture Termination Date, the indenture trustee under the Series 2007 Indenture securing the redemption of the Series 2007 Bonds) or (c) are not otherwise generally available for use by Borrower or the Obligated Group.

*"Revenues"* means, as calculated for any period for any Person or group of Persons, Basic Revenues plus the amount set forth in clause (c) of the definition of "Basic Revenues" set forth in this **Section 1.01**, which amount for purposes of calculating Revenues shall not exceed 15% of the Basic Revenues.

*"Sanction(s)"* means any sanction administered or enforced by the United States Government (including OFAC), the United Nations Security Council, the European Union, Her Majesty's Treasury or other relevant sanctions authority.

*"Secured Obligations"* means, as to any Member of the Obligated Group, collectively and without limitation, any and all "Obligations" or "Guaranteed Obligations", as applicable, of such Member.

*"Secured Swap Obligations"* means all liabilities and other obligations of the Obligated Group under any Swap Contract with Lender (or any of its designated Affiliates) as the counterparty.

*"Series 2007 Bonds"* means those $114,700,000 The Roman Catholic Bishop of Oakland Taxable Bonds, Series 2007, issued pursuant to the Series 2007 Indenture.

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 90 of 170

"*Series 2007 Indenture*" means that Bond Trust Indenture dated as of November 1, 2007, among Borrower, RCC and U.S. Bank National Association as indenture trustee (as successor to Deutsche Bank National Trust Company), as amended and supplemented to, and in effect on, the Closing Date, and as the same may be further amended and supplemented from time to time in accordance with the terms thereof.

"*Short-Term*", when used in connection with Indebtedness, means having an original maturity less than or equal to one year and not renewable at the option of the debtor for a term greater than one year.

"*Solvent*" means, as to any Person at any time, that (a) the present fair salable value of the property of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured; (b) such Person is able to pay its liabilities (including contingent liabilities) as they mature in the normal course of business; (c) such Person does not intend to incur liabilities beyond such Person's ability to pay as such liabilities mature; and (d) such Person is not engaged in business or a transaction for which such Person's property would constitute unreasonably small capital.

"*Stated Maturity Date*" means November 1, 2029 or, if earlier, the tenth anniversary of the Availability Period Termination Date.

"*Swap*" means any agreement, contract, or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"*Swap Contract*" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement, including any such obligations or liabilities thereunder.

"*Swap Obligation*" means, with respect to any Person, any obligation to pay or perform under any Swap.

"*Swap Termination Value*" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s) and (b) for any date prior to the date referenced in clause (a) of this definition, the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 91 of 170

mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include Lender or any Affiliate of Lender).

"*Taxes*" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholdings), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"*Tax-Exempt Organization*" means a Person organized under the laws of the United States of America or any state thereof which is an organization described in Section 501(c)(3) of the Code, which is exempt from federal income taxes under Section 501(a) of the Code and which is not a "private foundation" within the meaning of Section 509(a) of the Code, or corresponding provisions of federal income tax laws from time to time in effect.

"*Threshold Amount*" means $1,000,000.

"*Total Collateral Value*" or "*TCV*" means, as calculated at any time for the Members of the Obligated Group taken as a whole, the *sum* (without duplication) of:

(a)     an amount equal to 97.0% of all Cash in the possession of Lender or otherwise maintained in or credited to a Deposit Account, in each case to the extent subject to a first priority security interest in favor of Lender perfected by control (in the case of a Deposit Account and the Cash maintained therein or credited thereto) or possession (in the case of all other Cash) in accordance with Division 9 of the UCC, *plus*

(b)     an amount equal to 100% of all certificated certificates of deposit issued by Lender and satisfying the criteria applicable to such type of Eligible Personal Property set forth in **Exhibit A**, in each case to the extent subject to a first priority security interest in favor of Lender perfected by possession in accordance with Divisions 8 and 9 of the UCC, *plus*

(c)     as calculated separately for each type of Eligible Personal Property Collateral (other than as set forth in the preceding **clauses (a)** and **(b)** of this definition) satisfying the criteria applicable to such type of Eligible Personal Property set forth in **Exhibit A**, an amount equal to the applicable TCV% corresponding to each such type (as set forth in **Exhibit A**) of all such other Eligible Personal Property Collateral, in each case to the extent credited as a Securities Entitlement to a Securities Account subject to a first priority security interest in favor of Lender perfected by control in accordance with Divisions 8 and 9 of the UCC, *plus*

(d)     for each Appraised Location (if any), an amount equal to a percentage of the Appraised Value of Owned Real Property of such Appraised Location, with such percentage to be designated separately for each such Appraised Location, for purposes of this **clause (d)**, by Lender (in its Reasonable Discretion) in writing to the Group Representative prior to the initial inclusion of such Appraised Location in the calculation of the Asset Coverage Ratio.

For purposes of the calculation of the Asset Coverage Ratio as of any date of determination, (i) the applicable amounts of **clauses (a)** through **(d)** above, inclusive, shall be determined from time to time by Lender in its Reasonable Discretion, including based upon the

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 92 of 170

applicable monthly (or other applicable period) account statements furnished to Lender from time to time by the applicable Bank(s) and/or Security Intermediary(ies), and (ii) the applicable amounts of the Appraised Value of Owned Real Property shall be determined as of the applicable dates set forth in such definition; *provided, however,* that such appraised values shall be subject to adjustment from time to time based on new written third party real estate appraisals of one or more subject locations (inclusive of the real property and the improvements located thereon) obtained (A) by Lender (*provided* that so long as no Event of Default has occurred and is continuing, Borrower shall bear the costs of only one such additional appraisal during any five consecutive calendar year period prior to the Maturity Date) or (B) by any Member (bearing its own costs), *provided* that each such new appraisal shall be prepared by a certified real estate appraiser (acceptable to Lender in its Reasonable Discretion) for such purpose in compliance with the appraisal standards of FIRREA, including as codified at 12 C.F.R. Part 323, as determined by Lender (in its Reasonable Discretion).

"*UCC*" means the Uniform Commercial Code as in effect from time to time in the State of California; *provided* that, to the extent perfection or the effect of perfection or non-perfection or the priority of any security interest in any collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of California, "*UCC*" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"*United States Government Obligations*" means direct obligations of, or obligations the principal of and interest on which are fully guaranteed by, the full faith and credit of the United States of America.

"*Unrestricted Cash and Liquid Investments*" means, as calculated at any time, all Cash and Liquid Investment balances held by the Obligated Group for any corporate purpose, including such amounts constituting donor-restricted funds for debt service, whether classified as current or noncurrent assets, as set forth in the most recent Combined Statements delivered to Lender pursuant to **Section 6.01(a)**, in each case which are not Restricted.

"*Unrestricted Net Assets*" means, as calculated in accordance with GAAP as of the last day of each Fiscal Year of Borrower for the Members of the Obligated Group taken as a whole, the unrestricted net assets of the Obligated Group as so designated on the combined balance sheet dated as of such date and included in the Combined Statements of the Obligated Group delivered to Lender pursuant to **Section 6.01(a)**; *provided, however*, that restricted assets that are not specifically restricted by the donor in such a way that would prevent their use for the payment of debt service shall be included in this definition.

"**Unused Commitment Fee**" has the meaning given such term in **Section 2.07**.

**1.02. UCC Definitions**. Terms used herein without definition that are defined in the UCC have the respective meanings given them in the UCC and if defined in more than one article of the UCC, such terms will have the meaning defined in Divisions 8 or 9, as applicable, of the UCC, including the following terms (which are capitalized herein):

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 93 of
170

> *"Bank"*
> *"Certificated Security"*
> *"Deposit Account"*
> *"Entitlement Holder"*
> *"Financial Asset"*
> *"General Intangible"*
> *"Investment Property"*
> *"Proceeds"*
> *"Security"*
> *"Securities Account"*
> *"Securities Intermediary"*
> *"Security Entitlement"*
> *"Uncertificated Securities"*

    **1.03. Other Interpretive Provisions.** With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

    (a)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

    (b)    (i)    The words *"herein,"* *"hereto,"* *"hereof"* and *"hereunder"* and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof.

    (ii)    Article, Section, Exhibit and Schedule references are to the Loan Document in which such reference appears.

    (iii)    The term *"including"* is by way of example and not limitation.

    (iv)    The term *"documents"* includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

    (c)    In the computation of periods of time from a specified date to a later specified date, the word *"from"* means *"from and including;"* the words *"to"* and *"until"* each mean *"to but excluding;"* and the word *"through"* means *"to and including."*

    (d)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

    **1.04. Accounting Terms.** (a) All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, applied in a manner consistent with that used in preparing the Annual Financial Information, *except* as otherwise specifically prescribed herein.

Case: 24-04053   Doc# 36   Filed: 05/23/25   Entered: 05/23/25 17:31:07   Page 94 of 170

(b)     If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either Borrower or Lender shall so request, Lender and Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of Lender), *provided* that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) Borrower shall provide to Lender financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

**1.05.    Financial Statements.** Where used, the reference to the "financial statements" of the Members shall mean the financial statements of CSA, RCC and RCWC, whether audited or unaudited.

**1.06.    Calculating Financial Covenants.** For the avoidance of doubt and notwithstanding anything herein to the contrary, the Historical Debt Service Coverage Ratio, the Historical Pro Forma Debt Service Coverage Ratio and all financial covenants set forth in **Section 7.08** and **Section 8.08** (including the component definitions set forth in **Section 1.01**) to be calculated for each Member of the Obligated Group as of the last day of each Fiscal Year of Borrower (which is, on a January 1 through December 31 fiscal year) shall, for each Member other than RCWC, be calculated for the period corresponding to the applicable Fiscal Year of Borrower; *provided, however*, that such financial covenant, when so calculated as of the last day of any Fiscal Year of Borrower, shall be calculated for RCWC (which is on a July 1 through June 30 fiscal year) for the Fiscal Year of RCWC most recently ended prior to the applicable Fiscal Year-end of Borrower.

**1.07.    Rounding.** Any financial ratios required to be maintained by Borrower pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

**1.08.    References to Agreements and Laws.** Unless otherwise expressly *provided* herein, (a) references to Organization Documents, agreements (including the Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, extensions, supplements and other modifications are not prohibited by any Loan Document; and (b) references to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

**1.09.    Times of Day.** Unless otherwise specified, all references herein to times of day shall be references to California time (daylight or standard, as applicable).

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 95 of 170

# ARTICLE II
## THE COMMITMENT AND LOANS

**2.01. Delayed Draw Term Facility.** Upon the terms, subject to the conditions, including the conditions precedent set forth in **Section 4.02**, and in reliance upon the representations and warranties of Borrower and each other Member of the Obligated Group set forth in this Agreement and in the other Loan Documents, Lender agrees from time to time during the Availability Period to make loans (each such loan, a "**Loan**") of immediately available funds to Borrower, on a non-revolving basis on any Business Day specified by Borrower in the applicable Loan Notice, in an aggregate principal amount not to exceed, taken together with all previous Loans advanced by Lender, the Commitment. Each Loan will be denominated in Dollars. Amounts borrowed as Loans that are repaid or prepaid by Borrower may not be reborrowed.

**2.02. Borrowings, Conversions and Continuations of Loans.**

(a)   Each borrowing shall be made upon Borrower's irrevocable Loan Notice to Lender, which may be by facsimile or other approved electronic communications in accordance with this Agreement. Each such Loan Notice must be received by Lender not later than 1:00 p.m. three Business Days prior to the requested date of any borrowing of a Loan. Each borrowing of a Loan shall be in a minimum principal amount of $1,000,000 or in whole multiples of $100,000 in excess thereof. Each Loan Notice shall specify (i) the requested date of the borrowing (which shall be a Business Day) and (ii) the principal amount of the Loan to be borrowed.

(b)   Upon satisfaction of the applicable conditions set forth in **Section 4.02** (and, if a borrowing is the initial borrowing of Loans hereunder, **Section 4.01**), Lender shall make the proceeds of each Loan available to Borrower either by (i) crediting the account of Borrower on the books of Lender with the amount of such proceeds or (ii) wire transfer of such proceeds, in each case in accordance with instructions *provided* to (and reasonably acceptable to) Lender by Borrower.

(c)   Lender shall promptly notify Borrower of the interest rate applicable to any Interest Period for a Loan upon determination of such interest rate. The determination of the Applicable Loan Rate by Lender shall be conclusive in the absence of manifest error.

**2.03. Prepayments.**

(a)   Borrower may, upon written notice to Lender, at any time or from time to time voluntarily prepay any Loan in whole or in part without premium or penalty; *provided* that (i) such notice must be received by Lender not later than 1:00 p.m. three Business Days prior to any date of prepayment of a Loan; (ii) any prepayment of a Loan shall be in a minimum principal amount of $1,000,000 or in whole multiples of $100,000 in excess thereof or, if less, the entire principal amount of the Loans then outstanding. Each such notice shall specify the date and amount of such prepayment. If such notice is given by Borrower, Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 96 of 170

date specified therein. Each prepayment of a Loan shall be accompanied by all accrued interest thereon, together with any additional amounts required pursuant to **Section 3.04**.

**2.04. Termination or Reduction of Commitment**. Borrower may, upon written notice to Lender at any time during the Availability Period, terminate the Commitment, or from time to time permanently reduce the Commitment; *provided* that (i) any such notice shall be received by Lender not later than 1:00 p.m., five Business Days prior to the date of termination or reduction, (ii) any such partial reduction shall be in a minimum amount of $5,000,000 or in whole multiples of $1,000,000 in excess thereof, and (iii) Borrower shall not terminate or reduce the Commitment if, after giving effect thereto and to any concurrent prepayments hereunder, the then Outstanding Amount of the Loans would exceed the Commitment. All Unused Commitment Fees accrued until the effective date of any termination of the Commitment shall be paid on the effective date of such termination.

**2.05. Repayment of Loans**. The Borrower shall repay to Lender the aggregate principal amount of the Loans outstanding as of the Availability Period Termination Date (the "*Total Amortizing Loan Amount*") in quarterly principal installments due and payable on each Interest Payment Date, commencing with the first Interest Payment Date to occur after the Availability Period Termination Date, calculated based on a twenty-five (25) year mortgage-style principal amortization of such Total Amortizing Loan Amount using, for reference, the Applicable Loan Rate in effect as of the Availability Period Termination Date. Lender shall, not later than ten (10) Business Days prior to the first Interest Payment Date to occur after the Availability Period Termination Date, provide Borrower with a principal repayment schedule based on the foregoing calculation for the then outstanding Loans, which principal repayment schedule shall be attached hereto as **Exhibit F** and incorporated herein as part of this Agreement. Notwithstanding such scheduled amortization of the Loans, the entire remaining Outstanding Amount of the Loans, together with any and all accrued and unpaid interest and any and all other Obligations outstanding hereunder or under any of the other Loan Documents, shall be due and payable on the Maturity Date

**2.06. Interest.**

(a) Subject to the provisions of **Sections 2.06(c)** and **(d)**, the principal amount of the each Loan that is outstanding from time to time shall bear interest at the Applicable Loan Rate. Interest shall accrue on the outstanding principal balance of the Loans until paid in full, and such interest shall be payable by Borrower quarterly in arrears on or prior to each Interest Payment Date, commencing March 30, 2017, and upon earlier prepayment in accordance with **Section 2.03** or demand in accordance with **Section 9.02**.

(b) Lender shall determine the Applicable Loan Rate on each Computation Date, and such rate shall become effective on the LIBOR Index Reset Date next succeeding the Computation Date and interest at such rate shall accrue each day during the Interest Period that commences upon such LIBOR Index Reset Date. If the Applicable Loan Rate is not determined by Lender on the Computation Date, the rate of interest borne on the Loans shall be the rate in effect for the immediately preceding Interest Period until Lender next determines the Applicable Loan Rate as required hereunder. The computation of the Applicable Loan Rate by Lender shall,

Case: 24-04053   Doc# 36   Filed: 05/23/25   Entered: 05/23/25 17:31:07   Page 97 of 170

in the absence of manifest error, be binding and conclusive upon Borrower and the Obligated Group.

(c)     If an Event of Default under **Section 9.01(a)** occurs as a result of Borrower's failure to timely make any principal payment of the Loans or any other Obligations when due and payable under this Agreement or any of the other Loan Documents (after giving effect to any applicable cure period), whether at stated maturity, by acceleration or otherwise, or an Event of Default occurs under **Section 9.01(f)** or **Section 9.01(g)**, then the entire outstanding amount of the Obligations under this Agreement and the other Loan Documents will thereafter, from the date such Event of Default occurred and continuing until such Event of Default has been cured or waived by Lender in writing, without any required notice from Lender, bear interest at a fluctuating rate *per annum* at all times equal to the Default Rate, to the fullest extent permitted by applicable Laws.

(d)     If any Event of Default (other than an Event of Default under **Section 9.01(a), Section 9.01(f)** or **Section 9.01(g)**) occurs, then upon written notice to Borrower from Lender, the entire outstanding amount of the Obligations under this Agreement and the other Loan Documents will, effective as of the date of delivery of such written notice to Borrower and continuing until the related Event of Default has been cured or waived by Lender in writing, bear interest at a fluctuating rate *per annum* at all times equal to the Default Rate, to the fullest extent permitted by applicable Laws.

(e)     Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

**2.07.    Unused Commitment Fee.** Borrower shall pay to Lender a commitment fee (the *"Unused Commitment Fee"*) equal to 0.20% *times* the actual daily amount by which the Commitment in effect as of such date exceeds the *sum* of (a) the Outstanding Amount of the Loans as of such date and (b) the aggregate principal amount of the Loans hereunder which have been prepaid or repaid as of such date. The Unused Commitment Fee shall accrue daily during the Availability Period, including at any time during which one or more of the conditions in **Article IV** is not met, and shall be due and payable quarterly in arrears on each Interest Payment Date, commencing March 30, 2017, and on the Maturity Date.

**2.08.    Computation of Interest and Fees.** All computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a 365-day year). Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid, *provided* that any Loan that is repaid on the same day on which it is made shall bear interest for one day.

**2.09.    Evidence of Debt.** The Loans made by Lender shall be evidenced by one or more accounts or records maintained by Lender in the ordinary course of Lender's business. The accounts or records maintained by Lender shall be conclusive absent manifest error of the amount of the Loans made by Lender to Borrower and the interest and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 98 of 170

obligation of Borrower hereunder to pay any amount owing with respect to the Obligations. Upon the request of Lender, Borrower shall execute and deliver to Lender a Note, which shall evidence Lender's Loans in addition to such accounts or records. Lender may attach schedules to the Note and endorse thereon the date, amount and maturity of each Loan and payments with respect thereto.

**2.10. Payments Generally.**

(a)     All payments to be made by Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. *Except* as otherwise expressly *provided* herein, all payments by Borrower hereunder shall be made to Lender at the applicable Lending Office in Dollars and in immediately available funds not later than 2:00 p.m. on the date specified herein. All payments received by Lender after 2:00 p.m. shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.

(b)     If any payment to be made by Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(c)     At least five days prior to each Interest Payment Date, Lender shall provide Borrower a written notice of the amount of the next scheduled payment of principal (if any) and interest due and payable on such next Interest Payment Date.

(d)     Nothing herein shall be deemed to obligate Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

(e)     Borrower hereby authorizes Lender (i) to deduct automatically all principal, interest or fees when due hereunder or under any Note from any account of Borrower maintained with Lender and (ii) if and to the extent any payment of principal, interest or fees under this Agreement is not made when due to deduct any such amount from any or all of the accounts of Borrower maintained at Lender. Lender agrees to provide written notice to Borrower of any automatic deduction made pursuant to this **Section 2.10(e)** showing in reasonable detail the amounts of such deduction.

## ARTICLE III
## TAXES, YIELD PROTECTION AND ILLEGALITY

**3.01. Taxes.**

(a)     **Payments Free of Taxes.** Any and all payments by or on account of any obligation of Borrower or any other Member under any Loan Document will be made without deduction or withholding for any Taxes, *except* as required by applicable Law. If any applicable Law (as determined in the good faith discretion of Lender) requires the deduction or withholding of any Tax from any such payment by Lender, then Lender will be entitled to make such deduction or withholding and will timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable Law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Member will be increased as necessary

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 99 of 170

so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this **Section 3.01**) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)     **Payment of Other Taxes by the Members.** Without limiting the provisions of **Section 3.01(a)**, each Member will timely pay to the relevant Governmental Authority in accordance with applicable Law, or at the option of Lender, timely reimburse it for the payment of, any Other Taxes.

(c)     **Indemnification.** Each Member, jointly and severally, shall indemnify Lender, within ten days after written demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this **Section 3.01**) payable or paid by Lender or required to be withheld or deducted from a payment to Lender and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate setting forth in reasonable detail as to the amount or amounts of such payment or liability delivered to the Group Representative by Lender will be conclusive absent manifest error.

**3.02.     Illegality.** If Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for Lender or its Lending Office to make, maintain or fund Loans, or to determine or charge interest rates based upon the LIBOR Index, then, on notice thereof by Lender to Borrower, any obligation of Lender to make or continue Loans shall be suspended until Lender notifies Borrower that the circumstances giving rise to such determination no longer exist. Lender agrees to designate a different Lending Office if such designation will avoid the need for such notice and will not, in the good faith judgment of Lender, otherwise be materially disadvantageous to Lender.

**3.03.     Increased Cost and Reduced Return; Capital Adequacy.**

(a)     If Lender determines that if as a result of any Change in Law, or Lender's compliance therewith, there shall be any increase in the cost to Lender of agreeing to make or making, funding or maintaining Loans, or a reduction in the amount received or receivable by Lender in connection with any of the foregoing (excluding for purposes of this **clause (a)** any such increased costs or reduction in amount resulting from (i) Indemnified Taxes or Excluded Taxes (as to which **Section 3.01** shall govern), (ii) changes in the basis of taxation of overall net income or overall gross income by the United States or any foreign jurisdiction or any political subdivision of either thereof under the Laws of which Lender is organized or has its Lending Office, and (iii) reserve requirements utilized in the determination of the LIBOR Index), then from time to time upon demand of Lender, Borrower shall pay to Lender such additional amounts as will compensate Lender for such increased cost or reduction.

(b)     If Lender determines that any Change in Law affecting Lender, any Lending Office of Lender or Lender's holding company, in each case regarding capital or liquidity adequacy or any change therein or in the interpretation thereof, or compliance by Lender (or its Lending Office) therewith, has the effect of reducing the rate of return on the

Case: 24-04053   Doc# 36   Filed: 05/23/25   Entered: 05/23/25 17:31:07   Page 100 of
170

capital of Lender or any corporation controlling Lender as a consequence of Lender's obligations hereunder (taking into consideration its policies with respect to capital adequacy and Lender's desired return on capital), then from time to time upon demand of Lender, Borrower shall pay to the Lender such additional amounts as will compensate Lender for such reduction.

**3.04. Funding Losses.** Upon demand of Lender from time to time, Borrower shall promptly compensate Lender for and hold Lender harmless from any loss, cost or expense incurred by it as a result of (a) any payment or prepayment of any Loan on a day other than the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise) or (b) any failure by Borrower (for a reason other than the failure of Lender to make a Loan) to prepay or borrow any Loan on the date or in the amount notified by Borrower, including any loss or expense in each case arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained. Borrower shall also pay any customary administrative fees charged by Lender in connection with the foregoing.

**3.05. Requests for Compensation.** A certificate of Lender claiming compensation under this **Article III** and setting forth the additional amount or amounts to be paid to it hereunder shall be conclusive in the absence of manifest error. In determining such amount, Lender may use any reasonable averaging and attribution methods.

**3.06. Survival.** All of Borrower's obligations under this **Article III** shall survive termination of the Commitment and repayment, satisfaction or discharge of all other Obligations hereunder.

## ARTICLE IV
## CONDITIONS PRECEDENT TO THE EFFECTIVENESS OF THIS AGREEMENT AND TO THE MAKING OF THE LOANS

**4.01. Effectiveness of this Agreement.** The effectiveness of this Agreement is subject to the satisfaction of the following conditions precedent:

(a) Lender will have received the following, each of which will be (unless otherwise specified herein or otherwise required by Lender) (i) in form and substance satisfactory to Lender, (ii) dated the Closing Date (or, in the case of certificates of governmental officials, a recent date before the Closing Date), (iii) an executed original (or facsimile or portable document format versions thereof (in either such case, promptly followed by originals thereof), and (iv) to the extent to be executed by a Member, be duly executed by a Responsible Person of such Member:

(i) **This Agreement.** This Agreement, executed by Lender, Borrower and each other Member of the Obligated Group;

(ii) **Note.** If requested by Lender, a separate Note executed by Borrower to the order of Lender evidencing the Loans to be made by Lender hereunder;

(iii) **Certificate of Authority.** A Certificate of Authority executed by the Bishop of Oakland, certifying among other things, (A) that attached to such certificate is a

Case: 24-04053   Doc# 36   Filed: 05/23/25   Entered: 05/23/25 17:31:07   Page 101 of 170

true, correct and complete copy of (1) the Organization Documents of such Member then in full force and effect and (2) a certificate of good standing or status from each of the Secretary of State and the Franchise Tax Board of the State of California, (B) that the Bishop of Oakland, as the incumbent corporation sole, has the power and authority under applicable Canon Law and civil law to execute, deliver and perform the Loan Documents to which Borrower is a party, and (C) that Lender may conclusively rely on such certificate;

(iv) **Certificates of Authenticity and Incumbency of Diocesan Custodian of Records.** Separate certificates, executed by the custodian of records of the Diocese of Oakland (or, as appropriate, a Responsible Person) on behalf of each Member of the Obligated Group (other than Borrower), certifying, among other things, (A) that attached to such certificate are true, correct and complete copies of (1) the Organization Documents of such Member then in full force and effect, (2) the resolutions then in full force and effect adopted by the Governing Body of such Member authorizing and ratifying the execution, delivery and performance by such Member of the Loan Documents to which it is a party, (3) a certificate of good standing or status from each of the Secretary of State and the Franchise Tax Board of the State of California, (B) the name(s) of the Responsible Persons of such Member authorized to execute Loan Documents on behalf of such Member, together with incumbency samples of the true signatures of such Responsible Person, and (C) that Lender may conclusively rely on such certificate; and

(v) **Opinions of the Members' Counsel.** Favorable opinions of counsel from the following counsel, addressed to Lender as of the Closing Date as to such matters as are reasonably required by Lender with respect to the Members and the Loan Documents:

(A) Opinion of the Judicial Vicar of the Diocese of Oakland as to matters related to Canon Law, and

(B) Opinion of Foley & Lardner, LLP, special counsel to the Members, as to matters of California and other civil law.

(b) **Consent of the Holders of the Series 2007 Bonds.** Lender will have received a written consent, in form and substance satisfactory to Lender (in its Reasonable Discretion), of the holders of the Series 2007 Bonds pursuant to the terms of the Master Indenture and the Series 2007 Indenture, consenting to the Members entering into and performing their obligations under this Agreement and the other Loan Documents, including incurring the Obligations hereunder and granting the security interest and other Liens contemplated hereby in favor of Lender, in form and substance satisfactory to Lender.

(c) **Insurance.** Lender will have received documentation satisfactorily demonstrating that all insurance required to be maintained pursuant to **Section 6.07** has been obtained and is in effect, including the certificates of property and liability insurance, in the latter instance naming Lender as an additional insured in respect of each policy of liability insurance of the Members.

(d) **No Litigation.** No investigation, litigation, alternative dispute proceeding or other similar suit or proceeding instituted by any Person (including any Governmental

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 102 of 170

Authority) will be pending in any court or before any arbitrator or mediator or before any Governmental Authority, or will have been threatened in writing by any Person (including any Governmental Authority) to be instituted, (i) with respect to this Agreement or any of the related Loan Documents, or (ii) which could, if adversely determined, reasonably be expected to have or result in a Material Adverse Change.

(e)     **Due Diligence**. Lender will have completed, to its satisfaction, all legal, tax, business and other due diligence with respect to the business, assets, liabilities, operations and condition (financial or otherwise) of the Members of the Obligated Group, all in scope and determination satisfactory to Lender (as part of such diligence, Lender will have received and approved a copy of the investment policies of Borrower and the other Members of the Obligations).

(f)     **Know Your Customer**. Lender will have received all documentation and other information requested by Lender from the Members under applicable "know your customer" and other Sanctions, anti-money laundering and anti-corruption Laws, including the PATRIOT Act, with results satisfactory to Lender.

(g)     **Payment of Lender's Expenses.** Borrower will have paid all reasonable and documented out-of-pocket fees, expenses, charges and disbursements of Lender, including the reasonable fees, expenses, charges and other disbursements of Sheppard Mullin Richter & Hampton, LLP, as special counsel to Lender.

**4.02.     Conditions to the Borrowing of Loans.** Commencing with the Closing Date and thereafter during the Availability Period, but subject expressly to the satisfaction of the conditions precedent set forth in **Section 4.01** as to the initial borrowing of a Loan hereunder, the obligation of Lender to make any Loan hereunder is further subject to the satisfaction, as determined by Lender, of each of the following separate and additional conditions precedent:

(a)     **Truth and Correctness of Representations and Warranties.** The representations and warranties of Borrower and each other Member contained in this Agreement (including **Article V**) or in any other Loan Document will be true and correct in all material respects (*except* that such materiality qualifier will not be applicable to any portion of any representation and warranty that is already qualified or modified by materiality in the text thereof) on and as of the date of the funding of such Loan to Borrower, *except* to the extent that any such representation or warranty specifically refers to an earlier date, in which case such representation or warranty will be true and correct in all material respects (*except* that such materiality qualifier will not be applicable to any portion of any representation and warranty that is already qualified or modified by materiality in the text thereof) as of such earlier date.

(b)     **Loan Notice.** Lender will have received the applicable Loan Notice, completed and executed by a Responsible Person of Borrower.

(c)     **No Default or Event of Default.** No Default or Event of Default will then exist, or will result from the making of such proposed Loan or from the application of the proceeds thereof.

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 103 of 170

(d) **Pro Forma Asset Coverage Ratio**. The Asset Coverage Ratio, as determined by Lender and calculated on a *pro forma* basis as of two Business Days preceding the borrowing date requested in the applicable Loan Notice taking into account the borrowing of the Loan requested in such Loan Notice, shall not be less than 1.00:1.00.

(e) **No Material Adverse Change.** No Material Adverse Change will have occurred since December 31, 2015.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

To induce Lender to enter into this Agreement and to make the Loans hereunder, each Member of the Obligated Group hereby represents and warrants to Lender as follows:

**5.01. Existence, Qualification and Power; Compliance with Laws.** (a) Borrower is a corporation sole and nonprofit religious corporation duly organized, validly existing and in good standing under the Laws of the State of California; (b) RCWC and RCC each is a nonprofit religious corporation duly organized, validly existing and in good standing under the Laws of the State of California; (c) Adventus is a nonprofit public benefit corporation duly organized, validly existing and in good standing under the Laws of the State of California; (d) each other Member of the Obligated Group joined to this Agreement pursuant to **Section 11.01(b)** is a nonprofit corporation duly organized, validly existing and in good standing under the Laws of the applicable state of incorporation or organization; and (e) each Member of the Obligated Group has all requisite power and authority under applicable Law and all requisite licenses, authorizations, permits, consents and approvals to (i) own its assets, including each of the Facilities, and to conduct, in all material respects, its business and affairs as currently conducted and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party.

**5.02. Corporate Authorization; No Contravention.** The execution, delivery and performance by each Member of the Obligated Group of each Loan Document to which such Member is party have been duly authorized by all necessary corporate or other organizational action and do not and will not (a) contravene the terms of any of such Member's Organization Documents; (b) conflict with or result in any breach or contravention of, or the creation of any Lien (other than Permitted Liens) under (i) any Contractual Obligation to which such Member is a party or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Member or its property is subject; or (c) violate any applicable Law, including and applicable canon Law.

**5.03. Tax Exempt Organizations.** Each Member of the Obligated Group is listed in the Official Catholic Directory and is a Tax Exempt Organization pursuant to the group ruling issued annually to the United States Conference of Catholic Bishops with respect to the Roman Catholic Church in the United States by the Internal Revenue Service, which group ruling is and remains in full force and effect; and neither Borrower nor any other Member of the Obligated Group has "unrelated business taxable income" as defined in Section 512 of the Code which could reasonably be expected to affect adversely its status as an organization described in Section 501(c)(3) of the Code or its exemption from federal income taxation under Section

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 104 of 170

501(a) of the Code or which, if such income were subject to federal income taxation, could reasonably be expected to have or result in a Material Adverse Change.

**5.04. Governmental or Other Authorizations.** No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required under any applicable Law, including under applicable Canon Law, in connection with the execution, delivery or performance by, or enforcement against, any Member of the Obligated Group of this Agreement or any other Loan Document (*except* as has otherwise already been obtained).

**5.05. Binding Effect.** This Agreement has been, and each other Loan Document, when delivered hereunder, will have been, duly executed and delivered by each Member of the Obligated Group that is party thereto. This Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding joint and several obligation of such Member, enforceable against each Member that is party thereto in accordance with its terms, *except* as enforcement thereof may be limited by Debtor Relief Laws or other applicable Laws affecting the enforcement of creditors' rights generally and by general principles of equity.

**5.06. Enforceability of Section 6.15.** Without limiting the generality of **Section 5.05**, there is no law, rule, procedure, agreement, corporate document or instrument under Canon Law or under any applicable civil Law that would create any material impediment to the validity or enforceability of the covenant contained in **Section 6.15**, and the public juridic persons subject to the governance of the Bishop of Oakland do not have any objections or defenses against Borrower or the Bishop of Oakland using his authority to obtain the funds necessary to meet its Contractual Obligations in the manner set forth in **Section 6.15**.

**5.07. Financial Statements; No Material Adverse Change.**

(a)     The Annual Financial Information for the Fiscal Year of Borrower ended December 31, 2015 (i) was prepared in accordance with GAAP consistently applied throughout the period covered thereby, *except* as otherwise expressly noted therein, (ii) fairly presents the financial condition of the Obligated Group as of the date thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, *except* as otherwise expressly noted therein, and (iii) shows all material indebtedness and other liabilities, direct or contingent, of the Obligated Group as of the date thereof to the extent required to be disclosed by GAAP.

(b)     The unaudited quarterly financial statements of CSA and RCC dated June 30, 2016 (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, *except* as otherwise expressly noted therein, and (ii) fairly present the financial condition of CSA and RCC as of the date thereof and their results of operations for the period covered thereby, subject to the absence of footnotes and to normal year-end audit adjustments.

(c)     Since December 31, 2015, there has been no event or circumstance, either individually or in the aggregate, that has had or would reasonably be expected to have or result in a Material Adverse Change.

Case: 24-04053   Doc# 36   Filed: 05/23/25   Entered: 05/23/25 17:31:07   Page 105 of 170

**5.08. Litigation.** There are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Members of the Obligated Group, threatened in writing, at law, in equity, in arbitration or before any Governmental Authority, by or against Borrower or any other Member of the Obligated Group or against any of their Properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document, or any of the transactions contemplated hereby, or (b) either individually or in the aggregate would reasonably be expected to have or result in a Material Adverse Change.

**5.09. No Default.** No Member of the Obligated Group is in default under or with respect to any Contractual Obligation that would, either individually or in the aggregate, reasonably be expected to have or result in a Material Adverse Change. No Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

**5.10. Ownership of Property; Liens.** *Except* for donor restrictions as to disposal, alienation, or such equivalent transfers, the Obligated Group has good record and marketable title in fee simple to, or valid leasehold interests in, all real property necessary or used in the ordinary conduct of its business, *except* for such defects in title as would not, individually or in the aggregate, reasonably be expected to have or result in a Material Adverse Change. The Property of the Members of the Obligated Group is not subject to any Liens other than Permitted Liens.

**5.11. Environmental Compliance.** The Members of the Obligated Group conduct in the ordinary course of business a review of the effect of existing Environmental Laws and claims, if any, alleging potential liability or responsibility for violation of any Environmental Law on their respective operations and Properties, and as a result thereof Borrower has reasonably concluded that such Environmental Laws and claims could not, individually or in the aggregate, reasonably be expected to have or result in a Material Adverse Change.

**5.12. ERISA Plans.** No Member nor any of Borrower's other ERISA Affiliates has received any notice or has any knowledge to the effect that it is not in compliance in all material respects with the applicable provisions of ERISA, the Code and other related Federal or, to the extent not pre-empted by ERISA, state Laws. With respect to each Plan of any Member or of any of Borrower's other ERISA Affiliates, no Reportable Event, Prohibited Transaction or other fact or circumstance exists which may have an adverse effect on the tax qualified status of such Plan. Neither any member nor any of Borrower's other ERISA Affiliates has (a) any withdrawal liability in connection with a Multiemployer Plan, (b) any accumulated funding deficiency within the meaning of ERISA or (c) any liability, or knows of any fact or circumstances which could result in any liability to PBGC, the IRS, the United States Department of Labor or any participant in connection with any Plan (other than accrued benefits which are or may become payable to participants or beneficiaries of any such Plan).

**5.13. Margin Regulations.** No Member is engaged or will engage, principally or as one of its important activities, in the business of purchasing or carrying Margin Stock, or extending credit for the purpose of purchasing or carrying Margin Stock. No part of the proceeds of the Loans will be used, directly or indirectly, to purchase or carry any Margin Stock, or to refinance any Indebtedness originally incurred for such purpose, or for any other purpose, in

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 106 of 170

each case, in a manner that entails a violation (including on the part of Lender) of the provisions of Regulations U or X adopted by the FRB.

**5.14.   Disclosure.** No Loan Document and no other document delivered pursuant to **Sections 6.01, 6.02** and **6.03** that is furnished by or on behalf of any Member to Lender contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading; *provided* that, with respect to projected financial information, the Members represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

**5.15.   Compliance with Laws.** Each Member is in compliance in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its Properties, *except* in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in accordance with **Section 12.01** or (b) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have or result in a Material Adverse Change.

**5.16.   Solvency.** Borrower is, and the Obligated Group taken as a whole is, Solvent.

**5.17.   Taxes.** The Members have filed all Federal, state and other material tax returns and reports required to be filed, and have paid all Federal, state and other material taxes, assessments, fees and other governmental charges levied or imposed upon them or their Properties otherwise due and payable, *except* those which are being contested in accordance with **Section 12.01**.

**5.18.   Swap Contracts.** Borrower is, and at the time Borrower enters into each Swap Contract contemplated by **Section 6.12** Borrower will be, an "eligible contract participant" within the meaning of the Commodity Exchange Act. Before entering into each Swap Contract contemplated by **Section 6.12**, Borrower shall have consulted with appropriate legal counsel concerning the Swap Contract, and Borrower fully understands the legal effect and risks associated with entering into the Swap Contracts.

**5.19.   Anti-Corruption Laws and Anti-Terrorism Laws.**

(a)     No Member nor, to the actual knowledge of any Member, any director, officer, employee or agent of any such Member, is a Person that is or is owned or otherwise Controlled by any other Person that is (i) currently the subject or target of any Sanctions or (ii) located, organized or resident in a Designated Jurisdiction.

(b)     Each Member has conducted its business in compliance with applicable Anti-Corruption Laws and Anti-Terrorism Laws and have instituted and maintained policies and procedures designed to promote and achieve compliance with such Laws.

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 107 of 170

# ARTICLE VI
# AFFIRMATIVE COVENANTS

Until the Commitment shall have expired or been terminated, the principal of and interest on each Loan and all fees, expenses and other amounts (other than under Secured Swap Obligations, Cash Management Obligations and unasserted contingent indemnification obligations) under any Loan Document have been paid in full in cash, each Member of the Obligated Group covenants and agrees, jointly and severally, with Lender that it will:

**6.01. Financial Statements.** Deliver, or cause the Group Representative to deliver on behalf of each Member, to Lender (in form and detail satisfactory to Lender):

(a)     As soon as reasonably available but in no event later than 180 days after the last day of each Fiscal Year of Borrower (for CSA), RCC (for RCC) and RCWC (for RCWC), as applicable, (i) an accountants' report attaching the audited financial statements for CSA and RCC and the compiled financial statements for RCWC for each applicable Fiscal Year, in each case prepared by the firms currently auditing (in the case of CSA and RCC) or compiling (in the case of RCWC) the financial information of CSA, RCC and RCWC as of the Closing Date (the "*Current Firms*") or by a firm or firms of nationally recognized independent certified public accountants selected by the Group Representative and satisfactory to Lender in its Reasonable Discretion (a "*New Firm*") and covering the operations of CSA, RCC or RCWC, as applicable for such Fiscal Year, and (ii) an accountant's report attaching an unaudited combined Statement of Financial Position for CSA, RCC and RCWC and an unaudited combined Statement of Activities for CSA, RCC and RCWC (collectively, the "*Combined Statements*"), prepared by the Current Firms or a New Firm, which report shall contain a calculation of the Historical Debt Service Coverage Ratio for such Fiscal Year based on the Combined Statements and shall state whether, based on the Combined Statements, the covenants in **Section 7.08** (if such Fiscal Year ended on or before the Master Indenture Termination Date) or **Section 8.08** (if such Fiscal Year ended after the Master Indenture Termination Date) have been satisfied (the annual reports described in the preceding clauses (i) and (ii) are referred to collectively as the "*Annual Financial Information*").

(b)     As soon as reasonably available but in no event later than 60 days after the last day of each of the second quarterly fiscal period of each Fiscal Year of Borrower, a certificate of the Chief Financial Officer of the Group Representative (or other authorized officer having primary responsibility for the financial affairs of the Group Representative) setting forth (i) changes in net fixed assets, (ii) changes in the Indebtedness of the Obligated Group, (iii) the aggregate balance of all Investments (including all Cash and Liquid Investments) of the Members that are not Restricted, (iv) that to such Responsible Person's knowledge, no Default, Event of Default or Material Adverse Change has occurred, (v) the unaudited, internally prepared financial statements for each of CSA and RCC, (vi) a summary discussion covering significant changes to the financial condition and operations of each of the Members, including updates, if any, of litigation matters, all in reasonable detail and certified, subject to year-end adjustment, by authorized financial officers of each of the Members.

**6.02. Certificates; Other Information.** Deliver, or cause the Group Representative to deliver on behalf of each Member, to Lender (in form and detail satisfactory to Lender):

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 108 of 170

(a)     Concurrently with the delivery of the Annual Financial Information referred to in **Section 6.01(a)** for the Fiscal Year most recently ended, a duly completed Compliance Certificate signed by the Chief Financial Officer of the Group Representative (or other authorized officer having primary responsibility for the financial affairs of the Group Representative).

(i)     In the event the Historical Debt Service Coverage Ratio for any Fiscal Year, as calculated and certified pursuant to the Compliance Certificate delivered pursuant to this **Section 6.02(a)** for such most recently completed Fiscal Year, is less than 1.35:1, the Members of the Obligated Group, at their expense, shall retain a Consultant to make recommendations with respect to the rates, fees and charges, *cathedraticum* and assessments, property sales and asset liquidation of the Members and with respect to the Members' methods of operation and other factors affecting the Obligated Group's financial condition in order to increase such Historical Debt Service Coverage Ratio to at least 1.35:1.

(ii)     As soon as reasonably available but in no event later than ten days after receipt by the Members or the Group Representative on behalf of the Members, a copy of each Consultant's report and Consultant's recommendations shall be delivered to Lender.

(iii)     The Members shall in good faith follow such recommendations of the Consultant to the extent reasonably feasible (as determined by the Governing Bodies of the applicable Members) and to the extent permitted by applicable Law. The undertaking described in the preceding sentence shall not be construed to prohibit the Members of the Obligated Group from serving the indigent and the community to the extent required for them to continue their qualification as Tax-Exempt Organizations, or from serving any other class or classes of people without charge or at reduced rates.

(b)     Concurrently with the delivery of the financial statements referred to in **Sections 6.01(a)**, a certificate signed by the Chief Financial Officer of the Group Representative (or other authorized officer having primary responsibility for financial affairs of the Group Representative) stating that in preparing such financial statements no knowledge was obtained of any Default having occurred that is then still continuing or, if any such Default shall exist, stating the nature and status of such event.

(c)     Promptly after any request by Lender, made in its Reasonable Discretion, copies of any detailed audit reports, management letters or recommendations submitted to the Governing Body (or any designated committee or representative thereof) of Borrower or any other Member by independent accountants in connection with their audit or review of the accounts or books of any Member of the Obligated Group, including of CSA.

(d)     As soon as reasonably available but in no event later than 180 days after the last day of the Fiscal Year of RCWC, an annual operating budget of RCWC as adopted by its Governing Body for the forthcoming Fiscal Year.

(e)     As soon as reasonably available, all updates to the investment policies of Borrower and the other Members of the Obligated Group delivered to Lender pursuant to **Section 4.01(e)**.

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 109 of 170

(f)     Such additional information as Lender may reasonably request concerning any Member; *provided, however*, that a Member shall in no event be required to make available nonfinancial documents of a confidential nature.

**6.03.   Notices.** Promptly notify Lender, or cause the Group Representative on behalf of each Member, to promptly notify Lender:

(a)     of the occurrence of any Default;

(b)     of (i) the institution of any investigation, litigation or alternative dispute proceeding by any Person, including any Governmental Authority, (A) which creates a material risk of resulting, after giving effect to any applicable insurance, in the payment by the Obligated Group or any Member thereof of more than the Threshold Amount, (B) with respect to which there is a reasonable likelihood of a finding adverse to a Member, which adverse finding, if made, could reasonably be expected to have or result in a Material Adverse Change, or (C) which seeks in any manner to invalidate any Loan Document or any provision thereof or to otherwise enjoin the performance of any Loan Document or any provision thereof, and (ii) any material development in any investigation, litigation or alternative dispute proceeding described in the preceding **subclause (b)(i);**

(c)     of any matter that has resulted or would reasonably be expected to have or result in a Material Adverse Change;

(d)     of any change of independent accountants by any Member of the Obligated Group, which notice shall state (i) the effective date of such change, (ii) whether there were any unresolved disagreements with the former accountants on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure, which the accountants claimed would have caused them to refer to the disagreement in a report on the disputed matter, if it was not resolved to their satisfaction, and (iii) such additional information relating thereto as Lender may reasonably request;

(e)     of any material change in accounting policies or financial reporting practices by the Obligated Group;

(f)     of the destruction of any Facilities of the Obligated Group or any portion thereof as a result of fire or other casualty, or any damage to such Facilities or portion thereof as a result of fire or other casualty, the Net Proceeds of which are estimated to exceed $3,000,000; and

(g)     of any prospective or pending condemnation proceedings with respect to any Facilities of the Obligated Group or any portion thereof, and of the receipt of the Net Proceeds of any such condemnation received by the Obligated Group in excess of $3,000,000.

**6.04.   Payment of Obligations.** Pay and discharge as the same will become due and payable, (a) all tax liabilities, assessments and governmental charges or levies upon it or its Properties, the failure of which to pay would reasonably be expected to have or result in a Material Adverse Change; (b) all lawful claims which, if unpaid, would by law become a Lien upon its property (other than a Permitted Lien); and (c) all Indebtedness, as and when due and

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 110 of 170

payable (but subject to any subordination provisions contained in any instrument or agreement evidencing such Indebtedness), *except* where, in the case of each of the preceding **clauses (a)** through **(c)**, such failure to timely pay or discharge in full is being contested in accordance with **Section 12.01.**

**6.05. Preservation of Existence, Rights, Privileges, Permits, Licenses, Accreditations and Qualifications.** (a) Preserve, renew and maintain in full force and effect its legal existence and good standing, including as a nonprofit corporation, under the Laws of the State of California, (b) preserve and maintain in full force and effect its legal existence as a Tax-Exempt Organization and (c) *except* to the extent that failure to do so could not reasonably be expected to have or result in a Material Adverse Change, take all reasonable action to maintain all rights, privileges, permits, licenses, accreditations and qualifications necessary or reasonably desirable in the normal operation and use of its Facilities and conduct of its activities and businesses.

**6.06. Maintenance of Properties.** At all times (a) use its Facilities only in furtherance of its lawful purposes, (b) cause its activities and businesses to be carried on and conducted and its Properties to be maintained, preserved and kept in good working order and condition, ordinary wear and tear excepted, and in as safe condition as its operations will reasonably permit, and (c) make all necessary and proper repairs and replacements thereof and thereto so that its operations and activities and businesses shall at all times be conducted in an efficient, proper and advantageous manner; *provided, however*, that nothing herein contained shall be construed to prevent any Member from ceasing to operate any portion of its Property if in its reasonable good faith judgment (evidenced, in the case of such a cessation other than in the ordinary course of business, by a determination by its Governing Body) it is advisable not to continue to operate the same, or if it intends to sell or otherwise Dispose of the same and within a reasonable time endeavors to effect such Disposition.

**6.07. Insurance.** Maintain, at the Obligated Group's sole expense, insurance with respect to its activities and businesses and its Property and the operation thereof against such casualties, contingencies and risks (including public liability, sexual misconduct, earthquake and employee dishonesty) and, in such amounts (*except* for earthquake and sexual misconduct coverage) not less than is customary in the case of Persons engaged in the same or similar activities and similarly situated and as, in the judgment of the Group Representative, is adequate to protect the Property, activities and operations of the Obligated Group. In the case of earthquake and sexual misconduct coverage, each Member shall maintain or cause to be maintained, at its sole expense, reasonable coverage under the circumstances in such amounts as are reasonably available to each Member. The Group Representative shall annually review the insurance each Member of the Obligated Group maintains pursuant hereto as to its customariness and adequacy. In addition, the Group Representative shall at least once every two Fiscal Years (commencing with its Fiscal Year 2017) cause a report of an Insurance Consultant (along with a copy of the Group Representative's review of such report) to be delivered to Lender indicating the insurance (*except* for earthquake and sexual misconduct coverage) then being maintained by the Members of the Obligated Group is customary in the case of corporations engaged in the same or similar activities and similarly situated, and in the case of earthquake and sexual misconduct coverage, is reasonable coverage under the circumstances and is maintained in such amounts as are reasonably available to the Members. Any Member may self-insure or participate

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 111 of 170

in pooled-risk insurance or similar programs to the extent the Insurance Consultant determines that the same is prudent in the circumstances.

**6.08.   Compliance with Laws.** Comply in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, *except* in such instances in which the failure to comply therewith is being contested in accordance with **Section 12.01** or could not otherwise reasonably be expected to have or result in a Material Adverse Change.

**6.09.   Books and Records.** Maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the activities, business and Property of the Members of the Obligated Group.

**6.10.   Inspection Rights.** Permit representatives and independent contractors of Lender to visit and inspect any of the Members of the Obligated Group's Facilities and other Property, to examine the Members' corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss the Members' affairs, finances and accounts with their respective officers and independent accountants, at such reasonable times during normal business hours upon reasonable advance notice to the Group Representative; *provided* that (a) the primary contact with the Obligated Group under this **Section 6.10** shall be to the Group Representative, (b) that a Member shall in no event be required to make available nonfinancial documents of a confidential nature, (c) no more than one such inspection during any calendar year shall be at the expense of the Obligated Group, and (d) notwithstanding the preceding **clause (c)**, if an Event of Default has occurred and is then continuing, Lender (or any of its representatives or independent contractors) may do any of the foregoing at the expense of the Obligated Group at any time during normal business hours and without advance notice.

**6.11.   Performance of Covenants.** Faithfully perform at all times any and all covenants, undertakings and provisions contained in this Agreement and in each other Loan Document to which such Member is a party. In furtherance thereof, each Member covenants and agrees, jointly and severally, (a) that Canon Law is not, and shall not be construed to be, inconsistent with any covenant, undertaking or provision in this Agreement or any other Loan Document that by its terms under applicable civil Law is binding on such Member, and (b) to operate its Property and conduct its activities and businesses in such a manner as to provide revenue which, together with other available funds, is sufficient to pay promptly all payments of principal and interest on its Indebtedness, all expenses of operation, maintenance and repair of its Property and all other payments required to be made by it hereunder, to the extent permitted by applicable Law and consistent with its religious mission.

**6.12.   Swap Contracts.** Not later than 180 days following the Closing Date, Borrower shall have entered into and will thereafter maintain in effect one or more Swap Contracts providing protection against fluctuations in interest rates, in the notional principal amount equal to not less than 25% of the $70,000,000 total Commitment amount (as reduced from time to time by the proportional amount of projected scheduled amortization of the Loans after the Availability Period Termination Date); *provided* that such Swap Contracts (including the counterparties thereto) will be satisfactory to Lender (in its Reasonable Discretion) and will have

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 112 of 170

an aggregate term at execution of not less than the period from November 1, 2019 until the Stated Maturity Date.

**6.13. Maintenance of Deposit Account Relationship.** Not later than 180 days following the Closing Date, Borrower and the Obligated Group shall establish Deposit Accounts at Compass Bank in which the Obligated Group shall maintain Cash in the form of demand, time and other similar accounts of not less than (a) $3,000,000 at all times from the 30th day following the Closing Date through the 180th day following the Closing Date, (b) $8,000,000 at all times thereafter during the Availability Period, and (c) $12,000,000 at all times following the Availability Period Termination Date.

**6.14. Further Assurances.** In addition to the obligations and documents which this Agreement expressly requires that any Member execute, acknowledge, deliver and perform, each Member will execute and acknowledge (or cause to be executed and acknowledged) and deliver to Lender all documents, and take all actions, that may be reasonably requested by Lender from time to time hereunder to confirm the rights created or now or hereafter intended to be created under the Loan Documents, to protect and further the validity, extent, priority and enforceability of the Liens created under the Loan Documents, or otherwise to carry out the purposes of the Loan Documents and the transactions contemplated hereunder and thereunder.

**6.15. Covenant to Obtain Assets.** In the event the Obligated Group cannot make timely payments under the Obligations, in addition to other means of raising income which may be legally available to it, Borrower, through the Bishop of Oakland, will also take any or all of the following actions in order (a) to avoid, or to cure, an Event of Default hereunder, and (b) to satisfy the covenants contained in **Section 6.11**:

        (i)     use, control, and if necessary dispose of the assets of those public juridic persons subject to his governance;

        (ii)    increase the customary rate of the *cathedraticum* on all or substantially all of the public juridic persons subject to his governance;

        (iii)   impose an extraordinary and moderate exaction upon other physical and juridic persons;

        (iv)   increase prescribed fees and suggested free-will offerings; and

        (v)    institute a diocesan-wide extraordinary appeal.

## ARTICLE VII
## NEGATIVE COVENANTS
## (PRIOR TO THE MASTER INDENTURE TERMINATION DATE)

Until the earlier to occur of the Master Indenture Termination Date and the payment in full in cash of the principal of and interest on each Loan and all fees, expenses and other amounts (other than Secured Swap Obligations, Cash Management Obligations and unasserted contingent indemnification obligations), each Member of the Obligated Group covenants and agrees, jointly and severally, with Lender that it will not, directly or indirectly:

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 113 of 170

**7.01.** **Liens**. Create, incur, assume or suffer to exist any Lien upon any of its Property, assets or revenues, whether now owned or hereafter acquired, other than the following:

(a)    Liens granted, pledged or otherwise created pursuant to any Loan Document to secure the Secured Obligations;

(b)    Liens granted, pledged or otherwise created pursuant to the Master Indenture, the Series 2007 Indenture or any other Related Bond Document (as defined in the Master Indenture) to secure the payment and redemption of the Series 2007 Bonds;

(c)    Liens securing Non-Recourse Indebtedness permitted pursuant to **Section 7.02(i)**;

(d)    Liens securing Indebtedness of any Member of the Obligated Group permitted by **Section 7.02** if and to the extent both (i) after giving effect to all Liens permitted by this **Section 7.01(d)**, the Book Value, or, at the option of the Group Representative, the Current Value of the Property of the Obligated Group which is Encumbered by any such Liens (excluding amounts on deposit in any fund maintained under the Series 2007 Indenture for the purpose of matching periodic debt service payments by a Member with periodic debt service payments on the Series 2007 Bonds or for the purpose of an interest or debt service reserve fund, in all cases in amounts which do not exceed amounts customarily deposited in such a fund) is not more than 5% of the value of all of the Property of the Obligated Group (calculated on the same basis as the value of the Encumbered Property), and (ii) the conditions described in **Section 7.02(d)** are met for allowing the incurrence of one dollar of additional Funded Indebtedness; and

(e)    Permitted Encumbrances.

**7.02.** **Indebtedness**. Create, incur, assume or suffer to exist any Indebtedness, *except*:

(a)    Indebtedness under the Loan Documents;

(b)    Indebtedness under the Series 2007 Indenture and the Series 2007 Bonds issued thereunder;

(c)    Indebtedness, including Guaranties, outstanding on the date hereof and listed on **Schedule 7.02** and any refinancings, refundings, renewals or extensions thereof; *provided* that the amount of such Indebtedness is not increased at the time of such refinancing, refunding, renewal or extension *except* by an amount equal to a reasonable premium or other reasonable amount paid, and fees and expenses reasonably incurred, in connection with such refinancing and by an amount equal to any existing commitments unutilized thereunder;

(d)    Indebtedness, if prior to incurrence thereof (or, if such Funded Indebtedness was incurred in accordance with another clause of this **Section 7.02** and the Members wish to have such Indebtedness classified as having been issued under this **clause (d)** prior to such classification) there is delivered to Lender:

(i)    a written report of independent certified public accountants (which accountants and report, including the scope, form, substance and other aspects thereof, are

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 114 of 170

acceptable to Lender (in its Reasonable Discretion)) stating that the Historical Pro Forma Debt Service Coverage Ratio of the Obligated Group for the two most recent Fiscal Years preceding the date of delivery of the report for which combined financial statements reported upon by independent certified public accountants have been delivered to Lender (including pursuant to **Section 6.01(a)**) are available was not less than 1.35:1, or

        (ii)    a written report of independent certified public accountants (which accountants and report, including the scope, form, substance and other aspects thereof, are acceptable to Lender (in its Reasonable Discretion)) stating that the Historical Debt Service Coverage Ratio of the Obligated Group for the Fiscal Year next preceding the incurrence of such Funded Indebtedness for which Combined Statements have been delivered to Lender pursuant to **Section 6.01(a)** was not less than 1.50:1, and (B) a written Consultant's report (which report, including the scope, form, substance and other aspects thereof are acceptable to Lender (in its Reasonable Discretion)) to the effect that the Projected Debt Service Coverage Ratio of the Obligated Group for each of the next two succeeding Fiscal Years or, if such Indebtedness is being incurred in connection with the financing of Facilities, the two Fiscal Years succeeding the projected completion date of such Facilities, is not less than 1.50:1, which report shall include forecast balance sheets, statements of revenue and expense and statements of changes in financial position for each of such two Fiscal Years and a statement of the relevant assumptions upon which such forecasted statements are based, which financial statements must indicate that sufficient revenues and cash flow could be generated to pay the operating expenses of the Obligated Group's proposed and existing Facilities and the debt service on the Obligated Group's other existing Indebtedness during such two Fiscal Years; *provided* that the requirements of the preceding **subclause (ii)(A)** or **(B)**, as the case may be, shall be deemed satisfied if the report of a Consultant (which report, including the scope, form, substance and other aspects thereof are acceptable to Lender (in its Reasonable Discretion)) contains an opinion of such Consultant that applicable Laws have prevented or will prevent the Obligated Group from generating the amount of Income Available for Debt Service required to be generated by the preceding **subclause (d)(ii)(A)** or **(B)**, as the case may be, as a prerequisite to the issuance of Funded Indebtedness;

        (e)    Completion Funded Indebtedness in an aggregate principal amount not exceeding 20% of the aggregate principal amount of Funded Indebtedness originally issued to finance the Facilities to be completed if there is delivered to Lender:

        (i)    a certificate signed by a Responsible Person of the Group Representative stating that at the time the original Funded Indebtedness for the Facilities to be completed was incurred, the Members of the Obligated Group had reason to believe that the proceeds of such Funded Indebtedness together with other moneys then expected to be available would provide sufficient moneys for the completion of such Facilities,

        (ii)    a statement of an independent architect or other expert acceptable to Lender (in its Reasonable Discretion) setting forth the amount estimated to be needed to complete the Facilities, and

        (iii)    a certificate signed by a Responsible Person of the Group Representative stating that the proceeds of such Completion Funded Indebtedness to be applied

Case: 24-04053   Doc# 36   Filed: 05/23/25   Entered: 05/23/25 17:31:07   Page 115 of 170

to the completion of the Facilities, together with a reasonable estimate of investment income to be earned on such proceeds and the amount of moneys, if any, committed to such completion through enumerated bank loans (including letters or lines of credit) or through federal or state grants, will be in an amount not less than the amount set forth in the statement of an independent architect or other expert in the preceding **clause (e)(ii)**;

(f)     Funded Indebtedness for the purpose of refunding (whether in advance or otherwise) any outstanding Funded Indebtedness so as to render it no longer outstanding if prior to the incurrence thereof either:

(i)     a certificate of the Chief Financial Officer of the Group Representative (or other authorized officer having primary responsibility for the financial affairs of the Group Representative) is delivered to Lender stating that, taking the issuance of the proposed Funded Indebtedness and the refunding of the existing Funded Indebtedness into account, the Maximum Annual Debt Service Requirement of the Obligated Group will not be increased by more than 5%, or

(ii)     the conditions set forth in **Section 7.02(d)** are met with respect to such proposed Funded Indebtedness, taking the refunding of the Funded Indebtedness to be refunded into account;

(g)     Short-Term Indebtedness (other than Short-Term Indebtedness incurred in accordance with **Section 7.02(h)**) in a principal amount which at the time incurred does not, together with the principal amount of all other such Short-Term Indebtedness of the Obligated Group then outstanding and the principal payable on all Funded Indebtedness during the next succeeding twelve months, exceed 15% of the Revenues of the Obligated Group for the most recent Fiscal Year for which Combined Statements have been delivered to Lender pursuant to **Section 6.01(a)**; *provided, however*, that for a period of 20 consecutive calendar days in each Fiscal Year, the total amount of such Short-Term Indebtedness of the Obligated Group outstanding shall be not more than 3% of the Revenues of the Obligated Group for such Fiscal Year (for the purposes of this **Section 7.02(g)**, Short-Term Indebtedness shall not include overdrafts to banks to the extent there are immediately available funds of the Obligated Group sufficient to pay such overdrafts and such overdrafts are incurred and corrected in the normal course of business);

(h)     Short-Term Indebtedness if:

(i)     There is in effect at the time the Short-Term Indebtedness *provided* for by this **Section 7.02(h)** is incurred a binding commitment by a financial institution generally regarded as responsible, which commitment and institution are acceptable to Lender, to provide financing sufficient to pay such Short-Term Indebtedness at its maturity, and

(ii)     The conditions set forth in **Section 7.02(d)** are met with respect to such Short-Term Indebtedness when it is assumed that such Short-Term Indebtedness is Funded Indebtedness maturing over 20 years from the date of issuance of the Short-Term Indebtedness, bears interest on the unpaid principal balance at a market rate and is payable on a level annual debt service basis over a 20-year period;

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 116 of 170

(i)     Non-Recourse Indebtedness; *provided, however*, that the Book Value or, at the option of the Group Representative, the Current Value of the Property, Plant and Equipment subject to be a Lien securing such Non-Recourse Indebtedness, together with the Book Value or Current Value, as the case may be, of all other Property, Plant and Equipment subject to Liens securing Non-Recourse Indebtedness, shall not exceed 10% of the Book Value or the Current Value, as the case may be, of the Property, Plant and Equipment of the Obligated Group;

(j)     Guaranties (i) of the Obligations hereunder and under the other Loan Documents, (ii) of the Indebtedness permitted under **Section 7.02(b)**, and (iii) if the conditions set forth in **Section 7.02(d)** are otherwise satisfied if it is assumed that the obligation guaranteed is Funded Indebtedness of the Obligated Group (*provided* that the Obligated Group's Income Available for Debt Service shall not be deemed to include any Revenues of the primary obligor);

(k)     Liabilities for contributions to self-insurance, pooled or shared risk programs required or permitted to be maintained under this Agreement;

(l)     Indebtedness in the form of any Swap Contracts entered into pursuant to **Section 6.12** or otherwise in the Ordinary Course of Business, in each case providing protection to Members of the Obligated Group against fluctuations in interest rates in connection with the Members' operations, activities and business, in each case so long as the entering into of such Swap Contracts are bona fide hedging activities and are not for speculative purposes; and

(m)     Indebtedness owing from one Member of the Obligated Group to another Member.

**7.03.   Fundamental Changes.** Merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its Property to or in favor of any Person, *except* that, so long as no Default exists or would result therefrom:

(a)     any Member may merge or consolidate with (i) Borrower, *provided* that Borrower shall be the continuing or surviving Person, or (ii) any one or more other Members;

(b)     any Member (other than Borrower) may Dispose of all or substantially all of its Property (upon voluntary liquidation or otherwise) to Borrower or to another Member;

(c)     any Member (other than Borrower) may merge or consolidate with any other Person or may Dispose of all or substantially all of its Property to another Person if each of the following conditions is satisfied (as determined by Lender):

(i)     the successor (including any purchaser of all or substantially all the Property of the Member) is a corporation or trust organized and validly existing under the laws of the United States of America or a state thereof,

(ii)     the successor corporation or trust shall become a Member of the Obligated Group by becoming a Guarantor hereunder in accordance with and pursuant to **Section 11.01(b)**,

Case: 24-04053   Doc# 36   Filed: 05/23/25   Entered: 05/23/25 17:31:07   Page 117 of 170

(iii)    immediately after such merger, consolidation or Disposition, the conditions described in **Section 7.01(d)(ii)** would be met for the creation of a Lien on Property and the condition described in **Section 7.02(d)** would be met for the incurrence of one dollar of additional Funded Indebtedness,

(iv)    the Members demonstrate, in a certificate of the Chief Financial Officer of the Group Representative (or other authorized officer having primary responsibility for the financial affairs of the Group Representative) delivered to Lender, the Obligated Group's Historical Pro Forma Debt Service Coverage Ratios for each of the two Fiscal Years immediately preceding the proposed date of such merger, consolidation or Disposition (assuming and taking into account the consummation thereof) to be at least 1.25:1, and

(v)    the successor corporation or trust shall provide an opinion of legal counsel in form and substance satisfactory to Lender (in its Reasonable Discretion) stating, among other opinions to be provided, that this Agreement and the other Loan Documents are legal, valid and binding and enforceable against such successor corporation or trust to the extent successor corporation or trust is to become a party thereto.

**7.04.    Dispositions.** Make any Disposition of its Property that, together with all other Dispositions of Property by the Members of the Obligated Group during any period of twelve consecutive calendar months, totals in excess of 5% of the Property of the Obligated Group (calculated on the basis of the Book Value of the assets shown on the assets side of the balance sheet in the Annual Financial Information of the Obligated Group for the most recent Fiscal Year for which Annual Financial Information has been delivered to Lender pursuant to **Section 6.01(a)**, or, if the Group Representative so elects, on the basis of Current Value), other than Dispositions of Property:

(a)    to other Members of the Obligated Group;

(b)    in the Ordinary Course of Business;

(c)    to the extent that (i) such Property is exchanged for credit against the purchase price of similar replacement Property (which may include other Property of equal or greater value and usefulness) or (ii) the proceeds of such Disposition are reasonably promptly applied to the purchase price of such replacement Property, whether or not at the same location;

(d)    to the extent that such Property is or, within the next succeeding 24 calendar months, is reasonably expected to become inadequate, obsolete, worn out, unsuitable, unprofitable, undesirable or unnecessary and Disposition thereof will not impair the structural soundness, efficiency or economic value of the remaining Property;

(e)    upon fair and reasonable terms no less favorable to a Member than would be obtained in a comparable arm's-length transaction, if following such transfer the proceeds received by the transferor are applied to acquire additional Property or are applied to repay the principal of Funded Indebtedness of any Member of the Obligated Group;

(f)    to any Person, if such Property consists solely of assets which are specifically restricted by the donor or grantor to a particular purpose which is inconsistent with

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 118 of 170

their use for payment on the Obligations or Funded Indebtedness of any Member of the Obligated Group;

(g)     to any Person upon delivery to Lender of a certificate of the Chief Financial Officer of the Group Representative (or other authorized officer having primary responsibility for the financial affairs of the Group Representative) certifying that during each of the two Fiscal Years immediately preceding the proposed Disposition for which Combined Statements have been delivered to Lender pursuant to **Section 6.01(a)**, either (i) the Historical Pro Forma Debt Service Coverage Ratio would not have been reduced by more than 20% or to less than 3:1 if such Disposition had been taken into account in the calculation thereof or (ii) the Historical Pro Forma Debt Service Coverage Ratio would not have been reduced by more than 10% or to less than 1.75:1 if such Disposition had been taken into account in the calculation thereof;

(h)     consisting of Leases constituting Permitted Encumbrances;

(i)     Dispositions permitted by **Section 7.03**; or

(j)     Loans made to other Diocesan entities in the Ordinary Course of Business and in compliance with investment policies established by Borrower, in its reasonable and good faith discretion, from time to time and delivered to Lender pursuant to **Sections 4.01(e)** or **6.02(e)**, as applicable.

**7.05.   Transactions with Affiliates.** Enter into any transaction of any kind with any Affiliate of any Member of the Obligated Group, whether or not in the Ordinary Course of Business, other than on fair and reasonable terms substantially as favorable to such Member as would be obtainable in a comparable arm's length transaction; *provided* that the foregoing restriction shall not apply to transactions between or among the Members or to Loans to Diocesan entities permitted by **Section 7.04(j)**.

**7.06.   Use of Proceeds.** Use any portion of the proceeds of any Loans, whether directly or indirectly:

(a)     for any purpose other than (i) to redeem the Series 2007 Bonds as and when they become due in accordance with the terms of the Series 2007 Indenture, (ii) to fund the ongoing working capital and general business needs of Borrower and the other Members of the Obligated Group and (iii) for general corporate purposes;

(b)     for any purpose that entails a violation of Regulations U or X adopted by the FRB;

(c)     (i) to fund any activities or business of or with any Person, or in any country or territory, that, at the time of such funding, is, or whose government is, currently the subject or target of any Sanctions or located, organized or resident in a Designated Jurisdiction a Sanctioned Person, or (ii) in any manner that would result in a violation of Sanctions by any Person party hereto; or

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 119 of
170

(d)     for any payments that could constitute a material violation of any Anti-Corruption Law applicable.

**7.07. Members as Tax-Exempt Organizations.** Not distribute any of its revenues, income or profits, whether realized or unrealized, to any of its members, directors or officers or allow the same to inure to the benefit of any private person, association or corporation, other than for the lawful purposes of Borrower and the Obligated Group; *provided, however*, that the Obligated Group and each of the Members thereof may pay to any Person the value of any service or product performed for or supplied to such Member by such Person.

**7.08. Financial Covenants.**

(a)     **Historical Debt Service Coverage Ratio.** Permit the Historical Debt Service Coverage Ratio, as calculated as of the last day of each Fiscal Year of Borrower for the Fiscal Year ending on such date, to be less than 1.00:1.00.

(b)     **Liquidity.** Permit Unrestricted Cash and Liquid Investments, as calculated as of the last day of each Fiscal Year of Borrower, to be less than the amount that is equal to (a) 1.35 *multiplied* by (b) 40% of the *sum* of ((i) scheduled principal payments on the Series 2007 Bonds *plus* (ii) scheduled principal payments on the Loan Obligations hereunder), in each case becoming due and payable in the immediately following Fiscal Year.

(c)     **Capitalization Ratio.** Permit the Capitalization Ratio, as calculated as of the last day of each Fiscal Year of Borrower, to exceed 0.60:1.00.

(d)     **Asset Coverage Ratio.** Permit the Asset Coverage Ratio, as calculated as of the last day of each quarterly fiscal period of Borrower, to be less than 1.00:1.00.

## ARTICLE VIII
## NEGATIVE COVENANTS
## (AFTER THE MASTER INDENTURE TERMINATION DATE)

Commencing as of the Master Indenture Termination Date and thereafter until the payment in full in cash of the principal of and interest on each Loan and all fees, expenses and other amounts (other than Secured Swap Obligations, Cash Management Obligations and unasserted contingent indemnification obligations), each Member of the Obligated Group covenants and agrees, jointly and severally, with Lender that it will not, directly or indirectly:

**8.01. Liens.** Create, incur, assume or suffer to exist any Lien upon any of its Property, assets or revenues, whether now owned or hereafter acquired, other than the following:

(a)     Liens granted, pledged or otherwise created pursuant to any Loan Document to secure the Secured Obligations;

(b)     Liens securing Non-Recourse Indebtedness permitted pursuant to **Section 8.02(d)**;

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 120 of 170

(c)     Liens securing Indebtedness permitted by **Section 8.02** of any Member of the Obligated Group if and to the extent both (i) after giving effect to all Liens permitted by this **Section 8.01(c)**, the Book Value, or, at the option of the Group Representative, the Current Value of the Property of the Obligated Group which is Encumbered by any such Liens is not more than 5% of the value of all of the Property of the Obligated Group (calculated on the same basis as the value of the Encumbered Property), and (ii) the conditions described in **Section 8.02(c)** are met for allowing the incurrence of one dollar of additional Funded Indebtedness; and

(d)     Permitted Encumbrances.

**8.02.     Indebtedness**. Create, incur, assume or suffer to exist any Indebtedness, *except*:

(a)     Indebtedness under the Loan Documents;

(b)     Indebtedness, including Guaranties, outstanding on the Master Indenture Termination Date and any refinancings, refundings, renewals or extensions thereof; *provided* that the amount of such Indebtedness is not increased at the time of such refinancing, refunding, renewal or extension *except* by an amount equal to a reasonable premium or other reasonable amount paid, and fees and expenses reasonably incurred, in connection with such refinancing and by an amount equal to any existing commitments unutilized thereunder;

(c)     Non-Recourse Indebtedness; *provided, however*, that the Book Value or, at the option of the Group Representative, the Current Value of the Property, Plant and Equipment subject to a Lien securing such Non-Recourse Indebtedness, together with the Book Value or Current Value, as the case may be, of all other Property, Plant and Equipment subject to Liens securing Non-Recourse Indebtedness, shall not exceed 10% of the Book Value or the Current Value, as the case may be, of the Property, Plant and Equipment of the Obligated Group;

(d)     Guaranties (i) of the Obligations hereunder and under the other Loan Documents and (ii) of Indebtedness otherwise permitted by this **Section 8.03**;

(e)     Liabilities for contributions to self-insurance, pooled or shared risk programs required or permitted to be maintained under this Agreement;

(f)     Indebtedness in the form of any Swap Contracts entered into pursuant to **Section 6.12** or otherwise in the Ordinary Course of Business, in each case providing protection to Members of the Obligated Group against fluctuations in interest rates in connection with the Members' operations, activities and business, in each case so long as the entering into of such Swap Contracts are bona fide hedging activities and are not for speculative purposes;

(g)     Indebtedness owing from one Member of the Obligated Group to another Member; and

(h)     in addition to the other Indebtedness permitted under this **Section 8.02**, (i) Long-Term Indebtedness in the aggregate principal amount outstanding at any time not to exceed $5,000,000 and (ii) Short-Term Indebtedness in the aggregate principal amount outstanding at any time not to exceed $15,000,000.

Case: 24-04053     Doc# 36     Filed: 05/23/25     Entered: 05/23/25 17:31:07     Page 121 of 170

**8.03. Fundamental Changes.** Merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its Property to or in favor of any Person, *except* that, so long as no Default exists or would result therefrom:

      (a)    any Member may merge or consolidate with (i) Borrower, *provided* that Borrower shall be the continuing or surviving Person, or (ii) any one or more other Members;

      (b)    any Member (other than Borrower) may Dispose of all or substantially all of its Property (upon voluntary liquidation or otherwise) to Borrower or to another Member;

      (c)    any Member (other than Borrower) may merge or consolidate with any other Person or may Dispose of all or substantially all of its Property to another Person if each of the following conditions is satisfied (as determined by Lender):

      (i)    the successor (including any purchaser of all or substantially all the Property of the Member) is a corporation or trust organized and validly existing under the laws of the United States of America or a state thereof,

      (ii)    the successor corporation or trust shall become a Member of the Obligated Group by becoming a Guarantor hereunder in accordance with and pursuant to **Section 11.01(b),**

      (iii)    immediately after such merger, consolidation or Disposition, the conditions described in **Section 8.01(c)(ii)** would be met for the creation of a Lien on Property and the condition described in **Section 8.02(h)** would be met for the incurrence of one dollar of additional Indebtedness,

      (iv)    the Members demonstrate, in a certificate of the Chief Financial Officer of the Group Representative (or other authorized officer having primary responsibility for the financial affairs of the Group Representative) delivered to Lender, the Obligated Group's Historical Pro Forma Debt Service Coverage Ratios for each of the two Fiscal Years immediately preceding the proposed date of such merger, consolidation or Disposition (assuming and taking into account the consummation thereof) to be at least 1.25:1, and

      (v)    the successor corporation or trust shall provide an opinion of legal counsel in form and substance satisfactory to Lender (in its Reasonable Discretion) stating, among other opinions to be provided, that this Agreement and the other Loan Documents are legal, valid and binding and enforceable against such successor corporation or trust to the extent successor corporation or trust is to become a party thereto.

**8.04. Dispositions.** Make any Disposition of its Property that, together with all other Dispositions of Property by the Members of the Obligated Group during any period of twelve consecutive calendar months, totals in excess of 5% of the Property of the Obligated Group (calculated on the basis of the Book Value of the assets shown on the assets side of the balance sheet in the Combined Statements of the Obligated Group for the most recent Fiscal Year for which Combined Statements have been delivered to Lender pursuant to **Section 6.01(a)**, or, if

Case: 24-04053   Doc# 36   Filed: 05/23/25   Entered: 05/23/25 17:31:07   Page 122 of 170

the Group Representative so elects, on the basis of Current Value), other than Dispositions of Property:

    (a)    to other Members of the Obligated Group;

    (b)    in the Ordinary Course of Business;

    (c)    to the extent that (i) such Property is exchanged for credit against the purchase price of similar replacement Property (which may include other Property of equal or greater value and usefulness) or (ii) the proceeds of such Disposition are reasonably promptly applied to the purchase price of such replacement Property, whether or not at the same location;

    (d)    to the extent that such Property is or, within the next succeeding 24 calendar months, is reasonably expected to become inadequate, obsolete, worn out, unsuitable, unprofitable, undesirable or unnecessary and Disposition thereof will not impair the structural soundness, efficiency or economic value of the remaining Property;

    (e)    upon fair and reasonable terms no less favorable to a Member than would be obtained in a comparable arm's-length transaction, if following such transfer the proceeds received by the transferor are applied to acquire additional Property or are applied to repay the principal of Funded Indebtedness of any Member of the Obligated Group;

    (f)    to any Person, if such Property consists solely of assets which are specifically restricted by the donor or grantor to a particular purpose which is inconsistent with their use for payment on the Obligations or Funded Indebtedness of any Member of the Obligated Group;

    (g)    to any Person upon delivery to Lender of a certificate of the Chief Financial Officer of the Group Representative (or other authorized officer having primary responsibility for the financial affairs of the Group Representative) certifying that during each of the two Fiscal Years immediately preceding the proposed Disposition for which Combined Statements have been delivered to Lender pursuant to **Section 6.01(a)** either (i) the Historical Pro Forma Debt Service Coverage Ratio would not have been reduced by more than 20% or to less than 3.00:1.00 if such Disposition had been taken into account in the calculation thereof or (ii) the Historical Pro Forma Debt Service Coverage Ratio would not have been reduced by more than 10% or to less than 1.75:1.00 if such Disposition had been taken into account in the calculation thereof;

    (h)    consisting of Leases constituting Permitted Encumbrances;

    (i)    Dispositions permitted by **Section 8.03**; or

    (j)    Loans made to other Diocesan entities in the Ordinary Course of Business and in compliance with investment policies established by Borrower, in its reasonable and good faith discretion, from time to time and delivered to Lender pursuant to **Sections 4.01(e)** or **6.02(e)**, as applicable.

Case: 24-04053   Doc# 36   Filed: 05/23/25   Entered: 05/23/25 17:31:07   Page 123 of 170

**8.05. Transactions with Affiliates.** Enter into any transaction of any kind with any Affiliate of any Member of the Obligated Group, whether or not in the Ordinary Course of Business, other than on fair and reasonable terms substantially as favorable to such Member as would be obtainable in a comparable arm's length transaction; *provided* that the foregoing restriction shall not apply to transactions between or among the Members or to Loans to Diocesan entities permitted by **Section 8.04(j)**.

**8.06. Use of Proceeds.** Use any portion of the proceeds of any Loans, whether directly or indirectly:

      (a)    for any purpose other than (i) to redeem the Series 2007 Bonds as and when they become due in accordance with the terms of the Series 2007 Indenture, (ii) to fund the ongoing working capital and general business needs of Borrower and the other Members of the Obligated Group and (iii) for general corporate purposes;

      (b)    for any purpose that entails a violation of Regulations U or X adopted by the FRB;

      (c)    (i) to fund any activities or business of or with any Person, or in any country or territory, that, at the time of such funding, is, or whose government is currently the subject or target of any Sanctions or located, organized or resident in a Designated Jurisdiction, a Sanctioned Person, or (ii) in any manner that would result in a violation of Sanctions by any Person party hereto; or

      (d)    for any payments that could constitute a material violation of any Anti-Corruption Law applicable.

**8.07. Members as Tax-Exempt Organizations.** Not distribute any of its revenues, income or profits, whether realized or unrealized, to any of its members, directors or officers or allow the same to inure to the benefit of any private person, association or corporation, other than for the lawful purposes of Borrower and the Obligated Group; *provided, however,* that the Obligated Group and each of the Members thereof may pay to any Person the value of any service or product performed for or supplied to such Member by such Person.

**8.08. Financial Covenants.**

      (a)    **Fixed Charge Coverage Ratio.** Permit the Fixed Charge Coverage Ratio, as calculated as of the last day of each Fiscal Year of Borrower for the Fiscal Year ending on such date, to be less than 1.50:1.00.

      (b)    **Liquidity.** Permit the *sum* of (without duplication) (a) Unrestricted Cash and Liquid Investments and (b) all other Eligible Personal Property Collateral held by the Obligated Group for any corporate purposes to the extent not Restricted, calculated as of the last day of each Fiscal Year of Borrower, to be less than $125,000,000.

      (c)    **Asset Coverage Ratio.** Permit the Asset Coverage Ratio, as calculated as of the last day of each quarterly fiscal period of Borrower, to be less than 1.00:1.00.

Case: 24-04053   Doc# 36   Filed: 05/23/25   Entered: 05/23/25 17:31:07   Page 124 of 170

# ARTICLE IX
## EVENTS OF DEFAULT AND REMEDIES

**9.01.** **Events of Default.** Any of the following shall constitute an Event of Default:

      (a)    **Non-Payment.** Borrower fails to pay (i) when and as required to be paid. herein, any amount of principal of any Loan, or (ii) within three Business Days after the same becomes due, any interest on any Loan, any Unused Commitment Fee or other fee due hereunder, or any other amount payable hereunder; or

      (b)    **Specific Covenants.** Any Member fails to perform or observe any term, covenant or agreement contained in any of **Sections 6.12, Article VII** (other than, specifically, **Section 7.08(d)**) or **Article VIII** (other than, specifically, **Section 8.08(c)**); or

      (c)    **Other Defaults.** Any Member fails (i) to perform or observe any covenant or agreement contained in **Section 6.01** (inclusive), **Section 6.02** (inclusive) or **Section 6.03(a)**, on its part to be performed or observed, and such failure continues for ten Business Days, (ii) to perform or observe any covenant or agreement contained in **Section 7.08(d)** or **Section 8.08(c)** on its part to be performed or observed and such failure continues for ten Business Days after the earlier of (A) the date on which a Responsible Officer of any Member becomes aware thereof or (B) the date on which notice thereof is given to a Member by Lender, or (iii) to perform or observe any other covenant or agreement (not specified in **Sections 9.01(a)** or **(b)** or the preceding **clause (i)** of this **Section 9.01(c)**) contained in this Agreement or in any other Loan Document on its part to be performed or observed and such failure continues for 30 days after the earlier of (A) the date on which a Responsible Officer of any Member becomes aware thereof or (B) the date on which notice thereof is given to a Member by Lender; or

      (d)    **Representations and Warranties.** (i) Any representation, warranty, statement or certification made by any Member in this Agreement or in any other Loan Document or in any statement or certificate delivered to Lender by or on behalf of any Member in connection with any Loan Document that is subject to materiality or a Material Adverse Change qualification will not be true and correct in any respect when made or deemed made, or (ii) any representation, warranty, certification or statement of fact made or deemed made by or on behalf of any Member in this Agreement or in any other Loan Document or in any other statement or certificate delivered to Lender in connection with any Loan Document that is not subject to materiality or a Material Adverse Change qualifier will not be true and correct in any material respect when made or deemed made; or

      (e)    **Cross-Default.** (i) Borrower or any other Member (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Indebtedness or Guaranty (other than Indebtedness hereunder and the other Loan Documents and Indebtedness under Swap Contracts) having an aggregate principal amount (including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement) of more than the Threshold Amount, or (B) fails to observe or perform any other agreement or condition relating to any such Indebtedness or Guaranty or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event

SMRH:480003929.12

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 125 of 170

is to cause, or to permit the holder or holders of such Indebtedness or the beneficiary or beneficiaries of such Guaranty (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity, or such Guaranty to become payable or cash collateral in respect thereof to be demanded; or (ii) there occurs under any Swap Contract an Early Termination Date (as defined in such Swap Contract) resulting from (1) any event of default under such Swap Contract as to which Borrower is the Defaulting Party (as defined in such Swap Contract) or (B) any Termination Event (as defined in such Swap Contract) as to which the Borrower or any Subsidiary is an Affected Party (as defined in such Swap Contract) and, in either event, the Swap Termination Value owed by Borrower as a result thereof is greater than the Threshold Amount; or

(f) **Insolvency Proceedings, Etc.** Borrower or any other Member institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer for it or for all or any material part of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer is appointed without the application or consent of such Member and the appointment continues undischarged or unstayed for 60 calendar days; or any proceeding under any Debtor Relief Law relating to any such Member or to all or any material part of its property is instituted without the consent of such Member and continues undismissed or unstayed for 60 calendar days, or an order for relief is entered in any such proceeding; or

(g) **Inability to Pay Debts; Attachment.** (i) Borrower or any other Member becomes unable or admits in writing its inability or fails generally to pay its debts as they become due, or (ii) any writ or warrant of attachment or execution or similar process is issued or levied against all or any material part of the property of any such Person and is not released, vacated or fully bonded within 30 days after its issue or levy; or

(h) **Judgments.** There is entered against Borrower or any other Member (i) a final judgment or order for the payment of money in an aggregate amount exceeding the Threshold Amount (to the extent not covered by independent third-party insurance as to which the insurer does not dispute coverage), or (ii) any one or more non-monetary final judgments that have, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Change and, in either case, (A) enforcement proceedings are commenced by any creditor upon such judgment or order, or (B) there is a period of 30 consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, is not in effect; or

(i) **Invalidity of Loan Documents.** Any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or satisfaction in full of all the Obligations, ceases to be in full force and effect; or any Member or any other Person contests in any manner the validity or enforceability of any Loan Document; or any Member denies that it has any or further liability or obligation under any Loan Document, or purports to revoke, terminate or rescind any Loan Document.

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 126 of 170

**9.02. Remedies Upon Event of Default.** Upon the occurrence and during the continuing existence of any Default or Event of Default, Lender will have no obligation to extend any additional credit to or for the benefit of Borrower, whether in the form of the making of Loans or otherwise. In addition, upon the occurrence and during the continuance of any Event of Default, Lender may, at its discretion, take any or all of the following actions, all of which are hereby authorized by Borrower and each of the other Members:

(a) **Termination of Commitment.** Declare, by written notice to Borrower, the Commitment to be terminated, whereupon the Commitment will be terminated, but without affecting Lender's security interest in and Lien on the Collateral;

(b) **Acceleration of Obligations.** Declare all or any portion of the unpaid principal amount of the outstanding Loans, the interest accrued and unpaid thereon and the other amounts and Obligations owing or payable under this Agreement or under any other Loan Document or any other instrument executed by Borrower or any other Member pursuant to the Loan Documents (exclusive of any Secured Swap Obligations and any Cash Management Obligations) to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by Borrower and each such Member;

(c) **Discretionary Advances.** Make advances of Loans after the occurrence of any Event of Default, without thereby waiving its right to demand payment of the Obligations under this Agreement, or any of the other Loan Documents, or any other rights or remedies described in this Agreement or any other Loan Document, and without liability to make any other or further advances, notwithstanding Lender's previous exercise of any such rights and remedies; or

(d) **Exercise of Rights and Remedies.** Exercise, in addition to all rights and remedies granted or otherwise made available to Lender under this Agreement or any of the other Loan Documents, any and all rights and remedies granted or otherwise made available to Lender under the UCC or other applicable Law or in equity;

*provided*, that upon the occurrence of an actual or deemed entry of an order for relief with respect to Borrower under any Debtor Relief Law, the obligation of Lender to make or advance Loans will automatically terminate, the unpaid principal amount of all outstanding Loans and all interest and other amounts and Obligations as aforesaid will automatically become due and payable, in each case, without further act of Lender.

**9.03. Application of Funds.** After the exercise of remedies provided for in **Section 9.02** (or after the Loans have automatically become immediately due and payable), any amounts received on account of the Obligations shall be applied by the Lender in such order as it elects in its sole discretion.

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 127 of 170

# ARTICLE X
# SECURITY AGREEMENT

## 10.01. Generally.

(a)     As security for the full, complete and final payment and performance when due (whether at stated maturity, by acceleration or otherwise) of all the Secured Obligations, whether such Secured Obligations were incurred originally under any of the Loan Documents (or constitute Cash Management Obligations or Secured Swap Obligations) or otherwise, Borrower and each other Member of the Obligated Group hereby assigns, conveys, mortgages, pledges, hypothecates and transfers to Lender, and hereby grants to Lender, a security interest in and to all of such Member's right, title and interest in, to and under the personal property set forth on **Schedule 10.01** hereto, whether now owned or at any time hereafter acquired by such Member or whether such Member now has or at any time in the future may acquire any right, title or interest therein.

(b)     From time to time, the Group Representative, on behalf of one or more Members, may by written notice to Lender propose to add as additional Collateral hereunder Property otherwise qualifying as Eligible Personal Property Collateral. Lender shall approve (or disapprove) such additional Collateral in its Reasonable Discretion and shall notify the Group Representative in writing of its determination as promptly as reasonably practical and in any event within ten Business Days of Lender's receipt of such written proposal. Upon Lender's approval of any such proposal, Lender and Borrower shall amend **Schedule 10.01**, if requested by Lender, to include a description of the Eligible Personal Property Collateral to be added to the Collateral (with Lender's approval of the description of such new Collateral to be incorporated into **Schedule 10.01** and the effectiveness of the related amendment being further conditions to such additional Eligible Personal Property Collateral being included as Collateral in any calculation of the Asset Coverage Ratio), and the applicable Member(s) shall credit or deposit the proposed additional Collateral to or into a Securities Account in which Lender has a first priority security interest perfected by control under Divisions 8 and 9 of the UCC.

(c)     The Members may withdraw any Eligible Personal Property Collateral then held in a Securities Account in which Lender has a first priority security interest perfected by control free and clear of such security interest following prior written notice from the Group Representative to Lender of such proposed withdrawal; *provided* and subject to the conditions precedent that: (i) Lender shall not have objected to such withdrawal by written notice delivered to the Group Representative within five Business Days following Lender's receipt of the written notice of such proposed withdrawal; (ii) no Event of Default has occurred and is then continuing; and (iii) such withdrawal would not cause the Asset Coverage Ratio, calculated on a *pro forma* basis taking into account such withdrawal, to be less than 1.0:1.0.

(d)     From time to time, the Group Representative, on behalf of one or more Members, may, by written notice to Lender, propose to add as additional Collateral hereunder Property not then qualifying as Eligible Personal Property Collateral. Lender agrees to consider such proposal in good faith. The applicable Member may grant a Lien on and otherwise cause such Property to be Collateral only upon Lender's approval of the same and the Member's compliance with such conditions and other requirements that Lender may impose (including, in

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 128 of 170

respect of any proposed real property Collateral, such conditions and requirements as are set forth elsewhere in this Agreement).

**10.02. Perfection of Security Interest**. Each Member shall take all actions that may be necessary or desirable, or that Lender may request (in its Reasonable Discretion), so as at all times to maintain the validity, perfection, enforceability and priority of Lender's security interest in and Lien on the Collateral or to enable Lender to protect, exercise or enforce its rights hereunder and in the Collateral, including (a) promptly discharging all Liens other than Permitted Liens, (b) delivering to Lender, endorsed or accompanied by such instruments of assignment as Lender may specify, and stamping or marking, in such manner as Lender may specify, any and all certificated securities and instruments evidencing or forming a part of the Collateral, and (c) executing and delivering financing statements, control agreements, instruments of pledge, Deeds of Trust, notices and assignments, in each case in form and substance satisfactory to Lender, relating to the creation, validity, perfection, maintenance or continuation of Lender's security interest and Lien under the UCC or other Applicable Law. By its signature hereto, each Member hereby authorizes Lender to file against such Member, as debtor, one or more financing, continuation or amendment statements pursuant to the UCC in form and substance, including as to its description of the Collateral covered thereby, satisfactory to Lender.

**10.03. Ownership of Collateral**. Each Member hereby represents and warrants to Lender that it owns good title to each item of Collateral in which it has any ownership rights (*except* to the extent Disposed of as permitted by this Agreement), and has the power to grant the security interest and Lien in and upon the Collateral which it purports to grant a security interest and Lien in and upon hereunder, and such Collateral, in each case, is free and clear of any and all Liens other than Permitted Liens.

**10.04. Defense of Lender's Interests**. Until payment in full of the Secured Obligations, the termination or expiration of the Commitment and the termination of this Agreement, Lender's interests in the Collateral shall continue in full force and effect. During such period no Member of the Obligated Group shall, without Lender's prior written consent, pledge, sell (*except* for sales or other Dispositions otherwise permitted in **Section 7.04** or **Section 8.04**, as applicable), assign, transfer, create or suffer to exist a Lien upon or encumber or allow or suffer to be encumbered in any way any part of the Collateral (*except* for Permitted Liens). Each Member shall defend Lender's interests in the Collateral against any and all Persons whatsoever.

**10.05. Limitation on Lender's Duties with respect to Collateral; Exculpation of Liability**. Nothing herein contained shall be construed to constitute Lender as any Member's agent for any purpose whatsoever. Except as otherwise provided in this **Section 10.05**, Lender shall not be responsible or liable for any shortage, discrepancy, damage, loss or destruction of any part of the Collateral wherever the same may be located and regardless of the cause thereof. Lender, whether by anything herein or in any assignment or otherwise, shall not assume any of any Member's obligations under any instrument, contract or agreement assigned to Lender, and Lender shall not be responsible in any way for the performance by any Member of any of the terms and conditions thereof. Lender's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under Section 9207 of the UCC or otherwise, will be to deal with it in substantially the same manner as Lender deals with similar property for its own account. Neither Lender nor any of its officers, directors, employees,

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 129 of 170

representatives or agents will, *except*, in each case to the extent required under any non-waivable provisions of applicable Law, be (a) liable for failure to demand, collect or realize upon any of the Collateral or for any delay in doing so, or (b) under any obligation to sell or otherwise dispose of any Collateral upon the request of any Member or any other Person, or to take any other action whatsoever with regard to the Collateral or any part thereof. The powers conferred on Lender hereunder and in the other Loan Documents are solely to protect Lender's interests in the Collateral and will not, *except* to the extent required under any non-waivable provision of applicable Law, impose any duty upon Lender to exercise any such powers.

### 10.06. Lender's Appointment as Attorney-in-Fact.

(a)     Each Member hereby irrevocably constitutes and appoints Lender, and any officer thereof, with full power of substitution, as its true and lawful attorney-in-fact in the place and stead of such Member and in the name of such Member or in its own name, from time to time at Lender's Reasonable Discretion, for the purpose of carrying out the terms of this **Article X**, to take any and all appropriate action and to execute and deliver any and all documents and instruments which may be necessary or desirable to accomplish the purposes of this **Article X** and, without limiting the generality of the foregoing, hereby gives Lender the power and right, on behalf of such Member, without notice to or assent by such Member to do the following (*provided* that Lender agrees that it will not exercise the power of attorney or any rights granted to Lender in this **Section 10.06** *except only* upon the occurrence and during the continuing existence of an Event of Default):

(i)     to ask, demand, collect, receive and give acquittances and receipts for any and all monies due or to become due under the Collateral and, in the name of such Member in its own name or otherwise to take possession of, endorse and collect any checks, drafts, notes, acceptances or other Instruments for the payment of monies due under any such Collateral and to file any claim or to take or commence any other action or proceeding in any court of law or equity or otherwise deemed appropriate by Lender for the purpose of collecting any and all such monies due under any such Collateral whenever payable;

(ii)     to pay or discharge any Liens, including any tax lien, levied or placed on or threatened against such Collateral, to effect any repairs or any insurance called for by the terms of this Agreement and to pay all or any part of the premiums therefor and the costs thereof, which actions will be on behalf and for the benefit of Lender and not such Member; and

(iii)     to (A) direct any Person liable for any payment under or in respect of any of such Collateral to make payment of any and all monies due or to become due thereunder directly to Lender or as Lender will direct, (B) receive payment of any and all monies, claims and other amounts due or to become due at any time arising out of or in respect of any such Collateral, (C) commence, prosecute and defend any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect such Collateral or any part thereof and to enforce any other right in respect of any such Collateral, (D) settle, compromise or adjust any such suit, action or proceeding, and (E) sell, transfer, pledge, make any agreement with respect to or otherwise deal with any of such Collateral as fully and completely as though Lender were the absolute owner thereof for all purposes, and to do, at Lender's option and such Member's expense, at any time, or from time to time, all acts and things which Lender may

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 130 of 170

reasonably deem necessary to protect, preserve or realize upon such Collateral and Lender's security interest therein and Lien thereon in order to effect the intent of this Agreement, all as fully and effectively as such Member might do.

(b)     Each Member hereby ratifies, to the extent permitted by applicable Law, all that said attorney will lawfully do or cause to be done by virtue hereof. The power of attorney granted pursuant to this **Section 10.06** is a power coupled with an interest and will be irrevocable until the payment in full of the Secured Obligations and the termination of the Commitment and this Agreement.

# ARTICLE XI
# GUARANTY

### 11.01   Guaranty.

(a)     *Except* as may be expressly otherwise limited in this Agreement as to any specific Guarantor, each Guarantor at any time party hereto, jointly and severally, absolutely, unconditionally and irrevocably guarantees, as a guaranty of payment and performance and not merely as a guaranty of collection, Lender the full and prompt payment when due (whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise) and performance of the Obligations (the *"Guaranteed Obligations"*). The Guaranteed Obligations include interest that, but for a proceeding under any Debtor Relief Law, would have accrued on such Guaranteed Obligations, whether or not a claim is allowed against Borrower for such interest in any such proceeding.

(b)     A Person may become a Guarantor hereunder and a Member of the Obligated Group (including in connection with a merger, consolidation or Disposition of all or substantially all of the Property of a Member otherwise permitted by **Section 7.03(c)** or **Section 8.03(c)**, as applicable) if (i) such Person is approved by Lender (in its Reasonable Discretion) and executes and delivers to Lender a Joinder Agreement, in form and substance acceptable to Lender (in its Reasonable Discretion), and (ii) the other Members of the Obligated Group shall, by appropriate action of their respective Governing Bodies, approve the admission of such Person to the Obligated Group. Notwithstanding the foregoing, if such Person is not a nonprofit corporation or trust nor a Tax-Exempt Organization, as a further condition to such Person becoming a Guarantor hereunder and a member of the Obligated Group, Lender and the then existing Members agree to negotiate in good faith to amend the applicable representations and warranties and the covenants, including the financial covenants (and corresponding definitions) to take into account the legal and tax nature of such Person (such amendments being subject to the approval of Lender, in its discretion);

(c)     Notwithstanding any provision hereof or in any other Loan Document to the contrary, in the event that any Guarantor is not an "eligible contract participant" as such term is defined in Section 1(a)(18) of the Commodity Exchange Act at the time (i) any transaction is entered into under a Swap Contract or (ii) such Guarantor becomes a Guarantor hereunder, the Guaranteed Obligations of such Guarantor will not include (A) in the case of the preceding **clause (i)**, such transaction, including any Secured Swap Obligations arising thereunder, and (B) in the case of the preceding **clause (ii)**, any transactions, including any Secured Swap

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 131 of
170

Obligations, outstanding under any Swap Contracts as of the date such Guarantor becomes a Guarantor under the Loan Documents; *provided, however,* that at the time any Guarantor becomes an "eligible contract participant", the Guaranteed Obligations of such Guarantor will include any transaction entered into under any Swap Contract and any transactions, including any Secured Swap Obligations, outstanding under any Swap Contract. Each intends that this **Article XI** constitute, and this **Article XI** shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Guarantor for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

**11.02. Separate Obligation.** Each Guarantor acknowledges and agrees that (a) the Guaranteed Obligations are separate and distinct from any Indebtedness arising under or in connection with any other document, including under any provision of this Agreement other than this **Article XI**, executed at any time by such Guarantor in favor of Lender and are separate and distinct from the obligations of Borrower under this Agreement and the other Loan Documents, and (b) such Guarantor will pay and perform all of the Guaranteed Obligations as required under this **Article XI**. Lender may enforce any and all of its rights and remedies hereunder without regard to any other document, including any provision of this Agreement other than this **Article XI**, at any time executed by such Guarantor in favor of Lender, irrespective of whether any such other document, or any provision thereof or hereof, will for any reason become unenforceable or any of the Indebtedness thereunder will have been discharged, whether by performance, avoidance or otherwise (other than payment in full of all Guaranteed Obligations). Each Guarantor acknowledges that, in providing benefits to Borrower, Lender is relying upon the enforceability of this **Article XI** and the Guaranteed Obligations as separate and distinct Indebtedness of each such Guarantor, and each Guarantor agrees that Lender would be denied the full benefit of its bargain if at any time this **Article XI** or the Guaranteed Obligations were treated any differently. The fact that the Guaranty is set forth in this Agreement rather than in a separate guaranty document is for the convenience of Borrower and each Guarantor comprising the Obligated Group and will in no way impair or adversely affect the rights or benefits of Lender under this **Article XI**. Upon the occurrence of any Event of Default, a separate action or actions may be brought against each such Guarantor, whether or not Borrower or any other Member is joined therein or a separate action or actions are brought against Borrower or any such other Member.

**11.03. Insolvency Laws; Right of Contribution.**

(a) As used in this **Section 11.03(a)**, (i) the term "*Guarantor Applicable Insolvency Laws*" means Laws relating to bankruptcy, reorganization, arrangement, adjustment of debts, relief of debtors, dissolution, insolvency, fraudulent transfers or conveyances or other similar laws (including 11 U. S. C. §547, §548, §550 and other "avoidance" provisions of the Bankruptcy Code) as applicable in any proceeding in which the validity or enforceability of this Agreement or any other Loan Document against any Guarantor, or any Guarantor Specified Lien is in issue; and (ii) "*Guarantor Specified Lien*" means any Lien from time to time granted by any Guarantor securing the Guaranteed Obligations. Notwithstanding any provision of this Agreement to the contrary, if, in any proceeding, a court of competent jurisdiction determines that with respect to any Guarantor, this Agreement or any other Loan Document or any Guarantor Specified Lien would, but for the operation of this **Section 11.03(a)**, be subject to avoidance and/or recovery or be unenforceable by reason of Guarantor Applicable Insolvency

Case: 24-04053   Doc# 36   Filed: 05/23/25   Entered: 05/23/25 17:31:07   Page 132 of 170

Laws, this Agreement, such other Loan Document and each such Guarantor Specified Lien will be valid and enforceable against such Guarantor, only to the maximum extent that would not cause this Agreement, such other Loan Document or such Guarantor Specified Lien to be subject to avoidance, recovery or unenforceability. To the extent that any payment to, or realization by, Lender on the Guaranteed Obligations exceeds the limitations of this **Section 11.03(a)** and is otherwise subject to avoidance and recovery in any such proceeding, the amount subject to avoidance will in all events be limited to the amount by which such actual payment or realization exceeds such limitation, and this Agreement as limited will in all events remain in full force and effect and be fully enforceable against such Guarantor. This **Section 11.03(a)** is intended solely to reserve the rights of Lender hereunder against each Guarantor, in such proceeding to the maximum extent permitted by Guarantor Applicable Insolvency Laws and neither Borrower nor any other Member nor any other Person will have any right, claim or defense under this **Section 11.03(a)** that would not otherwise be available under Guarantor Applicable Insolvency Laws in such proceeding.

(b)     Each Guarantor hereby agrees that, to the extent that any Guarantor will have paid an amount hereunder to or on behalf of Lender that is greater than the net value of the benefits received, directly or indirectly, by such paying Guarantor as a result of the Loans extended hereunder, such paying Guarantor will be entitled to contribution from any Guarantor that has not paid its proportionate share, based on benefits received as a result of the making of the Loans. Any amount payable as a contribution under this **Section 11.03(b)** will be determined as of the date on which the related payment or distribution is made by the Guarantor seeking contribution and each Guarantor acknowledges that the right to contribution hereunder will constitute an asset of such Guarantor to which such contribution is owed. Notwithstanding the foregoing, the provisions of this **Section 11.03(b)** will in no respect limit the obligations and liabilities of any Guarantor to Lender hereunder or under any other Loan Document, and each Guarantor will remain jointly and severally liable for the full payment and performance of the Guaranteed Obligations.

**11.04. Liability of Guarantors.** The liability of each Guarantor under this **Article XI** will be irrevocable, absolute, independent and unconditional, and will not be affected by any circumstance that might constitute a discharge of a surety or guarantor other than the payment and performance in full of all Guaranteed Obligations. In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:

(a)     such Guarantor's liability hereunder will be the immediate, direct, and primary obligation of such Guarantor and will not be contingent upon Lender's exercise or enforcement of any remedy it may have against Borrower or any other Person, or against any collateral or other security for any Guaranteed Obligations;

(b)     this Guaranty is a guaranty of payment when due and not merely of collectability;

(c)     Lender may enforce this **Article XI** notwithstanding the existence of any dispute among Lender, on the one hand, and Borrower or any other Person, on the other hand, with respect to the existence of such Event of Default;

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 133 of 170

(d)　　such Guarantor's payment of a portion, but not all, of the Guaranteed Obligations will in no way limit, affect, modify or abridge such Guarantor's liability for any portion of the Guaranteed Obligations remaining unsatisfied; and

(e)　　such Guarantor's liability with respect to the Guaranteed Obligations will remain in full force and effect without regard to, and will not be impaired or affected by, nor will such Guarantor be exonerated or discharged by, any of the following events:

(i)　　any proceeding under any Debtor Relief Law;

(ii)　　any limitation, discharge, or cessation of the liability of Borrower or any Guarantor or other Person for any Guaranteed Obligations due to any applicable Law, or any invalidity or unenforceability in whole or in part of any of the Guaranteed Obligations or the Loan Documents;

(iii)　　any merger, acquisition, consolidation or change in structure of Borrower or any Guarantor or other Person, or any sale, lease, transfer or other disposition of any or all of the assets or shares of Borrower or any other Guarantor or Person, *except* to the extent any Guarantor is released from Guaranteed Obligations in connection therewith in accordance with the terms of this Agreement;

(iv)　　any assignment or other transfer, in whole or in part, of Lender's interests in and rights under this Agreement (including this **Article XI**) or the other Loan Documents;

(v)　　any claim, defense, counterclaim or setoff, other than that of prior performance, that Borrower, any Guarantor or any other Person may have or assert, including any defense of incapacity or lack of corporate or other authority to execute any of the Loan Documents;

(vi)　　Lender's amendment, modification, renewal, extension, cancellation or surrender of any Loan Document or any Guaranteed Obligations;

(vii)　　Lender's exercise or non-exercise of any power, right or remedy with respect to any Guaranteed Obligations or any collateral;

(viii)　　Lender's vote, claim, distribution, election, acceptance, action or inaction in any proceeding under any Debtor Relief Law; or

(ix)　　any other guaranty, whether by such Guarantor or any other Person, of all or any part of the Guaranteed Obligations or any other indebtedness, obligations or liabilities of Borrower to Lender.

**11.05. Consents of Guarantors.** Each Guarantor hereby unconditionally consents and agrees that, without notice to or further assent from any such Guarantor:

(a)　　the principal amount of the Guaranteed Obligations may be increased or decreased and additional indebtedness or obligations of Borrower under the Loan Documents

Case: 24-04053　Doc# 36　Filed: 05/23/25　Entered: 05/23/25 17:31:07　Page 134 of 170

may be incurred and the time, manner, place or terms of any payment under any Loan Document may be extended or changed, by one or more amendments, modifications, renewals or extensions of any Loan Document or otherwise;

(b)     the time for Borrower's (or any other Person's) performance of or compliance with any term, covenant or agreement on its part to be performed or observed under any Loan Document may be extended, or such performance or compliance waived, or failure in or departure from such performance or compliance consented to, all in such manner and upon such terms as Lender (as applicable under the relevant Loan Documents) may deem proper;

(c)     Lender may request and accept other guaranties and may take and hold security as collateral for the Guaranteed Obligations, and may, from time to time, in whole or in part, exchange, sell, surrender, release, subordinate, modify, waive, rescind, compromise or extend such other guaranties or security and may permit or consent to any such action or the result of any such action, and may apply such security and direct the order or manner of sale thereof; and

(d)     Lender may exercise, or waive or otherwise refrain from exercising, any other right, remedy, power or privilege even if the exercise thereof affects or eliminates any right of subrogation or any other right of such Guarantor against Borrower.

**11.06.  Guarantors' Waivers.** Each Guarantor hereby waives and agrees not to assert:

(a)     any right to require Lender to proceed against Borrower, any other Member or any other Person, or to pursue any other right, remedy, power or privilege of Lender whatsoever;

(b)     the defense of the statute of limitations in any action hereunder or for the collection or performance of the Guaranteed Obligations (and in this regard that the performance of any act or any payment which tolls any statute of limitations applicable to Obligations under any of the Loan Documents will similarly operate to toll the statute of limitations applicable to each such Guarantor's liability hereunder);

(c)     any defense arising by reason of any lack of corporate or other authority or any other defense of Borrower, such Guarantor or any other Person (other than payment in full of the Guaranteed Obligations or, subject to **Section 11.08**, that no Guaranteed Obligations were then due);

(d)     any defense based upon Lender's errors or omissions in the administration of the Guaranteed Obligations;

(e)     any rights to set-offs and counterclaims;

(f)     without limiting the generality of the foregoing, to the fullest extent permitted by law, any defenses or benefits that may be derived from or afforded by applicable Law limiting the liability of or exonerating guarantors or sureties, or that may conflict with the terms of this **Article XI**, including any and all benefits that otherwise might be available to such Guarantor under California Civil Code Sections 1432, 1439, 2809, 2810, 2815, 2819, 2822,

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 135 of 170

2839, 2845, 2848, 2849, 2850, 2899 and 3433 and California Code of Civil Procedure Sections 580a, 580b, 580d and 726; and

(g)     any and all notice of the acceptance of this Guaranty, and any and all notice of the creation, renewal, modification, extension or accrual of the Guaranteed Obligations, or the reliance by Lender upon this Guaranty, or the exercise of any right, power or privilege hereunder. The Guaranteed Obligations will conclusively be deemed to have been created, contracted, incurred and permitted to exist in reliance upon this Guaranty. Each Guarantor waives promptness, diligence, presentment, protest, demand for payment, notice of default, dishonor or nonpayment and all other notices to or upon Borrower, any other Member or any other Person with respect to the Guaranteed Obligations.

**11.07. Additional Guarantor Waivers and Agreements**. Each Guarantor understands and acknowledges that if Lender forecloses judicially or non-judicially against any real property security for the Obligations, that foreclosure could impair or destroy any ability that such Guarantor may have to seek reimbursement, contribution, or indemnification from Borrower or from any other Guarantor or other Person based on any right such Guarantor may have of subrogation, reimbursement, contribution, or indemnification for any amounts paid by such Guarantor under this Guaranty. Each Guarantor further understands and acknowledges that in the absence of this **Section 11.07**, such potential impairment or destruction of such Guarantor's rights, if any, may entitle such Guarantor to assert a defense to this Guaranty based on Section 580d of the California Code of Civil Procedure as interpreted in *Union Bank v. Gradsky*, 265 Cal. App. 2d 40 (1968). By executing this Guaranty, each Guarantor freely, irrevocably, and unconditionally (a) waives and relinquishes that defense and agrees that such Guarantor will be fully liable under this Guaranty even though Lender may foreclose, either by judicial foreclosure or by exercise of power of sale, any Deed of Trust securing the Obligations; (b) agrees that such Guarantor will not assert that defense in any action or proceeding which Lender may commence to enforce this Guaranty; (c) acknowledges and agrees that the rights and defenses waived by each Guarantor in this Guaranty include any right or defense that such Guarantor may have or be entitled to assert based upon or arising out of any one or more of Sections 580a, 580b, 580d, or 726 of the California Code of Civil Procedure or Section 2848 of the California Civil Code; and (d) acknowledges and agrees that Lender is relying on this waiver in creating the Obligations, and that this waiver is a material part of the consideration which Lender is receiving for creating the Obligations.

Without limitation of the preceding paragraph or of the other waivers set forth in this **Section 11.07**, each Guarantor hereby further waives all other rights and defenses that any such Guarantor may have because any of the Obligations is secured by real property. This means, among other things, that (i) Lender may collect from each of the Guarantors without first foreclosing on any real or personal property Collateral pledged by the other Members or any other Person and (ii) if Lender forecloses on any real property Collateral pledged by Borrower or any of the other Members or any other Person, (A) the amount of the Obligations may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the Collateral is worth more than the sale price, and (B) Lender may collect from each of the Guarantors even if Lender, by foreclosing on the real property Collateral, has destroyed any right any such Guarantor may have to collect from Borrower or any other Member. This is an

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 136 of 170

unconditional and irrevocable waiver of any rights and defenses each such Guarantor may have because any of the Obligations is secured by real property.

**11.08. Stay of Acceleration.** If acceleration of the time for payment of any of the Obligations is stayed in connection with any case commenced by or against Borrower under any Debtor Relief Law, or otherwise, all such amounts will nonetheless be jointly and severally payable by each Guarantor immediately upon demand by Lender to the extent such acceleration would otherwise be permitted but for such stay.

**11.09. Financial Condition of Borrower.** No Guarantor will have any right to require Lender to obtain or disclose any information with respect to (a) the financial condition or character of Borrower or the ability of Borrower to pay and perform the Obligations, (b) the Guaranteed Obligations, (c) any collateral or other security for any or all of the Guaranteed Obligations, (d) the existence or nonexistence of any other guarantees of all or any part of the Guaranteed Obligations, (e) any action or inaction on the part of Lender or any other Person or (f) any other matter, fact or occurrence whatsoever. Each Guarantor hereby acknowledges that it has undertaken its own independent investigation of the financial condition of Borrower and all other matters pertaining to this Guaranty set forth in this **Article XI** and further acknowledges that it is not relying in any manner upon any representation or statement of Lender with respect thereto.

**11.10. Subrogation.** Until the Guaranteed Obligations have been paid and performed in full and the Commitment has been terminated, no Guarantor will directly or indirectly exercise (a) any rights that it may acquire by way of subrogation under this **Article XI**, by any payment hereunder or otherwise, (b) any rights of contribution, indemnification, reimbursement or similar suretyship claims arising out of this **Article XI** or (iii) any other right that it might otherwise have or acquire (in any way whatsoever) that could entitle it at any time to share or participate in any right, remedy or security of Lender as against any Borrower or any other Guarantor or any other Person, whether in connection with this **Article XI**, any of the other Loan Documents or otherwise.

**11.11. Subordination.** All payments on account of all indebtedness, liabilities and other obligations of Borrower to any Guarantor, whether now existing or hereafter arising, and whether due or to become due, absolute or contingent, liquidated or unliquidated, determined or undetermined (the "*Guarantor Subordinated Indebtedness*") will be subject, subordinate and junior in right of payment and exercise of remedies, to the extent and in the manner set forth herein, to the prior payment in full in cash of the Guaranteed Obligations. As long as any of the Guaranteed Obligations (other than unasserted contingent indemnification obligations) will remain outstanding and unpaid, no Guarantor will accept or receive any payment or distribution by or on behalf of Borrower or any other Guarantor, directly or indirectly, or assets of Borrower or any other Guarantor, of any kind or character, whether in cash, property or securities, including on account of the purchase, redemption or other acquisition of Guarantor Subordinated Indebtedness, as a result of any collection, sale or other disposition of collateral, or by setoff, exchange or in any other manner, for or on account of the Guarantor Subordinated Indebtedness ("*Guarantor Subordinated Indebtedness Payments*"), *except* that, each Guarantor will be entitled to accept and receive payments on its Guarantor Subordinated Indebtedness not in contravention of any Law or the terms of the Loan Documents so long as (i) no Event of Default

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 137 of
170

has occurred and is occurring and (ii) Lender has not given notice that Guarantor Subordinated Indebtedness Payments are not permitted.

If any Guarantor Subordinated Indebtedness Payments will be received in contravention of this **Article XI**, such Guarantor Subordinated Indebtedness Payments will be held in trust for the benefit of Lender and will be paid over or delivered to Lender for application to the payment in full in cash of all Guaranteed Obligations remaining unpaid to the extent necessary to give effect to this **Article XI** after giving effect to any concurrent payments or distributions to Lender in respect of the Guaranteed Obligations.

**11.12. Reinstatement.** The Guaranty set forth in this **Article XI** will continue to be effective or will be reinstated and revived, as the case may be, if, for any reason, any payment of the Guaranteed Obligations by or on behalf of Borrower (or receipt of any proceeds of collateral) will be rescinded, invalidated, declared to be fraudulent or preferential, set aside, voided or otherwise required to be repaid to Borrower, its estate, trustee, receiver or any other Person (including under any Debtor Relief Law), or must otherwise be restored by Lender, whether as a result of proceedings under any Debtor Relief Law or otherwise. All losses, damages, costs and expenses that Lender may suffer or incur as a result of any voided or otherwise set aside payments will be specifically covered by the indemnity in favor of Lender contained in **Section 12.06**.

**11.13. Substantial Benefits.** The Loans *provided* to or for the benefit of Borrower hereunder by Lender have been and are to be contemporaneously used for the benefit of Borrower and each Guarantor. It is the position, intent and expectation of the parties that Borrower and each such Guarantor have derived and will derive significant and substantial direct and indirect benefits from the Loans to be made available by Lender under the Loan Documents.

**11.14. Knowing and Explicit Waivers.** Each Guarantor acknowledges and agrees that it either has obtained the advice of legal counsel or has had the opportunity to obtain such advice in connection with the terms and provisions of this **Article XI**, and that each of the waivers and consents set forth herein is made with full knowledge of its significance and consequences and that all such waivers and consents herein are explicit and knowing and that each such Guarantor expects such waivers and consents to be fully enforceable.

### ARTICLE XII
### MISCELLANEOUS

**12.01. Members' Right of Contest.** Notwithstanding anything to the contrary contained in this Agreement, no Member shall be required to pay any tax, levy, charge, fee, rate, assessment or imposition referred to in **Section 6.04**, to remove any Lien required to be removed under **Section 7.01** or **Section 8.01**, pay or otherwise satisfy and discharge its obligations, Indebtedness (other than any Obligations), demands and claims against it or to comply with any Lien with any ordinance, rule, order, decree, decision, regulation or other Law referred to in **Section 6.05** or **Section 6.08**, so long as such Member shall contest, in good faith and at its cost and expense, in its own name and behalf, the amount or validity thereof, in an appropriate manner or by appropriate proceedings which shall operate during the pendency thereof to prevent the collection of or other realization upon the tax, levy, charge, fee, rate, assessment,

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 138 of 170

imposition, obligation, Indebtedness, demand, claim or Lien so contested, and the sale, forfeiture, or loss of its Property or any part thereof; *provided* that no such contest shall subject Lender or any Related Person to the risk of any liability. While any such matters are pending, the Member will not be required to pay, remove or cause to be discharged the tax, levy, charge, fee, rate, charge, assessment, imposition, obligation, Indebtedness, demand, claim or Lien being contested unless the Member agrees to settle such contest. Each such contest shall be promptly prosecuted to final conclusion (subject to the right of the Member engaging in such a contest to settle such contest), and in any event the Member will save Lender and each Related Person harmless from and against all losses, judgments, decrees and costs (including all reasonable attorney fees, costs and expenses in connection therewith) as a result of such contest and will, promptly after the final determination of such contest or settlement thereof, pay and discharge the amounts which shall be levied, assessed or imposed or determined to be payable therein, together with all penalties, fines, interests, costs and expenses thereon or incurred in connection therewith. The Member engaging in such a contest will give Lender prompt written notice of any such contest. Each Member hereby waives, to the extent permitted by law, any right which it may have to contest any Obligation.

**12.02. Amendments; Etc.** No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by Borrower or any other Member therefrom, shall be effective unless in writing signed by Lender and by Borrower and the other applicable Members, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

**12.03. Notices and Other Communications; Facsimile Copies.**

(a) **General.** Unless otherwise expressly *provided* herein, all notices and other communications *provided* for hereunder shall be in writing (including by facsimile transmission). All such written notices shall be mailed, faxed or delivered to the address, facsimile number or (subject to **Section 12.03(b)**) electronic mail address specified for notices to the applicable party set forth below:

> If to the Group Representative (on behalf of Borrower and the other Members of the Obligated Group):
>
> The Roman Catholic Bishop of Oakland
> 2121 Harrison Street, #110
> Oakland, California 94612
> Attention: Chief Financial Officer
> Telephone: (510) 267-8321
> Email: pbongiovani@oakdiocese.org

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 139 of
170

with a copy (which shall not constitute notice) to:

Foley & Lardner LLP
555 California Street, Suite 1700
San Francisco, California 94104
Attention: Mark T. Schieble
Telephone: (415) 984-9804
Email: mschieble@foley.com

If to the Lender:

Compass Bank
1333 N. California Street, Suite 315
Walnut Creek, California 94596
Attention: Eli Nolan, Vice President & Commercial Relationship Manager
Telephone: (925) 951-1492
Email: eli.nolan@bbva.com

with a copy (which shall not constitute notice) to:

Sheppard Mullin Richter & Hampton, LLP
Four Embarcadero Center, 17th Floor
San Francisco, California 94111
Attention: Peter H. Carson
Telephone: (415) 774-2935
Email: pcarson@sheppardmullin.com

or to such other address, facsimile number or electronic mail address as shall be designated by such party in a notice to the other party. All such notices and other communications shall be deemed to be given or made upon the earlier to occur of (i) actual receipt by the relevant party hereto and (ii) (A) if delivered by hand or by courier, when signed for by or on behalf of the relevant party hereto, (B) if delivered by mail, four Business Days after deposit in the mails, postage prepaid, (C) if delivered by facsimile, when sent and receipt has been confirmed by telephone, and (D) if delivered by electronic mail (which form of delivery is subject to the provisions of **Section 12.03(b)**), when delivered; *provided, however*, that notices and other communications to Lender pursuant to **Article II** shall not be effective until actually received by Lender. In no event shall a voicemail message be effective as a notice, communication or confirmation hereunder.

(b)     **Limited Use of Electronic Mail**. Electronic mail and Internet and intranet websites may be used only to distribute routine communications, such as financial statements and other information as *provided* in **Sections 6.01, 6.02** and **Section 6.03**, and to distribute Loan Documents for execution by the parties thereto, and may not be used for any other purpose.

(c)     **Reliance by the Lender**. Lender shall be entitled to rely and act upon any notices purportedly given by or on behalf of Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 140 of 170

confirmation thereof. Borrower shall indemnify Lender, its Affiliates, and their respective officers, directors, employees, agents and attorneys-in-fact from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of Borrower.

(d) **Group Representative**. Each Member hereby agrees that any and all notices given to the Group Representative pursuant to the terms of this Agreement shall be effective notice to each Member with the same force and effect as if such notice was given directly to each Member.

**12.04. No Waiver; Cumulative Remedies**. No failure by Lender to exercise, and no delay by Lender in exercising, any right, remedy, power or privilege hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by applicable Law.

**12.05. Attorney Costs, Expenses and Taxes**. Borrower and each of the other Members of the Obligated Group agree, jointly and severally, (a) to pay or reimburse Lender for all out-of-pocket documented costs and expenses incurred in connection with the development, preparation, negotiation and execution of this Agreement and the other Loan Documents and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated hereby or thereby are consummated), and the consummation and administration of the transactions contemplated hereby and thereby, including all reasonable attorney fees, costs and expenses, and (b) to pay or reimburse Lender for all costs and expenses incurred in connection with the enforcement, attempted enforcement, or preservation of any rights or remedies under this Agreement or the other Loan Documents (including all such costs and expenses incurred during any "workout" or restructuring in respect of the Obligations and during any legal proceeding, including any proceeding under any Debtor Relief Law), including all reasonable attorney fees, costs and expenses. The foregoing costs and expenses shall include all search, filing, recording, title insurance and appraisal charges and fees and taxes related thereto, and other out-of-pocket expenses incurred by Lender and the cost of independent public accountants and other outside experts retained by Lender. All amounts due under this **Section 12.05** shall be payable within ten Business Days after demand therefor. The agreements in this Section shall survive the termination of the Commitment and repayment, satisfaction or discharge of all other Obligations.

**12.06. Indemnification by Borrower**. Whether or not the transactions contemplated hereby are consummated, Borrower and each of the other Members of the Obligated Group shall, jointly and severally, indemnify and hold harmless Lender, its Affiliates, and their respective directors, officers, employees, counsel, agents and attorneys-in-fact (collectively the "*Indemnitees*") from and against any and all liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses and disbursements (including reasonable attorney fees, costs and expenses) of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against any such Indemnitee in any way relating to or arising out of or in connection with (a) the execution, delivery, enforcement, performance or

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 141 of 170

administration of any Loan Document or any other agreement, letter or instrument delivered in connection with the transactions contemplated thereby or the consummation of the transactions contemplated thereby, (b) the Commitment or any Loan or the use or proposed use of the proceeds therefrom, or (c) any actual or alleged presence or release of Hazardous Materials on or from any property currently or formerly owned or operated by Borrower or any other Member or other Diocesan entity, or any Environmental Liability related in any way to Borrower or any other Member or other Diocesan entity, or (d) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, investigation, litigation or proceeding) and regardless of whether any Indemnitee is a party thereto (all the foregoing, collectively, the "*Indemnified Liabilities*"); *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses or disbursements are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee. No Indemnitee shall have any liability for any indirect or consequential damages relating to this Agreement or any other Loan Document or arising out of its activities in connection herewith or therewith (whether before or after the Closing Date). All amounts due under this **Section 12.06** shall be payable within ten Business Days after demand therefor. The agreements in this Section shall survive the termination of the Commitment and the repayment, satisfaction or discharge of all the other Obligations.

        **12.07. Payments Set Aside**. To the extent that any payment by or on behalf of Borrower or any other Member is made to Lender, or Lender exercises its right of set-off, and such payment or the proceeds of such set-off or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such set-off had not occurred.

        **12.08. Successors and Assigns**.

        (a)      The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, *except* that no Member may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of Lender and Lender may not assign or otherwise transfer any of its rights or obligations hereunder *except* (i) to an Eligible Assignee in accordance with the provisions of **Section 12.08(b)**, (ii) by way of participation in accordance with the provisions of **Section 12.08(c)**, or (iii) by way of pledge or assignment of a security interest subject to the restrictions of **Section 12.08(e)** (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in **Section 12.08(c)** and, to the extent expressly contemplated hereby, the Indemnitees) any legal or equitable right, remedy or claim under or by reason of this Agreement.

Case: 24-04053   Doc# 36   Filed: 05/23/25   Entered: 05/23/25 17:31:07   Page 142 of 170

(b)     Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of the Commitment and the Loans at the time owing to it) pursuant to documentation acceptable to Lender and the assignee. From and after the effective date specified in such documentation, such Eligible Assignee shall be a party to this Agreement and, to the extent of the interest assigned by Lender, have the rights and obligations of Lender under this Agreement, and Lender shall, to the extent of the interest so assigned, be released from its obligations under this Agreement (and, in the case of an assignment of all of Lender's rights and obligations under this Agreement, shall cease to be a party hereto but shall continue to be entitled to the benefits of **Sections 3.01, 3.03, 3.04, 12.05** and **12.06** with respect to facts and circumstances occurring prior to the effective date of such assignment). Upon request, Borrower (at its expense) shall execute and deliver new or replacement Notes to Lender and the assignee, and shall execute and deliver any other documents reasonably necessary or appropriate to give effect to such assignment and to provide for the administration of this Agreement after giving effect thereto.

(c)     Lender may at any time, without the consent of, or notice to, Borrower, sell participations to any Person (other than a natural person or any Member or any Affiliate of any Member) (each, a "*Participant*") in all or a portion of Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the outstanding Loans); *provided* that (i) Lender's obligations under this Agreement shall remain unchanged, (ii) Lender shall remain solely responsible to Borrower for the performance of such obligations and (iii) Borrower shall continue to deal solely and directly with Lender in connection with Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which Lender sells such a participation shall provide that Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; *provided* that such agreement or instrument may provide that Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification that would (A) postpone any date upon which any payment of money is scheduled to be made to such Participant, (B) reduce the principal, interest, fees or other amounts payable to such Participant (*provided, however,* that Lender may, without the consent of the Participant, (1) amend any financial covenant hereunder (or any defined term used therein) even if the effect of such amendment would be to reduce the rate of interest on any Loan or to reduce any fee payable hereunder and (2) waive the right to be paid interest at the Default Rate), (C) release any Guarantor from its Guaranty or (D) release any Collateral in from the Liens created by this Agreement and the Collateral Documents. Subject to **Section 12.08(d)**, Borrower agrees that each Participant shall be entitled to the benefits of **Sections 3.01, 3.03** and **3.04** to the same extent as if it were Lender and had acquired its interest by assignment pursuant to **Section 12.08(b)**. To the extent permitted by applicable Law, each Participant also shall be entitled to the benefits of **Section 12.10** as though it were the Lender.

(d)     A Participant shall not be entitled to receive any greater payment under **Section 3.01** or **3.03** than Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with Borrower's prior written consent. A Participant that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code shall not be entitled to the benefits of **Section 3.01** unless Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrower, to provide to Lender such tax forms

Case: 24-04053   Doc# 36   Filed: 05/23/25   Entered: 05/23/25 17:31:07   Page 143 of 170

prescribed by the IRS as are necessary or desirable to establish an exemption from, or reduction of, U.S. withholding tax.

(e)     Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under any Note) to secure obligations of Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; *provided* that no such pledge or assignment shall release Lender from any of its obligations hereunder or substitute any such pledgee or assignee for Lender as a party hereto.

(f)     As used herein, the following terms have the following meanings:

"*Approved Fund*" means any Fund that is administered or managed by (a) Lender or (b) an Affiliate of Lender.

"*Eligible Assignee*" means (a) an Affiliate of Lender; (b) an Approved Fund; and (c) any other Person (other than a natural person) approved by Borrower (such approval not to be unreasonably withheld or delayed); *provided* that no such approval shall be required if an Event of Default has occurred and is continuing.

"*Fund*" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

**12.09. Confidentiality.** Lender agrees to maintain the confidentiality of the Information (as defined below), *except* that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority, (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this **Section 12.09**, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any Swap transaction relating to Borrower and its obligations, (g) with the consent of Borrower or (h) to the extent such Information (x) becomes publicly available other than as a result of a breach of this **Section 12.09** or (y) becomes available to Lender on a nonconfidential basis from a source other than a Member. For purposes of this Section, "*Information*" means all information received from any Member relating to any Member or any of their respective businesses, other than any such information that is available to Lender on a nonconfidential basis prior to disclosure by any Member; *provided* that, in the case of information received from a Member after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this **Section 12.09** shall be considered to have complied with its obligation to do so if such Person has exercised the same

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 144 of 170

degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

**12.10. Set-off.** In addition to any rights and remedies of Lender *provided* by applicable Law, upon the occurrence and during the continuance of any Event of Default, Lender is authorized at any time and from time to time, without prior notice to Borrower or any other Member, any such notice being waived by Borrower (on its own behalf and on behalf of each Member) to the fullest extent permitted by applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held by, and other indebtedness at any time owing by, Lender to or for the credit or the account of the respective Members against any and all Obligations owing to the Lender hereunder or under any other Loan Document, now or hereafter existing, irrespective of whether or not Lender shall have made demand under this Agreement or any other Loan Document and although such Obligations may be contingent or unmatured or denominated in a currency different from that of the applicable deposit or indebtedness. Lender agrees promptly to notify Borrower after any such set-off and application; *provided, however,* that the failure to give such notice shall not affect the validity of such set-off and application.

**12.11. Interest Rate Limitation.** Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "***Maximum Rate***"). If Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to Borrower. In determining whether the interest contracted for, charged, or received by Lender exceeds the Maximum Rate, the Lender may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

**12.12. Counterparts.** This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which will constitute an original, but all of which when taken together will constitute a single contract. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or electronic transmission (such as by "pdf") will be effective as delivery of a manually executed counterpart of this Agreement

**12.13. Electronic Execution of Documents.** The words "execution," "signed," "signature" and words of similar effect in any Loan Document shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity and enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as *provided* for in any applicable Laws, including any state law based on the Uniform Electronic Transactions Act.

**12.14. Integration.** This Agreement, together with the other Loan Documents, comprises the complete and integrated agreement of the parties on the subject matter hereof and thereof and supersedes all prior agreements, written or oral, on such subject matter. In the event of any conflict between the provisions of this Agreement and those of any other Loan Document,

Case: 24-04053   Doc# 36   Filed: 05/23/25   Entered: 05/23/25 17:31:07   Page 145 of 170

the provisions of this Agreement shall control; *provided* that the inclusion of supplemental rights or remedies in favor of Lender in any other Loan Document shall not be deemed a conflict with this Agreement. Each Loan Document was drafted with the joint participation of the respective parties thereto and shall be construed neither against nor in favor of any party, but rather in accordance with the fair meaning thereof.

**12.15. Survival of Representations and Warranties.** All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by Lender, regardless of any investigation made by Lender or on its behalf and notwithstanding that Lender may have had notice or knowledge of any Default at the time of any Loan, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

**12.16. Severability.** If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**12.17. Governing Law; Jurisdiction.**

(a) THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF CALIFORNIA APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY WITHIN SUCH STATE.

(b) ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT MAY BE BROUGHT IN THE COURTS OF THE STATE OF CALIFORNIA SITTING IN SAN FRANCISCO OR OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF SUCH STATE, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH MEMBER AND LENDER EACH CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THOSE COURTS. EACH MEMBER AND LENDER EACH IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF *FORUM NON CONVENIENS*, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION OR PROCEEDING IN SUCH JURISDICTION IN RESPECT OF ANY LOAN DOCUMENT OR OTHER DOCUMENT RELATED THERETO. EACH MEMBER AND LENDER EACH WAIVES PERSONAL SERVICE OF ANY SUMMONS, COMPLAINT OR OTHER PROCESS, WHICH MAY BE MADE BY ANY OTHER MEANS PERMITTED BY THE LAW OF SUCH STATE.

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 146 of 170

**12.18. Waiver of Right to Trial by Jury.**

(a)     EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY LOAN DOCUMENT, OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER FOUNDED IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE SIGNATORIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

(b)     WITHOUT INTENDING IN ANY WAY TO LIMIT THE PARTIES' AGREEMENT TO WAIVE THEIR RESPECTIVE RIGHT TO A JURY TRIAL, IF THE ABOVE WAIVER OF THE RIGHT TO A JURY TRIAL IS NOT ENFORCEABLE, THE PARTIES TO THIS AGREEMENT HEREBY EXPRESSLY AGREE THAT THEIR DISPUTES MAY BE RESOLVED BY A JUDGE OR RETIRED JUDGE APPLYING THE APPLICABLE LAW. THEREFORE, THE PARTIES TO THIS AGREEMENT AGREE TO REFER, FOR A COMPLETE AND FINAL ADJUDICATION, ANY AND ALL ISSUES OF FACT OR LAW INVOLVED IN ANY LITIGATION OR PROCEEDING (INCLUDING ALL DISCOVERY AND LAW AND MOTION MATTERS, PRETRIAL MOTIONS, TRIAL MATTERS, AND POST-TRIAL MOTIONS (E.G., MOTIONS FOR RECONSIDERATION, NEW TRIAL AND TO TAX COSTS, ATTORNEY FEES AND PREJUDGMENT INTEREST)) UP TO AND INCLUDING FINAL JUDGMENT, BROUGHT TO RESOLVE ANY DISPUTE (WHETHER SOUNDING IN CONTRACT, TORT, UNDER ANY STATUTE, OR OTHERWISE) BETWEEN BORROWER (OR ANY ONE OR MORE OTHER MEMBERS) AND LENDER ARISING OUT OF, CONNECTED WITH, OR RELATED OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THE PARTIES IN CONNECTION WITH THIS AGREEMENT, THE LOAN DOCUMENTS OR THE TRANSACTIONS RELATED HERETO AND THERETO, TO A JUDICIAL REFEREE WHO SHALL BE APPOINTED UNDER A GENERAL REFERENCE PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 638. THE REFEREE'S DECISION WOULD STAND AS THE DECISION OF THE COURT, WITH JUDGMENT TO BE ENTERED ON HIS OR HER STATEMENT OF DECISION IN THE SAME MANNER AS IF THE ACTION HAD BEEN TRIED BY THE COURT. THE GROUP REPRESENTATIVE AND LENDER SHALL SELECT A SINGLE NEUTRAL REFEREE, WHO SHALL BE A RETIRED STATE OR FEDERAL JUDGE WITH AT LEAST FIVE YEARS OF JUDICIAL EXPERIENCE IN CIVIL MATTERS. IN THE EVENT THAT THE GROUP REPRESENTATIVE AND LENDER CANNOT AGREE UPON A REFEREE, THE REFEREE SHALL BE APPOINTED BY THE COURT. THE MEMBERS JOINTLY AND SEVERALLY SHALL BEAR THE FEES AND EXPENSES OF THE REFEREE UNLESS THE REFEREE OTHERWISE PROVIDES IN THE STATEMENT OF DECISION. THE PARTIES TO THE

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 147 of 170

AGREEMENT AGREE THAT ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS **SECTION 12.18** WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE REFERENCE TO A JUDICIAL REFEREE AS PROVIDED ABOVE.

**12.19. Immunity of Officers and Employees of the Members.** No recourse shall be had for the payment of the principal of or premium or interest on any of the Obligations or for any claim based thereon or upon any obligation, covenant or agreement contained in this Agreement against any past, present or future church leader or clergyman, officer, director, employee or agent of any Member, or of any successor entity, as such, either directly or through any Member or any successor entity, under any rule of law or equity, statute or constitution or by the enforcement of any assessment or penalty or otherwise, and all such liability of any such church leader or clergyman, officers, directors, employees or agents as such is hereby expressly waived and released as a condition of and consideration for the execution of this Agreement and the incurrence of the Obligations.

**12.20. USA Patriot Act Notice.** Lender hereby notifies Borrower and the other Members that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies the Members, which information includes the name and address of the Members and other information that will allow Lender to identify the Members in accordance with the Patriot Act.

*[Signature page follows]*

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 148 of 170

IN WITNESS WHEREOF, THE ROMAN CATHOLIC BISHOP OF OAKLAND on behalf of itself and as representative of the Obligated Group, THE ROMAN CATHOLIC WELFARE CORPORATION OF OAKLAND, THE ROMAN CATHOLIC CEMETERIES OF THE DIOCESE OF OAKLAND, ADVENTUS and COMPASS BANK have caused this Agreement to be duly executed as of the date first above written.

THE OBLIGATED GROUP:

THE ROMAN CATHOLIC BISHOP OF OAKLAND

By: *+Michael Barber s.f.*

The Most Reverend Michael C. Barber

THE ROMAN CATHOLIC WELFARE CORPORATION OF OAKLAND

By: *Paul Bongiovanni*
Name: Paul Bongiovanni
Title: Treasurer and Secretary

THE ROMAN CATHOLIC CEMETERIES OF THE DIOCESE OF OAKLAND

By: *Paul Bongiovanni*
Name: Paul Bongiovanni
Title: Treasurer and Secretary

ADVENTUS

By: *Paul Bongiovanni*
Name: Paul Bongiovanni
Title: President

LENDER:

COMPASS BANK

By: _____
Name:
Title:

Case: 24-04053   Doc# 36   Filed: 05/23/25   Entered: 05/23/25 17:31:07   Page 149 of 170

IN WITNESS WHEREOF, THE ROMAN CATHOLIC BISHOP OF OAKLAND on behalf of itself and as representative of the Obligated Group, THE ROMAN CATHOLIC WELFARE CORPORATION OF OAKLAND, THE ROMAN CATHOLIC CEMETERIES OF THE DIOCESE OF OAKLAND, ADVENTUS and COMPASS BANK have caused this Agreement to be duly executed as of the date first above written.

### THE OBLIGATED GROUP:

**THE ROMAN CATHOLIC BISHOP OF OAKLAND**

By: _+Michael Barber s.j._
The Most Reverend Michael C. Barber

**THE ROMAN CATHOLIC WELFARE CORPORATION OF OAKLAND**

By: _Paul Bongiovanni_
Name: Paul Bongiovanni
Title: Secretary / Treasurer

**THE ROMAN CATHOLIC CEMETERIES OF THE DIOCESE OF OAKLAND**

By: _Paul Bongiovanni_
Name: Paul Bongiovanni
Title: Secretary / Treasurer

**ADVENTUS**

By: _Paul Bongiovanni_
Name: Paul Bongiovanni
Title: President

### LENDER:

**COMPASS BANK**

By: _____
Name:
Title:

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 150 of 170

IN WITNESS WHEREOF, THE ROMAN CATHOLIC BISHOP OF OAKLAND on behalf of itself and as representative of the Obligated Group, THE ROMAN CATHOLIC WELFARE CORPORATION OF OAKLAND, THE ROMAN CATHOLIC CEMETERIES OF THE DIOCESE OF OAKLAND, ADVENTUS and COMPASS BANK have caused this Agreement to be duly executed as of the date first above written.

**THE OBLIGATED GROUP:**

**THE ROMAN CATHOLIC BISHOP OF OAKLAND**

By: _____
       The Most Reverend Michael C. Barber

**THE ROMAN CATHOLIC WELFARE CORPORATION OF OAKLAND**

By: _____
Name:
Title:

**THE ROMAN CATHOLIC CEMETERIES OF THE DIOCESE OF OAKLAND**

By: _____
Name:
Title:

**ADVENTUS**

By: _____
Name:
Title:

**LENDER:**

**COMPASS BANK**

By: _____
Name: *Eli Nolan*
Title: *Vice President*

[signature page to Credit and Security Agreement]

## Schedule 7.02

## Existing Indebtedness

None

**Schedule 10.01**

**Personal Property Collateral**

All of each Member's right, title and interest in, to and under each of the following, whether now owned or at any time hereafter acquired by such Member or whether such Member now has or at any time in the future may acquire any right, title or interest:

(1)     Cash in the possession of Lender, and

(2)     Certificated certificates of deposit issued by Lender and in the possession of Lender, and the Proceeds thereof.

# EXHIBIT A

## ELIGIBLE PERSONAL PROPERTY COLLATERAL

Eligible Personal Property Collateral is subject to the review and approval of Lender in its Reasonable Discretion.

| Type of Collateral | TCV% |
|---|---|
| BBVA Savings, Money Market or Certificate of Deposit Accounts; Commercial Paper (CP) and/or Eurodollars | 100% |
| Money Market Funds and Money Market Mutual Funds | 95.0% |
| **U.S. Government and Agencies; U.S. Treasuries; U.S. Treasury Inflation-Protected Securities (TIPS); and Government National Mortgage Association (GNMA) Non-Strip Securities:** | |
| ➤ < One (1) Year Tenor | 97.5% |
| ➤ > One (1) Year but ≤ Five (5) Year Tenor | 95.0% |
| ➤ > Five (5) Year Tenor | 90.0% |
| **Bond / Fixed Income [Muni, Corporate, Convertible Corporate, Variable Rate Demand Notes (VRDN), and Other]:** | |
| **Rated "A" or better:** | |
| ➤ Munis: < One (1) Year Tenor | 97.5% |
| ➤ Munis: > One (1) Year but ≤ Five (5) Year Tenor | 95.0% |
| ➤ Munis: > Five (5) Year Tenor | 90.0% |
| ➤ Corporate: < One (1) Year Tenor | 90.0% |
| ➤ Corporate: > One (1) Year but ≤ Five (5) Year Tenor | 85.0% |
| ➤ Corporate: > Five (5) Year Tenor | 80.0% |
| **Rated "BBB-" or better but less than "A":** | 80.0% |
| **Rated below "BBB-"** (Eligible Personal Property Collateral of this type included in Total Collateral Value as of any date for purposes of calculating the Asset Coverage Ratio shall be capped at 10.0% of Total Collateral Value): | 65.0% |
| **Interest Bearing Commercial Paper (CP):** | |
| ➤ Commercial Paper Rated "A-1" / "P-1" or Better | 95.0% |
| ➤ Commercial Paper Rated "A-2" / "P-2" to "A-1" / "P-1" | 90.0% |
| **Equities / Funds (Listed on the NYSE, NASDQ or other Domestic National Exchange):** | |
| ➤ Common Stock and American Depository Receipts (ADR) (>$10 per share or > $5 per share if the total value of the outstanding shares is at least $5 billion) | 75.0% |

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 154 of 170

| | | |
|---|---|---|
| ➤ Preferred Stock (>$10 per share or > $5 per share if the total value of the outstanding shares is at least $5 billion) | | 75.0% |
| ➤ Exchange Trade Funds (ETFs) (>$5 per share) | | 75.0% |
| ➤ Equity Mutual Funds (>$5 per share) | | 75.0% |
| ➤ Short Duration Bond Mutual Funds (>$5 per share) | | 80.0% |

# EXHIBIT B

## FORM OF LOAN NOTICE

_____, 20__

To:     Compass Bank
        1333 N. California Boulevard, Suite 315
        Walnut Creek, CA 94596
        Attention: Eli Nolan, Vice President & Commercial Relationship Manager
        Telephone: (925) 951-1492
        Electronic Mail: eli.nolan@bbva.com

Re: The Credit and Security Agreement dated as of February 1, 2017 (as the same may from time to time be amended, modified, supplemented or restated, the "*Credit Agreement*"), by and among THE ROMAN CATHOLIC BISHOP OF OAKLAND, a California corporation sole ("*Borrower*"), as borrower, the Guarantors party thereto as additional Members of the Obligated Group, and COMPASS BANK, an Alabama banking corporation, as Lender. Capitalized terms used but not defined herein have the meaning given to them in the Credit Agreement.

Ladies and Gentlemen:

1.      Borrower requests the borrowing of a Loan under the Credit Agreement (for purposes of this Loan Notice, the "*Borrowing*").

2.      The designated funding date, which is a Business Day, of the requested Borrowing is _____, 20__.

3.      The aggregate principal amount of the requested Borrowing is $_____.

4.      The designated deposit account to which proceeds of the requested Borrowing are to be transferred (together with wiring instructions, as applicable) are:

Bank:           [_____]
Account No.:    [_____]
ABA No.:        [_____]
Reference:      [_____]

The undersigned hereby certifies that the following statements are true on the date hereof, and will be true on the date of the requested Borrowing, before and after giving effect thereto and to the application of the proceeds therefrom:

(a)     All representations and warranties of Borrower and each other Member contained in the Credit Agreement (including **Article V** thereof) or in any other Loan Document are true and correct in all material respects (*except* that such materiality qualifier will not be applicable to any portion of any representation and warranty that is already qualified or modified by

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 156 of 170

materiality in the text thereof) on and as of the date of the funding of such Borrowing, *except* to the extent that any such representation or warranty specifically refers to an earlier date, in which case such representation or warranty will be true and correct in all material respects (*except* that such materiality qualifier will not be applicable to any portion of any representation and warranty that is already qualified or modified by materiality in the text thereof) as of such earlier date.

**(b)** No Default or Event of Default has occurred and is continuing, or would result from, such requested Borrowing;

**(c)** The Asset Coverage Ratio, as calculated on a *pro forma* basis taking into account the funding of such requested Borrowing, is not less than 1.00:1.00;

**(d)** no Material Adverse Effect has occurred since December 31, 2015; and

**(d)** immediately after giving effect to the funding of the requested Borrowing, the then Outstanding Amount of the Loans will not the Commitment then in effect.

THE ROMAN CATHOLIC BISHOP OF OAKLAND, a California corporation sole

By: _____
Printed
Name:
Title:

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 157 of 170

EXHIBIT C

## FORM OF NOTE

### (Compass Bank)

U.S. $70,000,000                                        _____, 20__

      THE ROMAN CATHOLIC BISHOP OF OAKLAND, a California corporation sole ("*Borrower*"), FOR VALUE RECEIVED, hereby promises to pay to COMPASS BANK, an Alabama banking corporation (together with its successors and assigns, "*Lender*"), in lawful money of the United States of America, the aggregate principal amount of all Loans made by Lender to Borrower under the Credit Agreement (as defined below), payable on the dates, in the amounts and in the manner set forth below.

      This promissory note (this "*Note*") is one of the Notes referred to in that Credit and Security Agreement dated as of February 1, 2017 (as the same may from time to time be amended, modified, supplemented or restated, the "*Credit Agreement*"), by and among Borrower, the Guarantors from time to time party thereto as additional Members of the Obligated Group, and Lender. All capitalized terms used but not defined herein will have the meaning given to them in the Credit Agreement.

      **1.**     **Principal Payments**. All payments of the principal amount hereunder will be made in Dollars of the United States of America and will be due and payable on the date(s) determined pursuant to the Credit Agreement.

      2.     **Interest Rate**. Borrower promises to pay interest on the sum of the daily unpaid principal balance of such Loans outstanding on each day, from the date of this Note until all such principal amounts will have been repaid in full, which interest will be payable in Dollars of the United States of America and at the rates *per annum* and on the dates determined pursuant to the Credit Agreement.

      **3.**     **Place Of Payment**. All amounts payable hereunder will be payable in the manner set forth in the Credit Agreement.

      **4.**     **Application Of Payments; Acceleration**. Payments on this Note will be applied in the manner set forth in the Credit Agreement. Without limiting the generality of **Section 1** of this Note, the Credit Agreement contains provisions for acceleration of the maturity of the principal amount of the Loans upon the occurrence of certain stated events.

      Each Loan made or advanced by Lender to Borrower pursuant to the Credit Agreement will be recorded by Lender on its books and records. The failure of Lender to record any repayment made on account of the principal balance thereof will not limit or otherwise affect the obligation of Borrower under this Note and under the Credit Agreement to pay the principal, interest and other amounts due and payable thereunder.

      Any principal repayment of or interest payment on the Loans not paid when due or within the applicable cure period, if any, whether at stated maturity, by acceleration or otherwise, may

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 158 of 170

thereafter bear interest at the Default Rate determined in accordance with the terms and conditions of **Sections 2.06(c)** and **(d)** of the Credit Agreement.

5. **Secured Note.** The full amount of this Note is secured by the Collateral identified and described as security therefor in the Credit Agreement and the Collateral Documents.

6. **Default.** Upon the occurrence of an Event of Default under the Credit Agreement or any of the other Loan Documents, all unpaid principal, accrued interest and other amounts owing hereunder may become, or may be declared to be, collectible by Lender, in accordance with the terms and conditions of the Credit Agreement and applicable Law.

7. **Waiver.** Borrower hereby waives presentment and demand for payment, notice of dishonor, protest and notice of protest of this Note, and will pay all costs of collection when incurred by or on behalf of Lender, including, without limitation, reasonable attorneys' fees, costs and other expenses.

8. **Governing Law.** This Note will be governed by, and construed and enforced in accordance with, the laws of the State of California.

9. **Successors And Assigns.** The provisions of this Note will inure to the benefit of, and be binding on, any successor to Borrower and will extend to any holder hereof.

THE ROMAN CATHOLIC BISHOP OF OAKLAND, a California corporation sole

By: _____
　　The Most Reverend Michael C. Barber

# COMPLIANCE CERTIFICATE

_____, 20__

To:     Compass Bank
        1333 N. California Boulevard, Suite 315
        Walnut Creek, CA 94596
        Attention: Eli Nolan, Vice President & Commercial Relationship Manager
        Telephone: (925) 951-1492
        Electronic Mail: eli.nolan@bbva.com

Re: The Credit and Security Agreement dated as of February 1, 2017 (as the same may from time to time be amended, modified, supplemented or restated, the *"Credit Agreement"*), by and among THE ROMAN CATHOLIC BISHOP OF OAKLAND, a California corporation sole (*"Borrower"*), as borrower, the Guarantors party thereto as additional Members of the Obligated Group, and COMPASS BANK, an Alabama banking corporation, as Lender. Capitalized terms used but not defined herein have the meaning given to them in the Credit Agreement.

Ladies and Gentlemen:

Reference is made to the Credit Agreement. Capitalized terms used in this Compliance Certificate have the same meaning when used herein as given to them in the Credit Agreement.

Pursuant to **Section 6.02(a)** of the Credit Agreement, Borrower, as the Group Representative, by its undersigned [Chief Financial Officer][Responsible Person], acting solely in such capacity, hereby certifies that the information furnished in *Schedule 1* attached hereto and incorporated herein by this reference was true, accurate and complete as of the last date of the Fiscal Year ended as of the date of this Compliance Certificate and that:

      1.     The undersigned is the duly appointed [_____] of Borrower and has primary responsibility for the financial affairs of Borrower and the other Members of the Obligated Group.

      2.     The undersigned [Chief Financial Officer][Responsible Person] has reviewed the terms of the Credit Agreement and has made, or caused to be made under his or her supervision, a review in reasonable detail of the transactions and financial condition of the Obligated Group during the accounting period ended [_____], 20[__], which have been delivered to Lender Agent pursuant to **Sections 6.01(a)** and **6.01(b)**, as applicable, of the Credit Agreement.

      3.     Such reviews have not disclosed the existence during or at the end of such accounting period, and the undersigned does not have knowledge of the existence as of the date hereof of any Default or Event of Default, except for such conditions or events listed on *Schedule 2* attached hereto, specifying the nature and period of existence thereof and what action Borrower has taken, or is taking and proposes to take, if any, with respect thereto.

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 160 of 170

**IN WITNESS WHEREOF,** this Compliance Certificate is executed by the undersigned this _____ day of _____, 20__.

THE ROMAN CATHOLIC BISHOP OF OAKLAND, a California corporation sole

By: _____
Name:
Title:

# SCHEDULE 1 TO COMPLIANCE CERTIFICATE

### Dated _____, 20__

## FINANCIAL COVENANTS OF OBLIGATED GROUP

*[Use the following to accompany all Compliance Certificates dated as of a date on or prior to the Master Indenture Termination Date]*

**I.** **Minimum Historical Debt Service Coverage Ratio (Section 7.09(a)).** The Obligated Parties will not permit the Historical Debt Service Coverage Ratio, as calculated for Borrower and the other Members of the Obligated Group taken as a whole as of the last day of each Fiscal Year of Borrower for the Fiscal Year ending on such date, to be less than 1.00:1.00.

| | | |
|---|---|---|
| **(a)** | Income Available for Debt Service (calculated as follows for such Fiscal Year): | |
| **(i)** | Revenues for such Fiscal Year | $_____ |
| **(ii)** | Expenses for such Fiscal Year | $_____ |
| **(iii)** | Income Available for Debt Service (Line I(a)(i) *minus* Line I(a)(ii)) | $_____ |
| **(b)** | Maximum Annual Debt Service Requirement for the Outstanding Amount of Funded Indebtedness | $_____ |
| **(c)** | Historical Debt Service Coverage Ratio ((Line I(a)(iii) *divided by* Line I(b)) | _____:1.00 |

**II.** **Minimum Liquidity (Section 7.09(b)).** The Obligated Parties will not permit Unrestricted Cash and Liquid Investments, as calculated as calculated for Borrower and the other Members of the Obligated Group taken as a whole as of the last day of each Fiscal Year of Borrower, to be less than the amount that is equal to (a) 1.35 *multiplied* by (b) 40% of the *sum* of ((i) scheduled principal payments on the Series 2007 Bonds *plus* (ii) scheduled principal payments on the Obligations hereunder), in each case becoming due and payable in the following Fiscal Year.

| | | |
|---|---|---|
| **(a)** | Unrestricted Cash and Liquid Investments as of such Fiscal Year-end | $_____ |
| **(b)** | Scheduled principal payments of certain Funded Indebtedness (calculated as follows): | |
| **(i)** | Scheduled principal payments on the Series 2007 Bonds becoming due and payable in the immediately following Fiscal Year | $_____ |

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 162 of 170

| | | |
|---|---|---|
| **(ii)** | Scheduled principal payments on the Loan Obligations becoming due and payable in the immediately following Fiscal Year | $_____ |
| **(iii)** | Line II(b)(i) *plus* Line II(b)(ii) | $_____ |
| **(iv)** | Amount equal to 40.0% of Line II(b)(iii) | $_____ |
| **(v)** | Amount equal to Line II(b)(iv) *multiplied* by 1.35 | $_____ |
| **(c)** | Liquidity: Is Line II(a) equal to or greater than (Line II(b)(v)? | [Yes]/[No] |

**III.** **Maximum Capitalization Ratio (Section 7.09(c)).** The Obligated Group will not permit the Capitalization Ratio, as calculated as of the last day of each Fiscal Year of Borrower, to exceed 0.60:1.00.

| | | |
|---|---|---|
| **(a)** | Aggregate principal amount of Long-Term Indebtedness outstanding as of such Fiscal Year-end | $_____ |
| **(b)** | Unrestricted Net Assets as of such Fiscal Year-end | $_____ |
| **(c)** | The *sum* of Line III(a) *plus* Line III(b) | $_____ |
| **(d)** | Capitalization Ratio ((Line III(a) *divided by* Line III(c)) | _____:1.00 |

Case: 24-04053     Doc# 36     Filed: 05/23/25     Entered: 05/23/25 17:31:07     Page 163 of 170

*[Use the following to accompany all Compliance Certificates dated as of a date after the Master Indenture Termination Date]*

I.    **Minimum Fixed Charge Coverage Ratio (Section 8.09(a)).** The Obligated Parties will not permit the Fixed Charge Coverage Ratio, as calculated for Borrower and the other Members of the Obligated Group taken as a whole as of the last day of each Fiscal Year of Borrower for the Fiscal Year ending on such date, to be less than 1.50:1.00.

| | | |
|---|---|---|
| (a) | Net change in Unrestricted Net Assets for the Fiscal Year just ended[1] (calculated as follows): | |
| (i) | Unrestricted Net Assets as of such Fiscal Year-end | $_____ |
| (ii) | Unrestricted Net Assets as of the last the of the immediately preceding Fiscal Year | $_____ |
| (iii) | Line I(a)(i) *minus* Line (a)(ii) | $_____ |
| (b) | Amounts treated as expenses for depreciation and amortization during such Fiscal Year | $_____ |
| (c) | Interest Expense for the Fiscal Year just ended | $_____ |
| (d) | The *sum* of Line I(a)(iii) *plus* Line I(b) *plus* Line (c) | $_____ |
| (e) | [The current portion of Long-Term Indebtedness becoming due and payable in the immediately following Fiscal Year][The current portion of Long-Term Indebtedness that became due and payable during the Fiscal Year just ended][2] | $_____ |
| (f) | The *sum* of Line I(e) *plus* Line I(c) | $_____ |
| (g) | Fixed Charge Coverage Ratio (Line I(c) *divided by* Line I(f)) | _____:1.00 |

II.   **Minimum Liquidity (Section 8.09(b)).** The Obligated Parties will not permit (i) Unrestricted Cash and Liquid Investments and (ii) all other Eligible Personal Property Collateral held by the Obligated Group for any corporate purposes to the extent not Restricted, calculated as of the last day of each Fiscal Year of Borrower, to be less than $125,000,000.

---

[1] Excluding unrealized gains or losses on Investments, changes in net mark-to-market exposure on Swap Contracts or any other non-cash items or non-recurring items

[2] Note - Use language in second set of brackets for the calculation of the Fixed Charge Coverage Ratio as of the last of the Fiscal Year of Borrower immediately preceding the Stated Maturity Date.

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 164 of 170

| | | |
|---|---|---|
| **(a)** | Unrestricted Cash and Liquid Investments as of such Fiscal Year-end | $_____ |
| **(b)** | Other Eligible Personal Property Collateral held by the Obligated Group for any corporate purposes to the extent not Restricted | $_____ |
| **(c)** | Liquidity: The *Sum* of Line II(a) and Line II(b) | $_____ |
| **(d)** | Liquidity: Is the Line II(c) equal to or greater than $125,000,000? | [Yes]/[No] |

## SCHEDULE 2 TO COMPLIANCE CERTIFICATE

**Dated _____, 20___**

### LIST OF EXCEPTIONS

*Condition(s) or event(s) constituting a Default or Event of Default:*

*Period of Existence:*

*Remedial action with respect to such condition or event:*

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 166 of
170

# FORM OF JOINDER AGREEMENT

This JOINDER AGREEMENT, dated as of _____, 20__, is entered into and made by _____, a _____ (the "*Additional Obligor*"), in favor of COMPASS BANK, an Alabama banking corporation, as Lender. All capitalized terms not defined herein will have the meaning ascribed to them in such Credit Agreement.

## RECITALS

A.    THE ROMAN CATHOLIC BISHOP OF OAKLAND, a California corporation sole, as borrower ("*Borrower*"), and THE ROMAN CATHOLIC WELFARE CORPORATION OF OAKLAND, a California religious corporation, THE ROMAN CATHOLIC CEMETERIES OF THE DIOCESE OF OAKLAND, a California religious corporation, and ADVENTUS, a California nonprofit public benefit corporation (each a "*Guarantor*" and collectively the "*Guarantors*" and, together with Borrower, the Members of the Obligated Group), have entered into that Credit and Security Agreement dated as of February 1, 2017 (as the same may from time to time be amended, modified, supplemented or restated, the "*Credit Agreement*") with Lender, pursuant to which Lender agreed to make certain Loans to Borrower on behalf and for the benefit of Borrower and the other Members of the Obligated Group up to an initial aggregate available principal amount of up to $70,000,000 on the terms and subject to the conditions set forth therein and the other Loan Documents.

B.    Pursuant to **Article XI** of the Credit Agreement, each of the Guarantors party to the Credit Agreement have, jointly and severally, unconditionally and irrevocably guaranteed the full and prompt payment when due (whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise) and performance of the Guaranteed Obligations.

C.    Additional Obligor is a currently obtains and enjoys and will continue to obtain and enjoy substantial direct and indirect benefit from Loans made by Lender pursuant to the Credit Agreement.

D.    The Additional Obligor has agreed to execute and deliver this Joinder Agreement in order to become a Guarantor and Member of the Obligated Group party to the Credit Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing recitals, and for other good and valuable consideration, the receipt of which is hereby confirmed, IT IS AGREED:

**1.**    <u>**Joined as Guarantor to Credit Agreement**</u>. By executing and delivering this Joinder Agreement, the Additional Obligor, as provided in **Article XI** of the Credit Agreement, hereby becomes a party to the Credit Agreement as a Guarantor and a Member of the Obligated Group thereunder with the same force and effect as if originally named therein as a Guarantor and a Member and, without limiting the generality of the foregoing, hereby expressly assumes all

Case: 24-04053    Doc# 36    Filed: 05/23/25    Entered: 05/23/25 17:31:07    Page 167 of 170

obligations and liabilities of a Guarantor and Member thereunder. The information set forth in **Annex I-A** hereto is hereby added to the information set forth in the schedules to the Credit Agreement. The Additional Obligor hereby represents and warrants that each of the representations and warranties contained in **Article V** of the Credit Agreement, with respect to itself, is true and correct in all material respects (except that such materiality qualifier will not be applicable to any portion of any representation or warranty that is already qualified or modified by materiality in the text thereof) on and as the date hereof (after giving effect to this Joinder Agreement) as if made on and as of such date; *provided, however*, that those representations and warranties expressly referring to another date are true, accurate and complete in all material respects (*except* that such materiality qualifier is not applicable to any portion of any representation and warranty that is already qualified or modified by materiality in the text thereof) as of such date. [*insert and reaffirm grant of security interest in Article X of Credit Agreement*]

2.    <u>GOVERNING LAW.</u> **THIS JOINDER AGREEMENT WILL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF CALIFORNIA.**

IN WITNESS WHEREOF, the undersigned has caused this Joinder Agreement to be duly executed and delivered as of the date first above written.

[ADDITIONAL OBLIGOR]

By: _____
         Name:
         Title:

Address for notices to the Additional Obligor (if different than the address(es) for the Obligated Group set forth in Schedule 12.02 to the Credit Agreement):

_____
_____

Attention: _____
Tel.: _____
Email: _____

# EXHIBIT 7

# Exhibit Filed Under Seal