**FOLEY & LARDNER LLP**
Thomas F. Carlucci (CA Bar No. 135767)
Tel: (415) 984-9824; tcarlucci@foley.com
Shane J. Moses (CA Bar No. 250533)
Tel: (415) 438-6404; smoses@foley.com
Emil P. Khatchatourian (CA Bar No. 265290)
Tel: (312) 832-5156; ekhatchatourian@foley.com
Ann Marie Uetz (admitted *pro hac vice*)
Tel: (313) 234-7114; auetz@foley.com
Matthew D. Lee (admitted *pro hac vice*)
Tel: (608) 258-4203; mdlee@foley.com
Geoffrey S. Goodman (admitted *pro hac vice*)
Tel: (312) 832-4515; ggoodman@foley.com
Mark C. Moore (admitted *pro hac vice*)
Tel: (214) 999-4150; mmoore@foley.com
555 California Street, Suite 1700
San Francisco, CA 94104-1520

*Counsel for the Debtor
and Debtor in Possession*

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| In re:<br><br>THE ROMAN CATHOLIC BISHOP OF OAKLAND, a California corporation sole,<br><br>Debtor. | Case No. 23-40523<br><br>Chapter 11 |
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF THE ROMAN CATHOLIC BISHOP OF OAKLAND,<br><br>Plaintiff,<br><br>v.<br><br>THE ROMAN CATHOLIC BISHOP OF OAKLAND, ADVENTUS, THE ROMAN CATHOLIC WELFARE CORPORATION OF OAKLAND, AND THE ROMAN CATHOLIC CEMETERIES OF THE DIOCESE OF OAKLAND,<br><br>Defendants. | Adv. Pro. No. 24-04053<br><br>**DEBTOR'S MOTION TO DISMISS FIRST AMENDED ADVERSARY COMPLAINT**<br><br>Judge: Hon. William J. Lafferty<br><br>Date: June 4, 2025<br>Time: 2:00 p.m.<br>Place: United States Bankruptcy Court<br>1300 Clay Street<br>Courtroom 220<br>Oakland, CA 94612 |

The Roman Catholic Bishop of Oakland, a California corporation and the debtor and debtor in possession (the "Debtor") in the above-captioned chapter 11 bankruptcy case (the "Chapter 11 Case"), hereby files this motion to dismiss (the "Motion") the *First Amended Adversary Complaint* [Docket No. 32] (the "Amended Complaint") filed in the above captioned adversary proceeding (the "Adversary Complaint") under Federal Rule of Civil Procedure 12(b)(6), incorporated as Bankruptcy Rule 7012. In support of this Motion, the Debtor incorporates by reference herein its Memorandum of Law in Support, set forth below.

WHEREFORE, the Debtor respectfully requests the Court dismiss the Amended Complaint against the Debtor, with prejudice, and grant such other and further relief as this Court finds just and proper.

DATED: May 23, 2025

**FOLEY & LARDNER LLP**
Thomas F. Carlucci
Shane J. Moses
Emil P. Khatchatourian
Ann Marie Uetz
Matthew D. Lee
Geoffrey S. Goodman
Mark C. Moore

*/s/ Shane J. Moses*
Shane J. Moses

*Counsel for the Debtor*
*and Debtor in Possession*

**FOLEY & LARDNER LLP**
Thomas F. Carlucci (CA Bar No. 135767)
Tel: (415) 984-9824; tcarlucci@foley.com
Shane J. Moses (CA Bar No. 250533)
Tel: (415) 438-6404; smoses@foley.com
Emil P. Khatchatourian (CA Bar No. 265290)
Tel: (312) 832-5156; ekhatchatourian@foley.com
Ann Marie Uetz (admitted *pro hac vice*)
Tel: (313) 234-7114; auetz@foley.com
Matthew D. Lee (admitted *pro hac vice*)
Tel: (608) 258-4203; mdlee@foley.com
Geoffrey S. Goodman (admitted *pro hac vice*)
Tel: (312) 832-4515; ggoodman@foley.com
Mark C. Moore (admitted *pro hac vice*)
Tel: (214) 999-4150; mmoore@foley.com
555 California Street, Suite 1700
San Francisco, CA 94104-1520

*Counsel for the Debtor
and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| In re:<br><br>THE ROMAN CATHOLIC BISHOP OF OAKLAND, a California corporation sole,<br><br>        Debtor. | Case No. 23-40523<br><br>Chapter 11 |
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF THE ROMAN CATHOLIC BISHOP OF OAKLAND,<br><br>        Plaintiff,<br><br>v.<br><br>THE ROMAN CATHOLIC BISHOP OF OAKLAND, ADVENTUS, THE ROMAN CATHOLIC WELFARE CORPORATION OF OAKLAND, AND THE ROMAN CATHOLIC CEMETERIES OF THE DIOCESE OF OAKLAND,<br><br>        Defendants. | Adv. Pro. No. 24-04053<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEBTOR'S MOTION TO DISMISS FIRST AMENDED ADVERSARY COMPLAINT**<br><br>Judge:   Hon. William J. Lafferty<br><br>Date:    June 4, 2025<br>Time:   2:00 p.m.<br>Place:   United States Bankruptcy Court<br>          1300 Clay Street<br>          Courtroom 220<br>          Oakland, CA 94612 |

# TABLE OF CONTENTS

I. PRELIMINARY STATEMENT ...........................................................................................1

II. RELEVANT BACKGROUND AND SUMMARY OF ALLEGED FACTS ......................2

    A.    General Background and Structure of the Debtor and the Diocese of Oakland .............2

    B.    The Funds Of The Debtor And Each Non-Debtor Catholic Entity ...............................4

    C.    The Series 2007 Bond Offering And 2017 Credit Agreement .......................................6

    D.    The Adversary Proceeding...............................................................................................7

III. LEGAL STANDARD .......................................................................................................8

IV. ARGUMENT .....................................................................................................................9

    A.    All Substantive Consolidation Claims (Counts 1–3) Fail To State A Claim And Should Be Dismissed With Prejudice ...........................................................................9

        1.    The Committee Has Failed To Plead Alter Ego Liability To Satisfy The Entanglement Test Of Substantive Consolidation......................10

        2.    The Committee Cannot Rely On The Creditor Expectation Test....................18

    B.    Count 4 Fails To State A Claim And Should Be Dismissed With Prejudice ...............20

V. CONCLUSION....................................................................................................................21

# <u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*Antoine v. BAE Sys., Inc.*,
   2018 WL 11471623 (N.D. Cal. July 30, 2018) ................................................................. 10, 13

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................................................. 8

*Avery v. Leya Techs., LLC (In re Prototype Eng'g & Mfg., Inc.)*,
   628 B.R. 132 (Bankr. C.D. Cal. 2020) ................................................................................. 20

*Begier v. I.R.S.*,
   496 U.S. 53 (1990) ................................................................................................................. 21

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................................................................. 8

*Butner v. U.S.*,
   440 U.S. 48 (1979) ................................................................................................................. 20

*Calvert v. Huckins*,
   875 F. Supp. 674 (E.D. Cal. 1995) ........................................................................... 10, 12, 15

*Cervantes v. Countrywide Home Loans, Inc.*,
   656 F.3d 1034 (9th Cir. 2011) ........................................................................................... 8, 16

*Doe v. Unocal*,
   248 F.3d 915 (9th Cir. 2001), abrogated on other grounds by Williams v. Yamaha Motor Co., 851
   F.3d 1015 (9th Cir. 2017) ................................................................................. 10, 11, 13, 15

*He Nam You v. Japan*,
   150 F.Supp. 3d 1140 (N.D. Cal. 2015) ................................................................................. 17

*In re Ame Zion Western Episcopal Dist.*,
   629 B.R. 69 (Bankr. E.D. Cal. 2021) ..................................................................................... 8

*In re Augie/Restivo Baking Co., Ltd.*,
   860 F.2d 515 (2d Cir. 1988) ............................................................................................... 9, 14

*In re Bonham*,
   229 F.3d 750 (9th Cir. 2000) ............................................................................................. 9, 19

*In re Republic Airways Holding Inc.*,
   565 B.R. 710 (Bankr. S.D.N.Y. 2017) ................................................................................. 18

Case: 24-04053   Doc# 41   Filed: 05/23/25   Entered: 05/23/25 20:45:36   Page 5 of 28

*In re SK Foods, L.P.,*
   499 B.R. 809 (Bankr. E.D. Cal. 2013) ............................................................................ 10

*In re The Lodge at Big Sky, LLC,*
   454 B.R. 138 (Bankr. D. Mont. 2011) ............................................................................ 18

*Johnson v. Riverside Healthcare Sys., LP,*
   534 F.3d 1116 (9th Cir. 2008) ......................................................................................... 8

*Katzir's Floor & Home Design, Inc. v. MMLS.com,*
   394 F.3d 1143 (9th Cir. 2004) ....................................................................................... 12

*Kramer Motors, Inc. v. British Leyland, Ltd.,*
   628 F.2d 1175 (9th Cir.1980) ........................................................................................ 13

*Law v. Siegel,*
   571 U.S. 415 (2014) ......................................................................................................... 9

*Meadows,*
   99 Cal. App. 2d .......................................................................................................... 13, 15

*Motul S.A. v. USA Wholesale Lubricant, Inc.,*
   901, 686 F.Supp.3d 900 (N.D. Cal. 2023) ............................................................... 11, 12

*Mou v. SSC San Jose Operating Co. LP,*
   415 F. Supp. 3d 918 (N.D. Cal. 2019) ..................................................................... 15, 16

*Neilson v. Union Bank of Cal., N.A.,*
   290 F.Supp.2d 1101 (C.D. Cal.2003) ...................................................................... 10, 16

*Official Committee of Unsecured Creditors of Verestar, Inc. v. American Tower Corp. (In re Verestar, Inc.),*
   343 B.R. 444 (Bankr. S.D.N.Y. 2006) ........................................................................... 18

*Payoda, Inc. v. Photon Infotech, Inc.,*
   2015 WL 4593911 .......................................................................................................... 12

*Postal Instant Press, Inc. v. Kaswa Corp.,*
   162 Cal. App. 4th 1510 (Cal. Ct. App. 2008) ................................................................ 17

*Ranza v. Nike, Inc.,*
   793 F.3d 1059 (9th Cir. 2015) ..................................................... 10, 11, 12, 13, 14, 15

*Sandoval v. Ali,*
   34 F. Supp. 3d 1031 (N.D. Cal. 2014) ..................................................................... 10, 15, 16

*Seltzer Sister Bottling Co. Inc. v. Source Perrier, S.A.,*
   1991 WL 279273 (N.D.Cal.1991) ................................................................................. 15

*Sonora Diamond Corp. v. Superior Ct.,*

Case: 24-04053    Doc# 41    Filed: 05/23/25    Entered: 05/23/25 20:45:36    Page 6 of 28

83 Cal. App. 4th 523 (Cal. Ct. App. 2000) ................................................................ 10, 11, 15, 16, 17

*Tomaselli v. Transamerica Ins. Co.*,
   25 Cal. App. 4th 1269 (1994) ..................................................................................... 12

*Troyk v. Farmers Grp., Inc.*,
   171 Cal. App. 4th 1305 (2009) ................................................................................... 12

*United States v. Ritchie*,
   342 F.3d 903 (9th Cir. 2003) ....................................................................................... 8

*Walsh v. Kindred Healthcare*,
   798 F. Supp. 2d 1073 (N.D. Cal. 2011) .................................................................... 10

*Williams v. Yamaha Motor Co.*,
   851 F.3d 1015 (9th Cir. 2017) ................................................................................... 13

*Wimbledon Fund, SPC v. Graybox, LLC*,
   2016 WL 7444709 (C.D. Cal. 2016) .......................................................................... 10

**Statutes**

§ 105 of the Bankruptcy Code ............................................................................... 7, 9, 18

§ 105(a) of the Bankruptcy Code .................................................................................... 9

§ 541 of the Bankruptcy Code ......................................................................... 2, 20, 21

§§ 1107(a) and 1108 of the Bankruptcy Code .............................................................. 2

**Rules**

Fed. R. Bankr. P. 1012 ................................................................................................... 8

Fed. R. Civ. P. 8(a)(2) ................................................................................................... 8

Fed. R. Civ. P. 9(b) ..................................................................................................... 10

Federal Rule of Civil Procedure 12(b)(6) ............................................................. 1, 8, 9

The Roman Catholic Bishop of Oakland, a California corporation and the debtor and debtor in possession (the "Debtor") in the above-captioned chapter 11 bankruptcy case (the "Chapter 11 Case"), hereby files this memorandum in support of its motion to dismiss (the "Motion") the *First Amended Adversary Complaint* [Docket No. 32] (the "Amended Complaint") filed in the above captioned adversary proceeding by the Official Committee of Unsecured Creditors (the "Committee") against (i) the Debtor, (ii) Adventus, (iii) the Roman Catholic Welfare Corporation of Oakland ("RCWC"), and (iv) the Roman Catholic Cemeteries of the Diocese of Oakland ("RCC," together with Adventus, RCWC, are the "Non-Debtor Catholic Entities"). In support hereof, the Debtor states as follows:

## I.

## PRELIMINARY STATEMENT

This Court should dismiss Counts 1–3 of the Amended Complaint because the Committee cannot substantively consolidate the Non-Debtor Catholic Entities with the Debtor. In light of this Court's opinion dated April 22, 2025 [Docket No. 30] (the "Opinion") dismissing the Committee's original complaint [Docket No. 1] (the "Original Complaint"), the Committee's only possible basis for substantively consolidating the Non-Debtor Catholic Entities with the Debtor would be by establishing that the Non-Debtor Catholic Entities are the ***alter egos*** of the Debtor. The Committee has utterly failed to do so.

In order to plead an alter ego claim under California law, the Committee must allege (1) that there is such unity of interest and ownership that the separate personalities of the two entities no longer exist, and (2) that failure to disregard the separate identities of the entities would result in fraud or injustice. The Committee has not pled sufficient facts to satisfy either prong of this test.

*First*, the Committee's allegations do not satisfy the "unity of interest" test. To meet this test, the Committee had to allege facts establishing that the Debtor has such "pervasive control" over ***every facet*** of the day-to-day operations of the Non-Debtor Catholic Entities to render them the mere instrumentality of the Debtor. The Committee's allegations of a shared address, an overlap in officers, directors and employees, a debt guarantee and the Debtor's purported control over aspects of RCWC's budget are woefully insufficient to meet this test under California law.

*Second*, the Committee also did not adequately plead the "fraud or injustice" element of an alter ego claim. The Committee did not plead facts alleging that the Non-Debtor Catholic Entities were created to perpetuate a fraud or injustice. The mere fact that the corporate separateness of two entities may make it harder for a plaintiff to collect on a claim is *not* a basis for alter ego liability under California law.

Because the Committee has not, and cannot, plead either element of an alter ego claim, there is no basis to substantively consolidate the Non-Debtor Catholic Entities with the Debtor. This Court should dismiss Counts 1–3 of the Amended Complaint with prejudice.

Count 4 seeks a declaratory judgment that the property of RCWC is somehow property of the Debtor's estate under § 541 of the Bankruptcy Code. Count 4 is nothing more than a "back door" attempt to substantively consolidate RCWC with the Debtor by alleging, without any support whatsoever, that the Debtor "owns" the property of this separate and distinct entity. Moreover, the Committee has not and cannot cite any basis under California law that would support a determination that the Debtor actually holds equitable title to RCWC's property. Accordingly, this Court should also dismiss Count 4 with prejudice.

## II.

## RELEVANT BACKGROUND AND SUMMARY OF ALLEGED FACTS

### A. General Background and Structure of the Debtor and the Diocese of Oakland[1]

The majority of the Amended Complaint is premised on the unsupported allegations that the Non-Debtor Catholic Entities do not observe or follow the proper corporate formalities in making decisions. The Committee attempts to support these allegations based on the purported "control" exerted by the Bishop (defined below), through the Debtor, over the Non-Debtor Catholic Entities (which the Debtor disputes). However, as noted below, the Amended Complaint merely demonstrates that the Non-Debtor

---

[1] On May 8, 2023 (the "Petition Date"), the Debtor caused its attorneys to file a voluntary petition for bankruptcy relief under chapter 11 of the Bankruptcy Code. The Debtor continues to operate its ministries and manage its properties as a debtor in possession under §§ 1107(a) and 1108 of the Bankruptcy Code. No trustee has been appointed in this Chapter 11 Case. Additional information regarding the Debtor, its mission, ministries, and operations, and the events and circumstances preceding the Petition Date, is set forth in the *Declaration of Charles Moore, Managing Director of Alvarez & Marsal North America, LLC, Proposed Restructuring Advisor to the Roman Catholic Bishop of Oakland, in Support of Chapter 11 Petition and First Day Pleadings* [Bankr. Docket No. 19] (the "First Day Declaration"), which is incorporated herein by reference.

Entities and the Debtor are each separate, but integral parts of the diocese of Oakland (the "Diocese"); the Amended Complaint is utterly devoid of any facts that support the Committee's claim.

The Debtor is a corporation sole organized under the laws of the State of California. Both before and after the Petition Date, the Debtor observed all requirements for its separate existence under applicable law. The Debtor conducts its civil affairs under the laws of the State of California and the United States of America and in accordance with the Code of Canon Law ("Canon Law"), the ecclesiastical law of the Roman Catholic Church (the "Catholic Church"). The Debtor estimates that it serves nearly 550,000 resident Catholics within the diocese of Oakland and assists approximately 260,000 people annually through its ministry and charitable services.

The Diocese is home to 82 local parish churches and missions and is home to 159 diocesan priests, 160 religious priests, 35 extern priests and 118 permanent deacons. The Diocese is comprised of, among other things, (i) the Central Services Administration (the "Chancery"); (ii) RCWC and its school activities; (iii) RCC and its cemetery and mortuary activities; and (iv) Adventus and its activities and assets. Am. Compl. ¶¶ 21 & 26 (alleging that the Non-Debtor Catholic Entities are "components" of the Diocese). The Chancery oversees the accounting, business development, property management, financial support, and other business operations within the Diocese, including the Non-Debtor Catholic Entities. *See, e.g., id.* ¶¶ 21, 27-28, & 30 (alleging that the Chancery provides financial support to Adventus and RCWC).

The Diocese has also been under the leadership of the incumbent bishop, Most Reverend Michael C. Barber, SJ (the "Bishop"), since his appointment on May 25, 2013. *See, e.g., id.* ¶¶ 19, 47. The Bishop has certain leadership roles in connection with certain Non-Debtor Catholic Entities within the Diocese, including Adventus, RCWC, and RCC, although they are separately incorporated under California law and are not debtors in the Chapter 11 Case. *See, e.g., id.* ¶¶ 19, 24, 48-54.

The Non-Debtor Catholic Entities are separately incorporated California nonprofit religious corporations that are *within the Diocese* and are *affiliates* of the Debtor. *See, e.g., id.* ¶ 21 (alleging that the Non-Debtor Catholic Entities are "components" of the Diocese) & ¶ 26 (alleging that the Debtor's website reflects that RCC and RCWC are components of the Diocese). Notably, each of the Non-Debtor Catholic Entities has its own board of directors and management. *See, e.g., id.* ¶¶ 32, 40, & 43.

RCWC is a California nonprofit religious corporation that oversees 32 elementary and two high schools (collectively, the "Schools") within the geographical limits of the Diocese.  *See, e.g., id.* ¶¶ 12-13 & 31.  Importantly, and omitted again from the Amended Complaint, the Schools are operated and managed by RCWC, and RCWC owns substantially all property of the Schools.  Bankr. Docket No. 1590 ¶ 6.  Each School collects revenues, pays expenses, and conducts other operation and financial matters of the school.  First Day Decl. ¶ 41.  RCWC has its own board and has at all times maintained its own separate bank accounts and had its own financial statements; it also relies on The Oakland Parochial Fund, Inc. ("OPF") to manage certain of its investments.  *Id.* ¶ 42.  Expenditures of Schools that exceed $50,000 must be reviewed by the "College of Consultors" and the Debtor's chief financial officer, with *final approval* by the Bishop.  Am. Compl. ¶¶ 33-34.

RCC is California a nonprofit religious corporation that operates and administers six cemeteries, five mortuaries, two mausoleums, and one crematory within the Diocese.  *See, e.g., id.* ¶¶ 14, 36-37.  RCC owns no real property and all real property necessary to carry out its activities (burial, entombment, and related services) is leased from the Debtor pursuant to ground leases or other appropriate lease forms.  *Id.* ¶¶ 38-39.  Funds from every interment are set aside for a permanent maintenance fund to be held, invested, and used to provide perpetual care.  First Day Decl. ¶ 46.  RCC has at all times segregated its funds from those of the Debtor and has at all times maintained separate accounts.  *Id.*  RCC holds and invests such segregated funds, and also bears the related obligation to provide perpetual care for the deceased.  *Id.* RCC has its own board and audited financial statements.  *Id.*

Adventus is a California nonprofit corporation that holds title in certain real estate, including single-family residences in Byron and Hayward and undeveloped land in Livermore.  Am. Compl. ¶¶ 16, 42.  At all relevant times, Adventus has always maintained a separate bank account.  First Day Decl. ¶ 67.

## B.    The Funds Of The Debtor And Each Non-Debtor Catholic Entity

The Amended Complaint further targets RCWC and RCC, asserting that prior to the transfer to OPF, their assets were "commingled" with those of the Debtor.  *See, e.g.,* Am. Compl. ¶¶ 120(v) & 131(v).  According to the Committee, these allegations support the illegitimate notion that the Debtor had the ability to control assets of RCWC and RCC, thereby demonstrating that these entities failed to observe corporate formalities.  *See, e.g., id.* ¶¶ 120-21 & 131-32.

As a preliminary matter, the cash and investments (the "Funds") of the Non-Debtor Catholic Entities are all held separately from the Debtor's cash and investments. Before April 2023, the Debtor managed certain deposits and investments on behalf of itself as well as participating Diocesan churches and RCWC, through two programs: (1) The Deposit and Loan Fund program (the "DLF"), which held cash, investments, and loans to participating churches and Schools, and (2) the Investment/Endowment Pool (the "Endowment Pool" and collectively with the DLF, the "Diocesan Investment Management Services") in which churches and the Schools could separately invest funds with long-term investment horizons in marketable securities. Am. Compl. ¶ 70; *see also* Bankr. Docket No. 1590 ¶ 8.

In particular, as part of the DLF program, Funds of the Debtor, as well as Funds by the churches and RCWC (including its Schools) were held in a general operating checking account at U.S. Bank, N.A. (the "Deposit Account"). Am. Compl. ¶ 78. The Deposit Account was a demand deposit account used for the short-term liquidity needs of the Debtor, Churches, and RCWC. *Id.* ¶ 79. It held cash that the Debtor, the churches, and the RCWC Schools could use for general operations and short-term needs, such as an unexpected repair, a charity event, or simply to cover short-term operating cash flow shortfalls. *Id.* ¶ 80.

In addition, part of the Funds in the DLF as well as the Debtor's Funds, beyond ones needed for general operations and other short-term needs, were invested and held in an investment account (the "Investment Account") at Principal Financial Group, as custodian for investments owned by the Debtor and certain Non-Debtor Catholic Entities. *Id.* ¶ 81. Importantly, only Funds of RCWC and participating churches are subject to the DLF program. *See* Bankr. Docket No. 1590 ¶¶ 15-18.

The Committee nevertheless alleges that prior to the transfers to OPF, Funds of all Non-Debtor Catholic Entities were all commingled in the DLF program. *See, e.g.*, Am. Compl. ¶¶ 71 & 77 (falsely alleging that excess funds from participating churches, Schools, and cemeteries were deposited by the Non-Debtor Catholic Entities into the DLF). But again, this is incorrect. From the outset of the case, the Debtor has maintained that Adventus and RCC have always segregated their funds from the Debtor (and each other) and maintained separate bank accounts. First Day Decl. ¶¶ 46, 67. Moreover, the Funds of RCWC held in the DLF program were scrupulously accounted for and held in trust for the benefit of RCWC by the Debtor in various accounts. Bankr. Docket No. 1590 ¶¶ 15-18.

## C.    The Series 2007 Bond Offering And 2017 Credit Agreement

The remaining allegations of the Amended Complaint focus on the purported single identity of the Debtor and Non-Debtor Catholic Entities.  *See, e.g.,* Am. Compl. ¶¶ 122-24, 133-34, & 143.  Again, the crux of these allegations center around the Bishop's purported ability to control the Debtor and the Non-Debtor Catholic Entities, particularly when it came to obtaining financing for the Diocese.  *See, e.g., id.* ¶¶ 49-51, 55-66, 67-69.

For instance, in 2007, the Debtor and the Non-Debtor Catholic Entities sought and obtained a bond (the "Series 2007 Bond"), with Deutsche Bank as the bond trustee, to build the Cathedral of Christ the Light and related complex including mausoleum, rectory, and offices (the "Cathedral Complex").  *See, e.g., id.* ¶¶ 55-56.  As part of the Series 2007 Bond transaction, the Debtor and the Non-Debtor Catholic Entities formed a "Bond Obligated Group." *Id.* ¶ 58.  According to the Series 2007 Bond Offering Memorandum, dated November 13, 2007 (the "Offering Memorandum"), the Debtor and each of the Non-Debtor Catholic Entities were allegedly chosen as the obligors of the Series 2007 Bond "because of the strength of their combined credit profile." *Id.* ¶ 59.  Importantly, ***and otherwise omitted from the Amended Complaint (but stated in the Original Complaint)***, each of the Non-Debtor Catholic Entities provided a joint and several guaranty of the Debtor's obligations under the Master Indenture Agreement. Original Compl., ¶ 76.

Moreover, the Committee alleges, again without support, that the Debtor represented to Deutsche Bank that the "wealth and financial wherewithal to pay the bond debt" included both its assets as well the assets of the Non-Debtor Catholic Entities.  Am. Compl. ¶ 63.  The Debtor also allegedly represented to Deutsche Bank that it had the authority to enter into the transaction on behalf of the other Non-Debtor Catholic Entities.  *Id.* ¶ 64.  But no support for that allegation exists.

Additionally, in 2017, the Debtor, the Non-Debtor Catholic Entities, and PNC entered into that certain Credit and Security Agreement, dated February 2017 (the "2017 Credit Agreement"), under which PNC issued $70 million to the Debtor to allegedly fund the redemption of the outstanding Series 2007

Bonds.  *See, e.g., id*.  ¶¶ 110 & 112.  The Debtor and Non-Debtor Catholic Entities allegedly served as guarantors under the 2017 Credit Agreement.[2]  *See, e.g., id.* ¶ 111.

### D.   The Adversary Proceeding

On December 11, 2024, the Committee filed the Original Complaint, initiating this adversary proceeding, containing two Counts that focused on consolidating the Non-Debtor Catholic Entities into the Debtor's bankruptcy estate.   Specifically, the Original Complaint was largely premised on false allegations that the property and assets and affairs of each Non-Debtor Catholic Entity are so entangled with those of the Debtor that they cannot be separated.   The Debtors and Non-Debtor Catholic Entities moved to dismiss the Original Complaint, arguing, *inter alia*, that the Court lacks the authority to substantively consolidate the Non-Debtor Catholic Entities under § 105 of the Bankruptcy Code, and, even if the Court had the authority to do so, that the Committee had not pled sufficient facts to support such a claim.

In its response to the motions to dismiss and at oral arguments, the Committee pivoted and argued that the Non-Debtor Catholic Entities were merely alter egos of the Debtor, which therefore, warranted substantive consolidation.  The Court, however, dismissed the Original Complaint without prejudice. While the Court stated that *Law v. Siegel* does not prohibit relief based on state law, such as alter ego, it also ruled that the Committee had failed to articulate such a claim.  *See* Opinion, at pp. 6-7. The Committee was granted leave to amend so that it could attempt to plead a claim based on state law.  *Id.*

On May 6, 2024, the Committee filed the instant Amended Complaint, containing four Counts that once again focus on substantive consolidation of the Non-Debtor Catholic Entities into the Debtor's bankruptcy estate.   In particular, the Amended Complaint seeks a determination that (1) the Non-Debtor Catholic Entities should be substantively consolidated with the Debtor under § 105 of the Bankruptcy Code (Counts 1–3); and (2) the Debtor is the "equitable owner" of the School Funds (Count 4).   The Amended Complaint mostly re-alleges the same "facts" as the Original Complaint, while purporting to attempt to meet the Ninth Circuit standard for alter ego in support of substantive consolidation.

---

[2] This allegation would mean that the Debtor guaranteed its own obligation, which it did not.  *See, e.g.,* Am. Compl. ¶ 58 (defining the "Bond Obligated Group" to include the Debtor and Non-Debtor Catholic Entities).

For the reasons set forth below, the Committee failed to plead a cognizable claim for substantive consolidation based on alter ego or any other relief. The Committee has had two years to allege a cognizable claim for this relief and has repeatedly failed to do so. This Court should dismiss the Amended Complaint with prejudice.

### III.

### LEGAL STANDARD

Under Fed. R. Civ. P. 12(b)(6), incorporated by Fed. R. Bankr. P. 1012, a complaint must be dismissed if it "fail(s) to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must offer more than "naked assertions devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, the complaint must contain sufficient facts that "state a claim to relief that is plausible on its face." *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Under this plausibility requirement, the complaint's allegations must be "enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 548. The plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (internal citation omitted). The basis for dismissal may be either "a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121–22 (9th Cir. 2008) (citing *Balistreri v. Pacifica Police Dep't.*, 901 F.2d 696, 699 (9th Cir. 1990). "A complaint that alleges only 'labels and conclusions' or a 'formulaic recitation of the elements of the cause of action' will not survive dismissal. *Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1041 (9th Cir. 2011) (quoting *Twombly*, 550 U.S. at 555). Moreover, a complaint should be dismissed with prejudice when an amendment to the complaint would be futile. *Id.*

In ruling on a motion to dismiss, the court may also consider materials outside of the complaint, such as (1) documents attached to the complaint as exhibits, (2) documents incorporated by reference in the complaint, and (3) matters properly subject to judicial notice. *In re Ame Zion Western Episcopal Dist.*, 629 B.R. 69, 77 (Bankr. E.D. Cal. 2021); *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) (noting that the court may consider a document offered by the defendant and treat such document as part

of the complaint to the extent the document is relied on by the Plaintiff, and "thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6).").

**IV.**

**ARGUMENT**

**A.      All Substantive Consolidation Claims (Counts 1–3) Fail To State A Claim And Should Be Dismissed With Prejudice**

Counts 1–3 of the Amended Complaint seek to substantively consolidate the Non-Debtor Catholic Entities with the Debtor *nunc pro tunc* to the Petition Date.  *See, e.g.,* Am. Compl. ¶¶ 113-45.  These Counts should be dismissed with prejudice because the Committee has failed to plead sufficient facts to support a claim for substantive consolidation *vis-à-vis* alter ego.[3]

Substantive consolidation is an equitable remedy that combines the assets and liabilities of separate and distinct, but related, legal entities into a single pool and treats them as though they belong to a single entity.  *In re Bonham*, 229 F.3d 750, 764 (9th Cir. 2000).  Substantive consolidation "enabl[es] a bankruptcy court to disregard separate corporate entities, to pierce their corporate veils in the usual metaphor, in order to reach assets for the satisfaction of debts of a related corporation."  *Id.* (citing *James Talcott, Inc. v. Wharton* (*In re Continental Vending Machine Corp.*), 547 F.2d 997, 1000 (2d Cir. 1975).  The Ninth Circuit in *Bonham* adopted the two-factor test to determine whether substantive consolidation is appropriate: (1) whether the affairs of the debtor are so entangled that consolidation will benefit all creditors (the "Entanglement Test"); or (2) whether creditors dealt with the subject entities as a single economic unit and did not rely on their separate identity in extending credit (the "Creditor Expectation Test").  *Id.* at 766 (adopting the Second Circuit's test in *In re Augie/Restivo Baking Co., Ltd.* 860 F.2d 515 (2d Cir. 1988)).  As discussed below, the Committee cannot rely on the Creditor Expectation Test because in the absence of establishing alter ego liability for the Non-Debtor Catholic Entities, those entities cannot be substantively consolidated with the Debtor under § 105 of the Bankruptcy Code.  But in any case, neither *Bonham* factor is present here.

---

[3] The Debtor maintains that the Court lacks the authority to substantively consolidate non-profit corporations under § 105(a) of the Bankruptcy Code, regardless of whether the basis would be under state law or bankruptcy law.  *See Law v. Siegel*, 571 U.S. 415 (2014).  As such, the Debtor reserves all rights for any later proceedings in adversary proceeding or on appeal.

Case: 24-04053      Doc# 41      Filed: 05/23/25      Entered: 05/23/25 20:45:36      Page 16 of
28

**1.** ***The Committee Has Failed To Plead Alter Ego Liability To Satisfy The Entanglement Test Of Substantive Consolidation***

The Committee contends that the Entanglement Test is satisfied because each Non-Debtor Entity is the alter ego of the Debtor. But aside from this conclusory statement, there is nothing alleged in the Amended Complaint to support such a claim.

Courts in the Ninth Circuit have determined that the Entanglement Test may be satisfied by a showing of the traditional alter ego factors under California state law. *See, e.g., In re SK Foods, L.P.,* 499 B.R. 809, 840-41 (Bankr. E.D. Cal. 2013). Alter ego, or piercing the corporate form, "is recognized as an extreme remedy." *Calvert v. Huckins*, 875 F. Supp. 674, 678 (E.D. Cal. 1995). Therefore "[c]ourts will pierce the corporate veil only in exceptional circumstances." *Id.* (internal quotations omitted). In order to plead alter ego, plaintiffs must overcome "a general presumption in favor of respecting the corporate entity." *Id.* In other words, alter ego requires overcoming the ordinary legal fact that "a corporation is regarded as a legal entity, separate and distinct from its stockholders, officers and directors, with separate and distinct liabilities and obligations." *Sonora Diamond Corp. v. Superior Ct.*, 83 Cal. App. 4th 523, 538 (Cal. Ct. App. 2000) (internal citations omitted). "Conclusory allegations of alter ego status are insufficient." *Walsh v. Kindred Healthcare*, 798 F. Supp. 2d 1073, 1082 (N.D. Cal. 2011) (citing *Hokoma v. E.F. Hutton & Co.*, 566 F.Supp. 636, 647 (C.D. Cal. 1983). "[A] plaintiff must allege specifically both of the elements of alter ego liability, as well as facts supporting each." *Sandoval v. Ali*, 34 F. Supp. 3d 1031, 1040 (N.D. Cal. 2014); *Neilson v. Union Bank of Cal., N.A.*, 290 F.Supp.2d 1101, 1116 (C.D. Cal.2003); *Wimbledon Fund, SPC v. Graybox, LLC*, 2016 WL 7444709 (C.D. Cal. 2016) (noting that courts in the Ninth Circuit are split on whether the heightened pleading standard of Fed. R. Civ. P. 9(b) applies to pleading alter ego liability).

To that end, to plead a cognizable claim for alter ego under California law, "a plaintiff must make out a prima facie case (1) that there is such unity of interest and ownership that the separate personalities [of the two entities] no longer exist **and** (2) that failure to disregard [their separate identities] would result in fraud or injustice." *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1073 (9th Cir. 2015) (citing *Doe v. Unocal*, 248 F.3d 915, 922 (9th Cir. 2001), abrogated on other grounds by *Williams v. Yamaha Motor Co.*, 851 F.3d 1015 (9th Cir. 2017)) (internal quotations omitted and emphasis added); *Antoine v. BAE Sys., Inc.*, 2018

WL 11471623, at *11 (N.D. Cal. July 30, 2018); *Sonora Diamond Corp.*, 83 Cal. App. 4th at 538 (applying the same test).

As set forth below, the Committee failed to allege a cognizable claim for alter ego under California law.

<strong><em>(i)     The Committee Fails To Satisfy The "Unity Of Interest And Ownership" Prong Of The Alter Ego Test</em></strong>

The Committee failed to plead facts in its Amended Complaint alleging "that there is such unity of interest and ownership that the separate personalities [of the two entities] no longer exist." *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1073 (9th Cir. 2015) (applying California law). The Committee's allegations in support of this argument consist of: (1) failure to maintain arm's length relationship among the Debtor and each Non-Debtor Catholic Entities, Am. Compl. ¶¶ 120(i), 131(i), 141(i); (2) use of the same officers and/or directors, *id.* ¶¶ 120(ii), 131(ii), 141(ii); (3) use of the same office or business location, *id.* ¶¶ 120(iii), 131(iii), 141(iii); (4) use of the same employees, *id.* ¶¶ 120(iv), 131(iv), 141(iv); (5) commingling of funds and other assets of the RCWC and RCC with the Debtor's, *id.* ¶¶ 120(v), 131(v); (6) the holding out by the Non-Debtor Catholic Entities that is liable for the debts of the Debtor, *id.* ¶¶ 120(vi), 131(vi), 141(v); and (vii) treating each of the Non-Debtor Catholic Entities' assets as the Debtor's own as its own, *id.* ¶¶ 120(vii), 131(vii), 141(vi).

While no single factor is determinative, they must, taken together, amount to "a showing that the parent controls the subsidiary to such a degree as to render the latter the mere instrumentality of the former." *Ranza*, 793 F.3d at 1073; *Motul S.A. v. USA Wholesale Lubricant, Inc.*, 901, 686 F.Supp.3d 900, 911 (N.D. Cal. 2023). Indeed, the unity of interest and ownership test envisions "pervasive control over the subsidiary, such as when a parent corporation dictates every facet of the subsidiary's business—from broad policy decisions to routine matters of day-to-day operation.' *Ranza*, 793 F.3d at 1073 (quoting *Doe v. Unocal Corp.*, 248 F.3d 915, 926 (9th Cir. 2001)). Here, however, none of the factors, taken together or apart, alleged by the Committee (even assuming they are true, which they are not) demonstrate this level of "pervasive control" required to plead an alter ego theory.

***First***, a majority of the allegations focus on the fact that the Debtor and Non-Debtor Catholic Entities share the same business address, have an overlap in officers, directors, and employees as well as

Case: 24-04053     Doc# 41     Filed: 05/23/25     Entered: 05/23/25 20:45:36     Page 18 of 28

the Debtor's and Bishop's ability to appoint directors and principal staff members of the Non-Debtor Entities. *See, e.g.,* Am. Compl. ¶¶ 120(i)-(iv), 131(i)-(iv), 141(i)-(iv). But these allegations fall far short of establishing alter ego liability; rather, they simply demonstrate there was "shared management" between and ownership of the Debtor and each Non-Debtor Catholic Entity.

Courts have expressly rejected allegations of "shared headquarters, facilities, finances, website, email address, phone number, employees and customers" as sufficient to plead alter ego without more specificity. *See Motul*, 686 F.Supp.3d at 911 (quoting *Payoda, Inc. v. Photon Infotech, Inc.*, 2015 WL 4593911, at *2 (internal quotations omitted)). Indeed, evidence "that the parent company owned 100 percent of the subsidiary's stock, it shared office space and policy manuals with the subsidiary, they had some common personnel, and they had consolidated financial statements" fell "woefully short of the showing on which alter ego normally rests." *Tomaselli v. Transamerica Ins. Co.*, 25 Cal. App. 4th 1269, 1285 (1994).

In rejecting similar alter ego claims, the Eastern District of California noted as to assertions of overlapping officers and directors, "[c]ourts have repeatedly held that such factors do not justify piercing the corporate veil." *Calvert v. Huckins*, 875 F. Supp. 674, 678 (E.D. Cal. 1995). Thus, the plaintiffs must show that the parent does "more than exercise the broad oversight typically indicated by common ownership and common directorship." *Id.* Indeed, as the Ninth Circuit bluntly stated: "Total ownership and shared management personnel are alone insufficient to establish the requisite level of control." *Ranza*, 793 F.3d at 1073; *see also Katzir's Floor & Home Design, Inc. v. MMLS.com*, 394 F.3d 1143, 1149 (9th Cir. 2004) ("[The] mere fact of sole ownership and control does not eviscerate the separate corporate identity that is the foundation of corporate law"). Where courts have articulated unity of officers and directors as a factor supporting alter ego, it has been based on "**identical** directors and officers." *See Troyk v. Farmers Grp., Inc.*, 171 Cal. App. 4th 1305, 1342 (2009) (emphasis added). While the Committee has alleged some overlap of directors between the Debtor and Non-Debtor Catholic Entities, it certainly has not alleged (and could not allege) identical boards and officers.[4]

---

[4] As a corporation sole, the Debtor does not have a board, whereas the Non-Debtor Catholic Entities do.

Case: 24-04053    Doc# 41    Filed: 05/23/25    Entered: 05/23/25 20:45:36    Page 19 of 28

Moreover, the Ninth Circuit has specifically found that alter ego was **_not_** demonstrated where a parent "placed several of its directors on the subsidiary's board." *Unocal*, 248 F.3d at 927 (citing *Kramer Motors, Inc. v. British Leyland, Ltd.*, 628 F.2d 1175, 1177 (9th Cir.1980)).[5] It is hard to imagine how the ability to appoint board members could be sufficient to establish alter ego liability when 100% shareholder control is not sufficient to establish such liability. This underscores the Committee's overreach. If the ability to control board seats was sufficient to support alter ego liability, then every corporate parent would be the alter ego of its subsidiaries, upending the fundamental underpinnings of corporate law. *See Meadows*, 99 Cal. App. 2d at 499 ("Mere ownership of all the stock and control and management of a corporation by one or two individuals is not of itself sufficient to cause the courts to disregard the corporate entity.")

**_Second_**, as to RCWC specifically, the Committee alleges that the Debtor orchestrated the transfer of School Funds to OPF, the School Funds are invested at the Debtor's discretion, and the Debtor and Bishop must approve capital expenditures and large purchases. *See, e.g.,* Am. Compl. ¶¶ 33, 34, & 120(i). But again, these alleges are insufficient to demonstrate the level of control required to establish alter ego. Control over another entity's budget, including approval authority for large purchases, has been specifically found to be insufficient to establish alter ego. *Ranza*, 793 F.3d at 1074. Moreover, loans from a parent to its subsidiaries do not establish an alter ego relationship where they are properly documented and corporate formalities observed. *Unocal*, 248 F.3d at 928. The Committee does not allege any failure to maintain corporate formalities or properly account for deposits and loans. Despite the Committee suggestion to the contrary, a failure to properly account cannot be inferred from the mere existence of the DLF.[6]

**_Third_**, the Committee alleges that the assets of RCWC and RCC were historically commingled with the Debtor's assets. *See, e.g.,* Am. Compl. ¶¶ 120(v) & 131(v). Again, this misses the mark and

---

[5] *Unocal* was abrogated on other grounds related to jurisdiction over foreign corporations. *See Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1021 (9th Cir. 2017). It remains good law as to alter ego. *See e.g.*, *Antoine*, 2018 WL 11471623, at *11 (citing *Unocal*).

[6] The Committee presumably asks the Court to draw this inference, because it knows that it cannot in good faith allege a failure to property account or observe corporate formalities, since the extensive discovery it has received amply demonstrates thorough accounting for the assets of all funds deposited in the DLF.

completely misstates the facts. As to RCC, the Debtor has consistently maintained that at all times RCC funds were segregated from those of the Debtor and has at all times maintained separate accounts. First Day Decl. ¶ 46. The fact that the Committee makes this bald assertion, without any supporting evidence, is borderline unethical. As to RCWC, this fact alone does not support alter ego—particularly in light of the fact that the funds are now separately held at OPF, and the Committee makes no allegation that RCWC's funds were not separately accounted for at all times. *See, e.g., In re Augie/Restivo Baking Co., Ltd.*, 860 F.2d 515, 519 (2d Cir. 1988) (noting that consolidation under the entanglement factor should not be "Pavlovian;" rather, "commingling, therefore, can justify substantive consolidation only where the time and expense necessary even to attempt to unscramble them is so substantial as to threaten the realization of any net assets for all the creditors, or where no accurate identification and allocation of assets is possible." (cleaned up)).[7]

**Fourth**, allegations that Bishop and/or the Debtor could use, control, or dispose of the Non-Debtor Catholic Entities' property to pay debt service on the Series 2007 Bond Offering is also insufficient to support a claim based on alter ego. *See, e.g.,* Am. Compl. ¶¶ 62(v)-(viii), 120(vi)-(vii), 131(vi)(vii), & 141(v)-(vi). Intentionally omitted from the Amended Complaint is the fact that each Non-Debtor Catholic Entities served as guarantors. To that end, these types of representations appear to be standard representations that a borrower and guarantor would make in obtaining a loan, and in no way, demonstrate the level of control required for an alter ego claim. Notably, the Committee fails to allege that such control was actually exercised by the Bishop or the Debtor; rather, it is only alleged that they had the ability to do so.

Fundamentally, cases in California and the Ninth Circuit uniformly hold that extensive "macromanagement" and interconnectedness between corporate entities is insufficient to support alter ego claims where the entities observed separate corporate formalities. *See, e.g., Ranza*, 793 F.3d at 1075.

---

[7] In fact, for further details of how to "untangle" (to extent they are tangled) the Funds that were held through the DLF program, the Debtor directs the Committee to the declaration of Paul Bongiovanni [Bankr. Docket No. 1590] filed in support of the *Debtor's Objection to the Official Committee of Unsecured Creditors' Motion for Standing to Prosecute Claims of the Debtor's Estate* [Bankr. Docket No. 1586].

Nothing in the Amended Complaint alleges any failure to observe corporate formalities by the Debtor or the Non-Debtor Catholic Entities.

Again, the "mere instrumentality" requirement of alter ego means that a plaintiff must show not just oversight and control of general policies, but that the parent controls "how the company will be operated on a day-to-day basis." *Calvert v. Huckins*, 875 F. Supp. 674, 679 (E.D. Cal. 1995) (quoting *Seltzer Sister Bottling Co. Inc. v. Source Perrier, S.A.*, 1991 WL 279273 (N.D.Cal.1991)); *Unocal*, 248 F.3d at 927 (alter ego requires exercise of day-to-day control). The Committee has not pled ***any*** facts from which it can be plausibly inferred that the Debtor dictates "***every facet*** [of the Non-Debtor Catholic Entities'] business," including "routine matters of day-to-day operation." *Ranza*, 793 F.3d at 1073 (emphasis added).

### (ii) *The Committee Fails To Plead Any Facts Demonstrating The "Fraud Or Injustice" Prong Of The Alter Ego Test*

Even assuming, *arguendo*, that the Committee has sufficiently pled the "unity of interests and ownership" prong of alter ego (which it has not), Counts 1–3 must nevertheless be dismissed because the Committee has failed to sufficiently plead the second element of alter ego liability—*i.e.*, the failure to disregard the corporate separateness would result in fraud or injustice.

The fraud or injustice prong is "one of the two essential elements of the alter ego doctrine." *Sonora Diamond Corp.*, 83 Cal. App. 4th at 538 (rejecting alter ego based on a failure of this prong of the test); *see also Ranza v. Nike, Inc.*, 793 F.3d 1059, 1073 (9th Cir. 2015) (stating the two prongs required for alter ego). Without allegations regarding the fraud or injustice of maintaining corporate separateness, the allegation of alter ego "is insufficient to justify the court in disregarding the corporate entity in the absence of allegations of facts from which it appears that justice cannot otherwise be accomplished." *Meadows v. Emett & Chandler*, 99 Cal. App. 2d 496, 498-99 (Cal. Ct. App. 1950) ("The rule is firmly settled that no reliance can be had on [alter ego] theory in the absence of pleading that recognition of the corporate entity would sanction a fraud or promote injustice."). As such, the failure to plead specific facts supporting this prong is **<u>fatal</u>** to a complaint based on alter ego. *See, e.g., Mou v. SSC San Jose Operating Co. LP*, 415 F. Supp. 3d 918, 931 (N.D. Cal. 2019) (dismissing alter ego claims based on a failure to allege facts supporting the fraud or injustice prong); *Sandoval v. Ali*, 34 F. Supp. 3d 1031, 1040 (N.D. Cal. 2014)

Case: 24-04053    Doc# 41    Filed: 05/23/25    Entered: 05/23/25 20:45:36    Page 22 of 28

(alter ego not properly plead where complaint lacked facts regarding fraud or inequitable request of recognizing corporate form).

In an unsuccessful attempt to support this element, the Committee alleges that alter ego liability is warranted because "injustice will result from the failure to disregard purported corporate formalities." *See, e.g.,* Am. Compl. ¶¶ 117, 130 & 140. However, aside from this formulaic recitation of the elements of alter ego under California law, the Amended Complaint is utterly devoid of factual allegations in support, and thus, must be dismissed. *See, e.g., Mou*, 415 F. Supp. 3d at 931; *Sandoval*, 34 F. Supp. 3d at 1040 (alter ego not properly pled where complaint lacked facts regarding fraud or inequitable request of recognizing corporate form); *see also Cervantes,* 656 F.3d at 1041 ("A complaint that alleges only 'labels and conclusions' or a 'formulaic recitation of the elements of the cause of action' will not survive dismissal.").

Indeed, nothing in the Amended Complaint, like its predecessor, articulates how any of the Non-Debtor Catholic Entities is a "sham corporate entity formed for the purpose of committing fraud or other misdeeds." *See Sonora Diamond Corp.*, 83 Cal. App. 4th at 538. Rather, the Committee merely alleges that that treating the Debtor and Non-Debtor Catholic Entities as separate corporations serves only to "shelter" hundreds of millions of dollars and other assets from the Debtor's estate and creditor. *See, e.g.,* Am. Compl. ¶¶ 1, 125, 135, & 144. Even assuming these allegations are true (which they are not), these allegations could not possibly support the reasonable inference that the Non-Debtor Catholic Entities were formed for the purpose of defrauding Survivors—particularly in light of the long history of their current structure. As to RCWC in particular, the Committee has already recognized (though omitted from the Amended Complaint) that RCWC was formed in 1962. *See* Original Compl. ¶ 54.

Moreover, general allegations that defendants operated as a single business for the purpose of evading liability and hiding money were "too vague and conclusory to support a plausible inference that there has been an abuse of corporate privileges." *See Mou*, 415 F. Supp. 3d at 931. Likewise, "California courts have rejected . . . the view that the potential difficulty a plaintiff faces collecting a judgment is an inequitable result that warrants application of the alter ego doctrine." *Sandoval*, 34 F. Supp. 3d at 1040, citing *Neilson*, 290 F.Supp.2d at 1117 (internal quotations omitted).

As such, Counts 1–3 of the Amended Complaint fail to allege the elements of alter ego and must be dismissed.  Furthermore, the Debtor raised this exact argument in seeking dismissal of the Original Complaint.  *See* Docket No. 24.  It follows that if the Committee had facts that would support meeting this test, it would have (or should have) added those allegations here.  Failure to do so ***in its Amended Complaint*** unquestionably demonstrates that the Committee has no facts that support alter ego, and therefore substantive consolidation.  This is another factor further warranting dismissal of the Amended Complaint ***with prejudice***.

### (iii)    The Committee's Alter Ego Allegations Are Contrary To California Law

Furthermore, alter ego liability should not be imposed on affiliated non-profit entities.  Alter ego is applied to hold "the equitable ownership of a corporation liable for the actions of the corporation." *Sonora Diamond Corp.*, 83 Cal. App. 4th at 538. Where the test is met (which it is not here, as demonstrated above), a court may "ignore the corporate entity and deem the corporation's acts to be those of the persons or organizations actually controlling the corporation." *Id.*

It is undisputed that the Non-Debtor Catholic Entities are non-profit corporations organized under the laws of California.  As such, they are by definition not subsidiaries of the Debtor, because they do not have equity.  The Committee simply ignores this foundational issue.

Further, to the extent the Committee seeks to get around this defect in its Amended Complaint by arguing that the Non-Debtor Catholic Entities are functionally subsidiaries because they are controlled by the Debtor, application of alter ego to hold the Non-Debtor Catholic Entities liable for the debts of the Debtor would be contrary to California law.  *See, e.g., He Nam You v. Japan,* 150 F.Supp. 3d 1140, 1149 (N.D. Cal. 2015) ("Outside reverse piercing occurs when a plaintiff that is not a shareholder (an outsider) seeks to reach the assets of a subsidiary based on a parent's liability (the reverse of traditional veil piercing, which seeks to reach the assets of a parent for the liability of its subsidiary).").  It is black-letter law that California does not recognize or allow "reverse veil-piercing," where a plaintiff seeks to hold a subsidiary liable for the debts of its parent.  *See, e.g., id.* at 1149-50 (applying California law and rejecting the use of outside reverse veil piercing as a basis for liability); *Postal Instant Press, Inc. v. Kaswa Corp.,* 162 Cal.

Case: 24-04053    Doc# 41    Filed: 05/23/25    Entered: 05/23/25 20:45:36    Page 24 of 28

App. 4th 1510, 1519-24 (Cal. Ct. App. 2008) (rejecting reverse veil piercing and holding that a third-party may not pierce the corporate veil to reach corporate assets to satisfy a shareholder's personal liability).

As such, because the Amended Complaint does not allege facts supporting an alter ego claim, Counts 1–3 of the Amended Complaint must be dismissed with prejudice.

### 2. *The Committee Cannot Rely On The Creditor Expectation Test*

Next, the Committee alleges that substantive consolidation is warranted because the Debtor and Non-Debtor Catholic Entities functioned as a single unit that creditors did not rely on their separate identity in extending credit. *See, e.g.,* Am. Compl. ¶¶ 123-24, 133-32, & 143. The Committee cannot rely on the Creditor Expectation Test to support substantive consolidation because that test is a creature of § 105 of the Bankruptcy Code—rather than the state law of alter ego. *See* Opinion, at p. 6 (ruling that *Law v. Siegel* limits relief that is prohibited under the Bankruptcy Code). Relying on the Creditor Expectation Test as a basis for consolidation would run afoul of this Court's prior ruling that the Court cannot substantively consolidate a non-debtor, non-profit entity solely under § 105 of the Bankruptcy Code under the Supreme Court's ruling in *Law v. Siegel*. *Id.*

Even if the Creditor Expectation Test could be a basis for substantive consolidation (and it cannot be here), the Amended Complaint fails to state a claim for substantive consolidation on that basis. Like the Original Complaint, aside from the bald assertions that creditors treated them as one, the Committee yet again to fails to include allegations of creditor confusion or that from a creditor's perspective they believed the Debtor and Non-Debtor Catholic Entities were one and the same.

Whether a creditor treats the entities as the same is viewed from the creditors' perspective. *See, e.g.*, *In re Republic Airways Holding Inc.,* 565 B.R. 710, 717 (Bankr. S.D.N.Y. 2017) ("The inquiry is whether *creditors* treated the debtors as a single entity, not whether the managers of the debtors themselves, or consumers viewed the [debtors] as one enterprise."). To that end, the Amended Complaint must allege facts that support a reasonable inference that the creditors perceived the debtor and non-debtor entities as one unit in extending credit. *Compare Official Committee of Unsecured Creditors of Verestar, Inc. v. American Tower Corp. (In re Verestar, Inc.),* 343 B.R. 444, 463 (Bankr. S.D.N.Y. 2006) (finding that the complaint failed to allege that creditors saw the debtor and other entity as one because the there were no specific allegations of creditor confusion or that the debtor's creditors extended credit based on

the target entity's financials); *with In re The Lodge at Big Sky, LLC,* 454 B.R. 138, 141-43 (Bankr. D. Mont. 2011) (finding that creditors treated the entities as one and substantive consolidation was appropriate because evidence demonstrated that vendors were sending invoices to the debtor even though operations were taken over by the target entity).  Nothing of the sort is alleged here.

There are no facts alleged that show any creditor believed that the Debtor and the Non-Debtor Catholic Entities were the same unit.  Instead, the Committee alleges that in obtaining the 2007 Series Bond, the Debtor made certain representations to Deutsche Bank and other "creditors" regarding the assets of the Debtor and each Non-Debtor Catholic Entity (who also served as guarantors).  *See, e.g.,* Am. Compl. ¶¶ 62-64 (alleging that the Debtor represented to Deutsche Bank that it had the financial wherewithal to pay the bond debt with its immediate assets but also with assets of the Non-Debtor Catholic Entities and had the authority to enter into the bond offering on behalf of each Non-Debtor Catholic Entity); ¶ 66 (alleging that payments on the 2007 Series Bond were made from the Debtor's bank accounts).  These types of representations appear to be standard representations that a borrower and guarantor would make in obtaining a loan.  Further, the fact that Deutsche Bank required the Non-Debtor Catholic Entities to guarantee the Bond obligations and that the Offering Memorandum made specific representations about the availability of their assets to satisfy the debt only demonstrates that Deutsche Bank fully understood that they were separate entities.  Put another way, had Deutsche Bank believed those different entities were all part of the same borrower, it would have had no need or desire for guarantees or the Debtor's debt from any of them.

Further, the Committee's reliance on the 2007 Series Bond documents, as well as the subsequent 2017 Credit Agreement, is misplaced, because those documents demonstrate the exact opposite of what the Committee suggests.  Each of these sets of loan documents specifically required a guaranty by the Non-Debtor Catholic Entities that make up the "Bond Obligated Group," demonstrating the lender's recognition of the separate nature of these entities.  If the lenders dealt with the Bond Obligated Group as a single economic unit, *see In re Bonham*, 229 F.3d at 766, they would not have required separate guarantees and separate financial disclosures.  The Committee also misconstrues references to juridic persons subject to the Debtor's governance, *i.e.,* the parish churches, as applying to the Non-Debtor Catholic Entities.  In reality, these lending agreements simply demonstrate that the first *Bonham* factor is

Case: 24-04053   Doc# 41   Filed: 05/23/25   Entered: 05/23/25 20:45:36   Page 26 of 28

not satisfied, because the lenders regarding the Debtor and the Non-Debtor Catholic Entities as affiliated, but separate, entities.

As such, while the Creditor Expectation Test cannot be the basis for substantive consolidation of the Non-Debtor Catholic Entities under any circumstances, the Committee has also fallen far short of alleging a cognizable claim for consolidation on that basis. Counts 1–3 of the Amended Complaint fail to state a claim for substantive consolidation and should be dismissed with prejudice.

### B. Count 4 Fails To State A Claim And Should Be Dismissed With Prejudice

Count 4 seeks a declaratory judgment that the Debtor is somehow the equitable owner of School Funds, which are, therefore, property of the Debtor's estate under § 541 of the Bankruptcy Code. According to the Committee, the Debtor's purported ability to transfer the School Funds to OPF somehow demonstrates that the Debtor is the "equitable owner" in that property. *See, e.g.,* Am. Compl. ¶¶ 147-54. This claim is fatally flawed in at least two respects.

*First*, Count 4 is nothing more than a "back door" attempt to substantive consolidate RCWC with the Debtor by alleging, without any basis whatsoever, that the Debtor somehow "controls" the School Funds. As discussed above, the Committee has failed to adequately plead substantive consolidation based on alter ego, and therefore, it cannot use § 541 as the mechanism to grab RCWC's property. *See Avery v. Leya Techs., LLC (In re Prototype Eng'g & Mfg., Inc.)*, 628 B.R. 132, 146 (Bankr. C.D. Cal. 2020) (noting that "*Bonham* supports the proposition that, upon issuance of a substantive consolidation order, the property of a consolidated non-debtor because property of the estate under 11 U.S.C. § 541."). Thus, for the same reasons noted above, Count 4 should be dismissed with prejudice.

*Second*, the Amended Complaint fails to allege any legal or factual basis for a determination that the Debtor actually holds equitable title to the School Funds of RCWC. Instead, the Committee entirely relies on the theory of "control;" asserting that because the Debtor transferred the School Funds to OPF, the Debtor's estate somehow has an "equitable interest" in the funds. *See e.g.,* Am. Compl. ¶¶ 147, 149 (alleging that the Debtor had the ability to "control" the School Funds prior to the OPF transfer). However, the mere ability to transfer funds does not alone prove that the Debtor is the "equitable owner" of the School Funds. There is no California law that provides as such. *Butner v. U.S.*, 440 U.S. 48, 55 (1979) ("Property interests are created and defined by state law."). Moreover, the Debtor has consistently

Case: 24-04053   Doc# 41   Filed: 05/23/25   Entered: 05/23/25 20:45:36   Page 27 of 28

maintained that the School Funds have always been held for the benefit of RCWC in trust; and the transfer of the School Funds to OPF did not alter this status.[8] It is axiomatic that funds held in trust are not property of the estate because the debtor does not hold any equitable interest in that property. *See, e.g., Begier v. I.R.S.*, 496 U.S. 53, 58-59 (1990) (finding that because the debtor did not hold an equitable interest in property, he held that property in trust for another, and so that interest was not "property of the estate").

RCWC is a separate and distinct entity that has its own assets and liabilities. The Committee's request for a declaration that would pilfer the assets of RCWC under the mantle of § 541 of the Bankruptcy Code is, at best, utterly without merit. This Court should dismiss Count 4 of the Complaint with prejudice.

**V.**

**<u>CONCLUSION</u>**

For the reasons set forth above, the Debtor respectfully requests that the Court grant the Motion, dismiss all Counts of the Amended Complaint with prejudice, and grant other relief that the Court deems just and proper.

DATED: May 23, 2025  **FOLEY & LARDNER LLP**
Thomas F. Carlucci
Shane J. Moses
Emil P. Khatchatourian
Ann Marie Uetz
Matthew D. Lee
Geoffrey S. Goodman
Mark C. Moore

*/s/ Shane J. Moses*
Shane J. Moses

*Counsel for the Debtor
and Debtor in Possession*

---

[8] *See Debtor's Objection to the Official Committee of Unsecured Creditors' Motion for Standing to Prosecute Claims of the Debtor's Estate* [Bankr. Docket No. 1586] and the declaration in support by Paul Bongiovanni [Bankr. Docket No. 1590].

Case: 24-04053    Doc# 41    Filed: 05/23/25    Entered: 05/23/25 20:45:36    Page 28 of 28